UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------- X
                            :

MELROSE CREDIT UNION, PROGRESSIVE CREDIT   :    **Index No.**
UNION, LOMTO FEDERAL CREDIT UNION, TAXI   :
MEDALLION OWNER DRIVER ASSOCIATION, INC.,   :
LEAGUE OF MUTUAL TAXI OWNERS, INC., KL   :
MOTORS, INC., SAFINI TRANSPORT, INC., WHITE &   :
BLUE GROUP CORP., FIMA SERVICE CO., INC.,   :
CARL GINSBERG, and JOSEPH ITZCHAKY,   :
                            :

           Plaintiffs,   :
                            :

      -against-   :
                            :

                            :    **COMPLAINT**
THE CITY OF NEW YORK; THE NEW YORK CITY   :
TAXI & LIMOUSINE COMMISSION; and MEERA   :
JOSHI, in her Official Capacity as the Chair of the New   :    **JURY TRIAL DEMANDED**
York City Taxi & Limousine Commission,   :
                            :

           Defendants.   :
                            :
---------------------------------------------------------------------- X

      Plaintiffs Melrose Credit Union, Progressive Credit Union, LOMTO Federal Credit Union,

Taxi Medallion Owner Driver Association, Inc., League of Mutual Taxi Owners, Inc., KL Motors,

Inc., Safini Transport, Inc., White & Blue Group Corp., FIMA Service Co., Inc., Carl Ginsberg,

and Joseph Itzchaky, by and through their attorneys, Crosby & Higgins LLP, as and for their

Complaint, allege as follows:

## PRELIMINARY STATEMENT

      1.     This dispute arises from the collapse of the regulatory structure governing for-hire

transportation in New York City, amidst the government-sanctioned proliferation of smartphone

technology being used by companies like Uber Technologies, Inc. ("Uber") to bypass taxicab

medallions and allow passengers to electronically hail a parallel network of unlicensed on-demand

vehicles ("E-Hails").  As set forth below, Defendants' deliberate evisceration of medallion taxicab hail exclusivity, and their ongoing arbitrary, disparate regulatory treatment of the medallion taxicab industry, has and continues to inflict catastrophic harm on this once iconic industry, and the tens of thousands of hardworking men and women that depend on it for their livelihood.

2.     Pursuant to 42 U.S.C. § 1983, Plaintiffs seek preliminary and permanent injunctive relief ordering an immediate end to Defendants' disparate regulatory treatment of the medallion taxicab industry, reflected in the countless regulatory burdens that medallion taxicabs are alone subjected to while similarly situated companies like Uber are allowed to compete in the same market free of those burdens. Defendants' disparate treatment of similarly situated individuals and entities, with no rational basis for engaging in such disparate treatment, constitutes a clear and continuing violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "Equal Protection Clause").

3.     Plaintiffs also seek to recover compensatory damages caused by Defendants' ongoing equal protection and due process violations, as well as just compensation for Defendants' illegal taking of Plaintiffs' property interests in the taxicab medallion, and in the statutory right to hail exclusivity that accompanies it, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution (the "Takings Clause") and Article I, § 7 of the New York State Constitution.

4.     Finally, Plaintiffs seek to recover compensatory damages caused by Defendants' fraudulent misrepresentations and omissions concerning the fair market value of the New York City taxicab medallion, as reflected in the false and misleading monthly "average" medallion transfer prices published each month on the Taxi and Limousine Commission ("TLC")'s website until late 2014, which was used by the TLC to determine the fair market value of the medallion

and calculate the 5% transfer tax collected for New York City on every taxicab medallion transfer. Defendants' deliberate misrepresentations and omissions could only have been intended to artificially inflate medallion prices, further compounding the harm caused to Plaintiffs and the entire taxicab industry.

## SUMMARY OF THE CASE

5.     From its inception, the regulatory structure of the for-hire ground transportation industry in New York City has been based on "hail" exclusivity.  In exchange for the price paid to New York City for a taxicab medallion, and in exchange for subjecting the operation of their private businesses to a complex, burdensome regulatory structure designed to promote public safety and other areas of legitimate government concern, including vehicle accessibility requirements for passengers with disabilities, medallion bearing taxicabs were granted the exclusive right to accept hails, while all other for-hire vehicles ("FHVs") operating in New York City, subject to certain limited statutory exceptions, were restricted to accepting passengers solely by pre-arrangement.

6.     Anchored by hail exclusivity, this market segmentation has long been reflected in the New York City Administrative Code (the "Code") and was reaffirmed by the New York State Legislature, most recently in the HAIL Act, which expressly provides that "*it shall remain the exclusive right of existing and future taxicabs* licensed by the TLC as a taxicab to pick up passengers via street hail . . . No driver of any for-hire vehicle shall accept a passenger within the city of New York by means other than pre-arrangement."  N.Y. Assemb. B. 8691, 235th Sess., at § 11 (2011) (emphasis added).

7.     Consistent with the HAIL Act, the Code provides that: "[n]o motor vehicle other than a duly licensed taxicab shall be permitted to accept hails from passengers in the street." N.Y.C.

Admin. Code § 19-504(a)(1) (2015). Correspondingly, the Code also provides that "[n]o driver of a for-hire vehicle . . . shall accept passengers unless the passengers have engaged the use of the for-hire vehicle on the basis of telephone contract or prearrangement." N.Y.C. Admin. Code § 19-507(a)(4) (2015).

8.     For nearly eighty years, the regulatory structure of the for-hire transportation industry worked as intended.  Medallion taxicabs, livery services, and black car companies co-existed and thrived, each operating in the particular segments of the market to which their respective services were restricted.

9.     While neither the Code nor the HAIL Act defined the terms "hail" and "pre-arrangement," the limitations on cell phone and consumer GPS technology made such definitions unnecessary.  If a passenger required immediate transport, they hailed a medallion taxicab.  If a passenger wished to arrange transportation in the future, they picked up the telephone and scheduled it with an FHV service—i.e., a livery or black car service.[1]  Common sense and practical experience made clear that a hail meant a passenger request for immediate transport, and pre-arrangement meant scheduling transportation in the future.

10.     New York City taxicab medallions are sold in private transactions and at public auction, both of which are regulated by the TLC.  The TLC is responsible for setting the minimum reserve price for taxicab medallions sold at auction, and the TLC is also responsible for determining the fair market value of medallions used to calculate the 5% transfer tax collected by New York City for each private medallion sale.

---

[1] Livery and black cars are licensed by the TLC and required to affiliate with a base station.  Livery car services traditionally served the transportation needs of the outer boroughs of New York City and the black car industry traditionally serviced corporate clients, primarily in Manhattan.

11.     The taxicab medallion, and with it, the exclusive right to accept hails, has long been recognized as private property—a transferrable commodity that until recently was trading hands at prices in excess of one million dollars for each medallion.  The TLC has repeatedly reinforced the investment expectations of medallion owners in the property rights being acquired by purchasing a New York City taxicab medallion, including the exclusive right to hails.  As the TLC's own marketing materials used to sell medallions at auction explain, "[t]he taxicab medallion is a tin affixed to the hood of a New York City taxicab, authorizing it to operate for hire within the City of New York.  The holders of these medallions possess the exclusive right to accept hails from passengers on the streets of New York City."

12.     According to the TLC, "the taxicab medallion license is unique among the licenses issued by the TLC inasmuch as it is limited in number by law and is transferable.  [] Not only is a medallion a license to operate a taxicab on the streets of New York, and generate income from such operations, it is also a license to own and operate a small business, to use the license as security for loans (which may include, but are not necessarily limited to purchase money loans), and to lease the license to other operators for a fee."

13.     Likewise, the TLC has represented in its annual reports that "New York City taxicab medallions have a long history as a solid investment with steady growth[,]" and provide owners with "*both a reliable and consistent income and guaranteed employment*[,]" as well as the ability to act as "collateral that can assist in home financing, college tuition, and a comfortable retirement." (emphasis added).  The TLC proclaims on its website that, "[o]ne can only imagine the number of children who were put through college and the number of hardworking folks whose medallion afforded them a comfortable retirement – and we are gratified to continue to have such a positive impact on people's lives."

5

14.     Defendants have thus marketed and sold medallion owners a protectable, vested property interest in the New York City taxicab medallion, along with the statutory right to hail exclusivity that accompanies it, for which medallion purchasers have reasonably relied in making the decision to purchase a medallion and operate their private businesses.

15.     In exchange for hail exclusivity, the TLC imposes upon taxicab medallion owners numerous, onerous regulatory requirements, which they alone must comply with (collectively, the "Disparate Medallion Taxicab Rules"): taxis must charge rates set by the TLC (35 R.C.N.Y § 58-26 (2015)); taxis must collect surcharges of thirty cents per trip to subsidize taxicab accessibility (35 R.C.N.Y. § 58-16(g) (2015)) and fifty cents per trip to fund MTA operations (35 R.C.N.Y. §§ 58-03(x), 58-26(a)(3) (2015)); taxis must use one of the few vehicle models that the TLC has approved (35 R.C.N.Y. §§ 67-04 to 67-06 (2015)); taxis must be leased within the lease caps set by the TLC (35 R.C.N.Y. § 58-21); taxis must comply with TLC specifications for a variety of features, including paint, finish, lighting, upholstery, seats, windows, air conditioner, and roof lights (35 R.C.N.Y. §§ 67-06 to 67-17 (2015)); taxis must comply with TLC specifications for taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" taxicab technology (35 R.C.N.Y. §§ 67-09 to 67-15 (2015)); and half of all taxis must be made accessible to people with disabilities (35 R.C.N.Y. § 58-50 (2015)).

16.     In addition to the Disparate Medallion Taxicab Rules, the TLC recently implemented the Accessible Conversion Rules, which require that at least 50% of New York City medallion taxicabs be made accessible to people with disabilities by 2020, in part pursuant to an ongoing lottery selection process being conducted by the TLC, which began earlier this year. *See generally* 35 R.C.N.Y. § 58-50 (2015).

17.     The Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, are plainly designed to advance the public interest in New York.  In doing so, however, they also exact a heavy price for taxicab medallion owners, drivers, and agents, and impose significant burdens and costs on the operation of their private businesses.

18.     It is only because medallion taxicabs were carefully separated from the rest of the for-hire industry by city and state law, and alone possessed the exclusive statutory right to accept hails, that New York City could even conceivably treat medallion taxicabs in such a dramatically different fashion compared to the rest of the for-hire industry, including with respect to the otherwise disparate regulatory burdens imposed on each.

19.     Absent a meaningful marketplace dichotomy separating vehicles that are permitted to accept hails from those permitted only to accept passengers through pre-arrangement, there is no possible rational basis for an individual or business owner to voluntarily subject his or her private transportation business – *which all for-hire ground transportation companies in New York City are* – to the significant time, resources and expenses associated with and occasioned by compliance with onerous government regulations, while similarly situated businesses operating "down the street" are permitted to provide the same transportation services to passengers free of those same burdens.  Equally important, it would lack any rational basis for New York City to impose onerous regulatory burdens on some, but not all, similarly situated private for-hire transportation companies, no matter how legitimate the government's interest may be in the regulatory burden itself.  It would also be unconstitutional.

20.     As discussed below, the now ubiquitous acceptance of on-demand E-Hails by every category of FHV operating in New York City, whether painted yellow, green,[2] or black, has

_____

[2] Under certain circumstances, the HAIL Act authorizes the TLC to issue "Hail Accessible Inter-borough licenses," or "HAIL licenses."  This authorization creates the right for designated HAIL vehicles, now referred to by the TLC

eviscerated hail exclusivity and destroyed the carefully designed marketplace dichotomy, eliminating any meaningful distinctions between the various types of companies offering for-hire ground transportation in New York City.

21.     By authorizing unrestricted on-demand E-Hails, as Defendants have deliberately chosen to do, all FHV companies operating in New York City now offer exactly the same on-demand transportation services, and are therefore similarly situated businesses to medallion taxicabs.

22.     Incredibly, even after Defendants decided that medallion taxicabs must now compete with all FHV companies in the market for on-demand E-Hails, which has quickly become a standard means for passengers on the street in New York City to hail immediate transportation, Defendants have continued to enforce disparate regulatory burdens on medallion yellow taxicabs compared with other FHVs—specifically the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules.

23.     As a result of Defendants' disparate treatment, companies like Uber[3] have been able to quickly construct parallel unlicensed taxi networks operating alongside with, and competing directly against, traditional New York City medallion yellow taxicabs, but without many of the significant regulatory burdens and expenses that medallion taxicabs are subject to,

---

as Street Hail Liveries, to pick up hails as medallion taxicabs do when outside the HAIL exclusionary zone. *See* N.Y. Assemb. B. 8691, 235th Sess., at § 4(b) (2011).  The "HAIL exclusionary zone" is defined as the airports of New York City and the area of New York City in Manhattan south of East 96th Street and West 110th Street. *See* N.Y. Assemb. B. 8691, 235th Sess., at § 4(c) (2011). A "HAIL vehicle" is defined as a for-hire vehicle having a taximeter and a TLC-sanctioned trip recording system, licensed by the TLC to carry for-hire passengers and authorized to accept hails, provided that such authorization prohibits accepting hails in the HAIL exclusionary zone. *See* N.Y. Assemb. B. 8691, 235th Sess., at § 4(f) (2011); *see also* N.Y. Assemb. B. 8691, 235th Sess., at § 11 (2011). By TLC regulation, Street Hail Liveries are painted green.

[3] Every fare accepted by an Uber affiliated FHV comes as the direct result of *on-demand electronic hails from passengers seeking immediate transport.*  Indeed, the only feature that Uber does not offer to passengers is the option to pre-arrange travel.

8

including costly medallion acquisition expenses, complicated and in many respects antiquated vehicle and technology requirements,[4] onerous accessible vehicle requirements for those passengers with disabilities, and inflexible metered fare restrictions set by the TLC rather than the marketplace.

24.     Exploiting the disparate regulatory burdens imposed by New York City, companies like Uber have captured market share from licensed medallion yellow taxicabs with stunning speed and success.  In just four years, the Uber black car taxi network has alone reportedly grown to approximately 30,000 drivers, operating more than 22,000 Uber affiliated FHVs—almost double the number of licensed medallion yellow taxicabs in New York City—now accepting millions of nearly instantaneous on-demand E-Hails each month.

25.     Free from many of the regulatory burdens imposed on medallion taxicabs, including any accessibility requirements for passengers with disabilities, Uber boasts that its service is "better, faster, and cheaper than a taxi." Indeed, a widely reported October 2015 analysis of TLC medallion taxicab and Uber trip data for the three month period from April to June 2015, compared with the three month period from April to June 2014, revealed that the number of Uber rides in the core of Manhattan, where medallion taxicabs were expressly granted hail exclusivity pursuant to the HAIL Act, increased by 3,818,179 rides, while medallion taxicab pickups in the core of Manhattan during the same three month period declined by 3,830,621—almost the exact same number.

26.     The data makes clear that, rather than creating a new market segment in the for-hire ground transportation industry, the medallion taxicab hail market is being unlawfully transferred

---

[4] Defendants have themselves mocked the taxi industry's "antiquated business models," and ridiculed the taxicab industry's inability to compete in the marketplace, knowing that it is the TLC's rules and regulations that unfairly dictate that business model. *See* Respondents' Memorandum of Law in Support of their Cross-Motion to Dismiss at 1, *Glyka Trans. LLC, v. City of New York*, No. 100578 (N.Y. Sup. Ct. 2015).

by Defendants to companies like Uber, while medallion owners are forced to compete with both hands tied behind their backs because of the disparate regulatory burdens that Defendants continue to arbitrarily impose upon them.

27.     The impact on the industry has been devastating and the pace of the deterioration continues to accelerate.  Indeed, based on one published analysis of the current five-month moving averages, "trips and meter revenue (farebox including credit card and TLC-estimate cash tips) are down by 24.9% and 18.4% from the post-2012-fare-increase peak, respectively." James Hickman, *New York City Taxi Revenue Declines Accelerate in Last Four Months*, THESTREET (Nov. 16, 2015).

28.     The resulting harm to medallion owners and the businesses that they operate has been catastrophic. In January 2014, Plaintiff Melrose Credit Union had aggregate taxicab medallion loan delinquencies of approximately $32,000.  As of May 31, 2015, delinquencies ballooned to $167,704,125.  In January 2014, Melrose had no medallion loans that were classified as troubled debt restructurings.[5]  As of May 31, 2015, loans classified as troubled debt restructurings totaled approximately $148,491,250. As of June 30, 2015, Melrose's medallion loan delinquencies totaled $202,670,195—an increase of approximately 21% in just four weeks. As of June 30, 2015, Melrose had approximately $360,864,282 in delinquencies and troubled debt restructurings across its medallion loan portfolio—an increase of approximately 14% in the same four-week period.

---

[5] A troubled debt restructuring is a situation in which the borrower requires one or more concessions to continue with the financing arrangement—for example, a lower interest rate, a reduced monthly payment or a higher loan to equity ratio than underwriting rules would otherwise permit. It is commonly understood in the industry that a troubled debt restructuring contemplates a loan modification or modifications that changes the terms of a loan in a material way. Such terms are so materially different that they would not be available to a borrower applying for a new loan, and, as a result, require an additional reserve against equity on the lender's balance sheet.

29.     The numbers have only continued to worsen as market share continues to erode and the value of the medallion plummets. As of July 31, 2015, Melrose's medallion loan delinquencies had increased to $206,248,126 and its delinquencies and troubled debt restructurings had increased to approximately $395,626,920 across its medallion portfolio.  As of August 31, 2015, Melrose's medallion loan delinquencies totaled $226,552,719—an increase of approximately 10% in a one-month period. Likewise, as of August 31, 2015, troubled debt restructurings totaled approximately $195,529,000. Thus, Melrose reached approximately $422,081,719 in delinquencies and troubled debt restructurings—an increase of approximately 7% in a single month, and a staggering 34% increase since May 31, 2015.

30.     On July 22, 2015, twenty-two taxicab companies filed for bankruptcy protection in the United States Bankruptcy Court for the Eastern District of New York as a direct result of plummeting taxicab medallion values and an inability to continue servicing medallion loans.  On September 18, 2015, the New York State Department of Financial Services announced that it had taken possession of taxicab medallion financier Montauk Credit Union and appointed the National Credit Union Association (the "NCUA") as conservator.

31.     The unfolding collapse of the medallion taxicab industry makes undeniable the increasing duress faced by medallion owners, many of whom have now all but lost the value of their hard-earned property because of Defendants' deliberate evisceration of statutory hail exclusivity and continuing disparate regulatory treatment.  Worse, every indication is that the industry shows no sign of stabilization and recovery. Plaintiff Melrose Credit Union alone has hundreds of medallion loans maturing between now and February 2016, virtually assuring that foreclosures will grow even more widespread.  In December alone, Melrose has 190 medallion loans maturing with almost $83,000,000 in balloon payments becoming due.

32.     As a direct result of Defendants' actions, including their deliberate evisceration of the medallion owners' statutory right to hail exclusivity, and their continuing enforcement of disparate regulatory burdens, the value of the medallion has plummeted by more than 40%, and the once vibrant market for the purchase and sale of New York City taxicab medallions is now frozen.

33.     As the TLC itself once explained, "strong medallion sale prices have historically been used to judge the overall health and viability of the industry."  If medallion values are indeed the measure of health and viability for the New York City medallion taxicab industry, then the City faces an industry collapse of historic magnitude.

34.     In the meantime, the lives of the thousands of hardworking men and women are being destroyed. For example, Plaintiff Ginsberg, an 82 year old retired medallion owner, and Plaintiff Joseph Itzchaky, a 73 year old retired medallion owner, were both selected by the TLC to convert their previously unrestricted medallions into accessible medallions as part of the first such lottery held pursuant to the Accessible Conversion Rules.  As a result of the forced conversion, both of them have been dropped by their leasing agents, who themselves are unable to locate enough drivers even to lease all of the available unrestricted medallions they manage, let alone find any drivers willing to lease the further burdened accessible medallion.

35.     Mr. Ginsberg and Mr. Itzchaky have now lost all of their leasing income, rendering their medallions worthless and leaving an insurmountable hole in their retirement income.  They are not alone.  In fact, the same tragic situation is playing out across the entire taxicab industry.

36.     Plaintiff Taxi Medallion Owner Driver Association, for example, represents the interests of approximately 975 independent medallion owners in New York City.  Approximately 45 of these independent medallion owners, all of whom have at some point driven their own

medallion taxicabs, have been selected to convert their unrestricted medallions to accessible medallions in 2016 pursuant to the Accessible Conversion Rules, inevitably leaving them to the same fate as Mr. Ginsberg and Mr. Itzchaky.

37.     The same is true for the thousands of medallion owners represented by Plaintiff League of Mutual Medallion Owners, Inc., many of whom will almost assuredly be forced to convert to accessible vehicles in the coming months as a result of the Accessible Conversion Rules.

38.     Plaintiff White & Blue Group Corp. is a TLC licensed agent that manages the single largest fleet of medallion taxicabs leased by shift in New York City.  With approximately 350 medallion taxicabs being leased each day to a pool of approximately 2,000 TLC licensed taxicab drivers, more than 600 of which are active, White & Blue Group Corp. has witnessed first hand the destruction being caused by Defendants' actions, including especially with respect to the Accessible Conversion Rules.

39.     White & Blue Group Corp. has seen its monthly leasing income drop as much as 50% in the past year, as it has been forced to idle approximately 20% of its taxicab medallion fleet on average, each day.  With companies like Uber operating in the marketplace free of the disparate regulatory burdens imposed on the medallion taxicab industry, including the Accessible Conversion Rules, licensed taxicab drivers have left the taxicab industry in droves, choosing instead to drive for Uber.

40.     As a result, companies like White & Blue Group Corp. have been forced to repeatedly slash daily lease rates to compete, thereby reducing leasing payments to medallion owners. Despite this, there are still not enough drivers willing to lease medallion taxicabs at any price, resulting in "taxicab graveyards" scattered throughout New York City.

41.     White & Blue Group Corp. has at least six unrestricted individual medallions in the fleet it manages that have been selected for conversion by the TLC in the first lottery.  White & Blue Group Corp. is unable to find any drivers for those vehicles, because none of its drivers want to lease accessible vehicles.  According to drivers, accessible vehicles are simply not worth leasing given the significant amount of additional regulatory burdens imposed on them and the alternative leasing options available, including abundant unrestricted medallion vehicles and an endless supply of unrestricted Uber vehicles.

42.     As a result, White & Blue Group Corp. likely will have no choice but to return those medallions to their owners at the end of the year, and they in turn will inevitably lose all of their leasing income, rendering their previously unrestricted medallions worthless as well. Even more alarming, approximately 200 vehicles in White & Blue Group Corp.'s fleet are scheduled to convert to accessible vehicles because of the mandate in the Accessible Conversion Rules that half of all mini-fleet medallions be made accessible starting on January 1, 2016.

43.     Once the Accessible Conversion Rules fully take effect, the impact on White & Blue Group Corp.'s business and the countless medallion owners it serves will be apocalyptic.  In fact, White & Blue Group Corp. may not be able to keep even half of its total fleet of medallion taxicabs on the road as the mini-fleet medallions are forced to convert to accessible vehicles.  The inevitable result across the taxicab industry will be thousands of additional previously unrestricted medallions being rendered worthless.

44.     To summarize, Defendants' deliberate decision to allow all FHVs to accept on-demand E-Hails has eviscerated hail exclusivity – a protectable property interest belonging to medallion owners, and the only conceivable justification for Defendants' disparate regulatory treatment.   As a result, Defendants have taken Plaintiffs' private property without just

compensation, and are now adding insult to injury by subjecting similarly situated businesses to vastly different regulatory burdens without any rational basis for such disparate treatment, in violation of Plaintiffs' constitutional rights.

45.     Accordingly, Plaintiffs Melrose Credit Union, Progressive Credit Union, and LOMTO Federal Credit Union (collectively, the "Credit Union Plaintiffs"), KL Motors, Inc., Safini Transport, Inc., FIMA Service Co., Inc., Carl Ginsberg and Joseph Itzchaky (collectively, the "Medallion Owner Plaintiffs"), Plaintiff White & Blue Group Corp., Plaintiff Taxi Medallion Owner Driver Association, Inc., and Plaintiff League of Mutual Taxi Owners, Inc., all join in seeking preliminary and permanent injunctive relief for Defendants' violations of the Equal Protection Clause.  Additionally, Credit Union Plaintiffs, Medallion Owner Plaintiffs, and Plaintiff White & Blue Group Corp., all join in seeking compensatory damages for losses incurred as a result of Defendants' violations of the Equal Protection Clause.

46.     The Credit Union Plaintiffs and Medallion Owner Plaintiffs also join in seeking compensatory damages as a result of Defendants' unconstitutional takings under the Takings Clause.  Additionally, the Credit Union Plaintiffs, Plaintiff KL Motors, Inc., and Plaintiff Safini Transport, Inc., join in seeking compensatory damages for fraud under New York law, based on Defendants' misrepresentations and omissions concerning the average monthly transfers posted on the TLC website, which was used by the TLC to determine the fair market value of the medallion for purposes of calculating the transfer tax collected by the City of New York.

47.     In addition, Medallion Owner Plaintiffs and Credit Union Plaintiffs join for violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and of the Due Process Clause of Article I, § 6 of the New York State Constitution, arising from the adoption of the TLC's Accessible Conversion Rules.  Credit Union Plaintiffs and

Medallion Owner Plaintiffs also join in seeking compensatory damages for Defendants' unconstitutional takings under Article I, § 7 of the New York State Constitution. Finally, all Plaintiffs in this action join in seeking declaratory relief.

## JURISDICTION AND VENUE

48.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331 as Plaintiffs are alleging claims under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. §§ 1983 and 1988, as well as the Takings Clause of the Fifth Amendment to the United States Constitution.

49.     Venue is proper in this Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) in that all Defendants reside in the State of New York and at least one Defendant resides in New York County.

## PARTIES

50.     Plaintiff Melrose Credit Union ("Melrose") is a federally insured, non-profit corporation duly organized under the laws of New York. Melrose is a provider of financing for taxicab medallions in New York City, with its principal place of business at 139-30 Queens Boulevard, Briarwood, New York 11435.

51.     As of June 1, 2015, Melrose held a security interest in approximately 3,110 taxicab medallions as collateral for 3,055 medallion loans totaling approximately $1.56 billion. Melrose's current membership stands at approximately 24,322. Plaintiff Melrose owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of security interests in medallions.

52.    As a result of Defendants' regulatory taking, as outlined herein, Plaintiff Melrose is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

53.    Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff Melrose has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

54.    Plaintiff Melrose detrimentally relied on the TLC's stated monthly average medallion transfers, which were posted on the TLC website, in underwriting medallion purchases until October 2013, when it learned that the TLC was deliberately overstating those averages.  The TLC used those monthly averages to determine the fair market value of the medallion and calculate the 5% transfer tax on each medallion purchase underwritten by Plaintiff Melrose.

55.    Plaintiff Melrose has suffered damages in an amount to be determined at trial, but reasonably believed to be in excess of $75,000, as a result of its reliance on the TLC's overstated and misrepresented monthly average medallion transfers.

56.    Plaintiff Progressive Credit Union ("Progressive") is a federally insured, non-profit corporation duly organized under the laws of New York.  Progressive is a provider of financing for taxicab medallions in New York City, with its principal place of business at 131 West 33rd Street, Suite 700, New York, New York 10001-2908.

57.    Progressive currently holds a security interest in 1,432 taxicab medallions as collateral for 928 medallion loans totaling approximately $722 million.  Progressive's current membership stands at approximately 3,860. Plaintiff Progressive owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of security interests in medallions.

17

58.     As a result of Defendants' regulatory taking, as outlined herein, Plaintiff Progressive is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

59.     Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff Progressive has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

60.     Plaintiff Progressive detrimentally relied on the TLC's stated monthly average medallion transfers posted on the TLC website in underwriting medallion purchases through 2014. The TLC used those monthly averages to determine the fair market value of the medallion and calculate the 5% transfer tax on each medallion purchase underwritten by Plaintiff Progressive.

61.     Plaintiff Progressive has suffered damages in an amount to be determined at trial, but reasonably believed to be in excess of $75,000, by relying on TLC's overstated and misrepresented monthly average medallion transfers.

62.     Plaintiff LOMTO Federal Credit Union ("LOMTO") is a federally insured, non-profit corporation duly organized under the laws of the United States.  LOMTO is a provider of financing for taxicab medallions in New York City, with its principal place of business at 50-24 Queens Boulevard, Woodside, New York 11377.

63.     LOMTO currently holds a security interest in 647 taxicab medallions as collateral for 628 medallion loans totaling approximately $138 million.  LOMTO's current membership stands at approximately 3,250. Plaintiff LOMTO owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of security interests in medallions.

64.     As a result of Defendants' regulatory taking, as outlined herein, Plaintiff LOMTO is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

65.     Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff LOMTO has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

66.     Plaintiff LOMTO detrimentally relied on the TLC's stated average medallion values in underwriting medallion purchases through 2014.  The TLC used those averages to determine the fair market value of the medallion and calculate the 5% transfer tax on each medallion underwritten by Plaintiff LOMTO.

67.     Plaintiff LOMTO has suffered damages in an amount to be determined at trial, but reasonably believed to be in excess of $75,000, by relying on TLC's overstated and misrepresented monthly average medallion transfers.

68.     The Credit Union Plaintiffs have security interests in medallion loans.  Pursuant to the Uniform Commercial Code ("UCC") § 9-515, every five years the Credit Union Plaintiffs file a UCC-1 Financing Statement with the State of New York.  This statement provides public notice that the Credit Union Plaintiffs have a security interest in each medallion for which they have provided a loan.

69.     Plaintiff Taxi Medallion Owner Driver Association, Inc. ("TMODA"), is a not-for-profit corporation duly incorporated and existing pursuant to the laws of New York, with its principal place of business at 132-22 Rockaway Boulevard, South Ozone Park, New York 11420.

70.     Plaintiff TMODA represents the interests of approximately 975 independent medallion owner drivers in New York City, approximately 65 of which are accessible medallions.

19

Approximately 45 of the independent medallion owners represented by Plaintiff TMODA have been selected to convert their unrestricted medallions to accessible medallions in 2016 pursuant to the Accessible Conversion Rules.

71.     Plaintiff TMODA joins in seeking injunctive and declaratory relief on behalf of its independent medallion owner driver members, concerning Defendants' ongoing disparate regulatory treatment of medallion taxicabs, in violation of the Equal Protection Clause, as outlined herein.

72.     Plaintiff League of Mutual Taxi Owners, Inc. ("Mutual Taxi Owners"), is a not-for-profit corporation duly organized under the laws of New York, with its principal place of business at 50-24 Queens Boulevard, Woodside, New York 11377.

73.     Plaintiff Mutual Taxi Owners represents the interests of approximately 3,000 medallion owners. Many of Plaintiff Mutual Taxi Owners' members will be affected by the Accessible Conversion Rules and forced to convert to accessible vehicles as the lottery process being conducted by the TLC continues.

74.     Plaintiff Mutual Taxi Owners joins in seeking injunctive and declaratory relief on behalf of its independent medallion owner driver members, concerning Defendants' ongoing disparate regulatory treatment of medallion taxicabs, in violation of the Equal Protection Clause, as outlined herein.

75.     Pursuant to Chapter 51 of the TLC rules, an independent medallion is "a class of Medallion Taxicab License, the owner of which may only own one Medallion."  As an owner of an independent medallion acquired on or after January 7, 1990, the owner "must drive his or her Taxicab a minimum of 900 hours each calendar year."  35 R.C.N.Y. § 58-20(a)(1)(i) (2015).  In certain instances, and for individuals only, owners "must drive his/her Taxicab a minimum of 600

hours each calendar year if he/she meets all of the following: A. He/she is the sole Owner of the Independent Medallion…B. He/she is at least 62 years of age at the beginning of the calendar year…[and] C. He/she has owned the Independent Medallion at least 5 years prior to turning age 62." 35 R.C.N.Y. § 58-20(a)(1)(iii) (2015).

76.     An owner of an independent medallion "does not have to personally drive the minimum number of hours of operation for an Independent Medallion Owner as set forth in Section 58-20(a)(1)(i)," if specific conditions are met regarding time of ownership and compliance with TLC rules. *See* 35 R.C.N.Y. § 58-20(a)(2) (2015).

77.     Plaintiff KL Motors, Inc. ("KL Motors"), owned by Maxim Kreditor and Paul Lvovsky, is a corporation duly incorporated and existing pursuant to the laws of New York, with its principal place of business at 41-25 36th Street, Long Island City, New York 11101.

78.     Mr. Kreditor is forty-three years old and resides in New York and is also the owner of Plaintiff Safini, defined below.  Mr. Kreditor immigrated to the United States in 1990 from the former Soviet Union's Republic of Latvia.  Mr. Kreditor, who is a well-respected, board certified oncologist, has lived in Manhattan for many years, and is now being forced to sell his apartment and use the money in order to attempt to refinance his medallion loan, because leasing payments for Plaintiff Safini no longer cover the monthly payments on its loan.

79.     Mr. Lvovsky is a 50% shareholder of Plaintiff KL Motors. Mr. Lvovsky is forty-three years old and resides in New York. Mr. Lvovsky moved with his family to the United States in 1974 from St. Petersburg, Russia.  Mr. Lvovsky has lived in New York City since 1988 and is a radiation oncologist with a facility in Brooklyn, New York.

80.     Mr. Lvovsky and Mr. Kreditor, through their interests in Plaintiffs KL Motors and Safini, collectively purchased five medallions between 2012 and 2013.  Neither Mr. Lvovsky nor

21

Mr. Kreditor had any previous experience in the taxi industry prior to purchasing their New York City taxicab medallions.

81.     Plaintiff KL Motors owns two medallions (license numbers 7N38 and 7N39), purchased on March 27, 2012, for approximately $2,000,000. Plaintiff KL Motors owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of a medallion.

82.     As a result of Defendants' regulatory taking, as outlined herein, Plaintiff KL Motors is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

83.     Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff KL Motors has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

84.     Plaintiff KL Motors detrimentally relied on the TLC's stated average monthly medallion prices in its purchase of two medallions in 2012.  The TLC used those monthly averages to determine the fair market value of the medallion and calculate the 5% transfer tax on each of the medallions purchased by Plaintiff KL Motors.

85.     Plaintiff KL Motors has suffered damages in an amount to be determined at trial, but reasonably believed to be in excess of $75,000, by relying on TLC's overstated and misrepresented monthly average medallion transfers in purchasing its medallions.

86.     Plaintiff Safini Transport, Inc. ("Safini"), solely owned by Maxim Kreditor, is a corporation duly incorporated and existing pursuant to the laws of New York, with its principal place of business at 300 East 23rd Street, Apartment 3D, New York, New York 10010.

87.     Plaintiff Safini owns three medallions (license numbers 6K26, 6K27, and 6K28), purchased on November 7, 2013, for approximately $3,600,000. Plaintiff Safini owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of a medallion.

88.     As a result of Defendants' regulatory taking, as outlined herein, Plaintiff Safini is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

89.     Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff Safini has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

90.     Plaintiff Safini detrimentally relied on the TLC's stated average monthly medallion prices in its purchase of three medallions in 2013.  The TLC used those monthly averages to determine the fair market value of the medallion and calculate the 5% transfer tax on each of the medallions purchased by Plaintiff KL Motors.

91.     Plaintiff Safini has suffered damages in an amount to be determined at trial, but reasonably believed to be in excess of $75,000, by relying on TLC's overstated and misrepresented monthly average medallion transfers in purchasing its medallions.

92.     Plaintiff White & Blue Group Corp. ("White & Blue Group"), is a corporation duly incorporated and existing pursuant to the laws of New York, with its principal place of business at 35-11 43rd Avenue, Long Island City, New York 11101.  Plaintiff White & Blue Group is a taxicab management company licensed with the TLC as a medallion leasing agent (Agent No. A0327).[6]

---

[6] Pursuant to 35 R.C.N.Y. § 63-03(a), an "Agent" is "an individual or Business Entity that has been Licensed by the Commission to operate or facilitate the operation of one or more Taxicabs on behalf of the Taxicab owner."  "The term of an Agent's License may be up to one year, but will expire on December 31 of the year in which it is issued or renewed, unless earlier suspended or revoked by the Commission." 35 R.C.N.Y. § 63-05(a) (2015). Pursuant to 35

93.     Plaintiff White & Blue Group manages the single largest fleet of medallion taxicabs leased by shift in New York City.  With approximately 350 medallion taxicabs being leased each day to a pool of approximately 2,000 TLC licensed taxicab drivers, roughly 600-700 of which are active, White & Blue Group has witnessed firsthand the destruction of the industry unfolding because of Defendants' actions.

94.     White & Blue Group has seen its monthly leasing income drop as much as 50% over the past year, as it has been forced to idle approximately 20% of its taxicab medallion fleet on average, each day.  With companies like Uber operating free of the disparate regulatory burdens imposed on the medallion taxicab industry, including the Accessible Conversion Rules, taxicab drivers have left the industry in droves, choosing instead to drive for Uber.

95.     As a result, White & Blue Group has been forced to repeatedly slash daily lease rates to compete. Despite this, there are simply not enough drivers willing to lease medallion taxicabs at any price, resulting in "taxicab graveyards" scattered throughout New York City.

96.     White & Blue Group desperately sought to compete for taxicab drivers and to increase ridership of medallion taxicabs, including by twice petitioning the TLC to amend its rules to make taxicabs more competitive by enhancing technology and convenience features, including mandatory WiFi and USB charging for passengers, as well as paperless receipts for all taxicab trips.  The TLC summarily rejected both of those petitions.

97.     White & Blue Group has at least six unrestricted individual medallions in the fleet it manages that have been selected by the TLC in the first lottery.  White & Blue Group is unable

---

R.C.N.Y. § 63-06(a), "[t]he fee for an Agent's License will be five hundred dollars ($500) annually." Additionally, "[a]n agent who operates one or more Taxicabs that are returned at the end of a shift must maintain business premises in an appropriately-zoned location." 35 R.C.N.Y. § 63-10 (2015). Any appropriate location must provide sufficient off-street parking at or near the business premises with a minimum capacity of the lesser of 25 vehicles, or 50% of the Taxicabs leased on a daily or shift basis plus 5% of Taxicabs leased for longer than one day. 35 R.C.N.Y. §63-10(a) (2015). Agents must also operate "[r]egular business hours, including the hours of 9:00 a.m. through 5:00 p.m. every weekday other than legal holidays." 35 R.C.N.Y. 63-10(c) (2015).

to find any drivers for those vehicles, because none of its drivers want to lease accessible vehicles. White & Blue Group surveyed its drivers and every one of them responded that they do not want to drive accessible vehicles.

98.     According to drivers, accessible vehicles rattle, are too big, guzzle gas, and are equally disliked by passengers.  According to drivers, accessible vehicles are simply not worth it to lease given the additional regulatory burdens imposed on them and the alternative leasing options available, including abundant unrestricted medallion vehicles and an endless supply of unrestricted Uber vehicles.

99.     As a result, White & Blue Group likely will have no choice but to return those medallions to their owners at the end of the year, who in turn will inevitably lose all of their leasing income, rendering their previously unrestricted medallions worthless as well. Even more alarming, approximately 200 vehicles in White & Blue Group's medallion fleet are scheduled to convert to accessible vehicles because of the mandate in the Accessible Conversion Rules that half of all mini-fleet medallions be made accessible starting on January 1, 2016.

100.     White & Blue Group is subject to the lease cap rates established by the TLC.  *See* 35 R.C.N.Y. 58-21(c) (2015).  As a result, White & Blue Group is barred from regulating its own leasing prices based on driver demand, which is typically higher for premium shifts and lower for less desirable shifts.  In other words, White & Blue Group cannot charge market rates in times of high demand (e.g. on Friday), thereby providing it with a revenue cushion to charge lower, more competitive rates on slower days (e.g. on Monday). As a result, White & Blue Group operates at a disadvantage to similarly situated FHV companies who are free to set whatever driver leasing rates they want based on supply and demand.

101.     As a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff White & Blue Group has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

102.     Plaintiff FIMA Service Co., Inc. ("FIMA"), is a corporation duly incorporated and existing pursuant to the laws of New York, with its principal place of business at 29 Claremont Lane, Suffern, New York 10901. FIMA is a mini-fleet that owns two medallions purchased from a New York City auction in 2004 (license numbers 3V48 and 3V49). Plaintiff FIMA owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of a medallion.

103.     As a result of Defendants' regulatory taking, as outlined herein, Plaintiff FIMA is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

104.     Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff FIMA has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

105.     Plaintiff Carl Ginsberg is an eighty-two year old New York City taxicab medallion owner residing in White Plains, New York. Mr. Ginsberg purchased his taxicab medallion (license number 3F24) in 1962, and immediately began driving his own taxicab.  Mr. Ginsberg owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of a medallion.

106.     Over the past thirty years, Mr. Ginsberg has supplemented his driving income by leasing out his medallion to other taxicab drivers through Taxi Fleet Management, LLC, in accordance with TLC regulations.  Now in retirement, Mr. Ginsberg is no longer able to regularly

drive a taxicab, and instead relies on leasing out his medallion to provide supplemental retirement income.

107.     Before Defendants authorized the acceptance of on-demand E-Hails by all FHVs, Mr. Ginsberg was earning approximately $3,300 per month leasing his medallion.  Over the past twelve months, Mr. Ginsberg's medallion leasing income has been reduced by almost a third, as leasing companies have been unable to attract enough drivers to lease all of the available medallion yellow taxicabs.

108.     Prior to the implementation of the Accessible Conversion Rules, Mr. Ginsberg was advised by his leasing company, Taxi Fleet Management, that if his unrestricted medallion were selected for conversion, his leasing company would have no choice but to drop his medallion altogether because drivers simply do not want to drive accessible taxicabs.  Mr. Ginsberg's medallion was subsequently selected for conversion in the lottery held by the TLC pursuant to the Accessible Conversion Rules.

109.     As a result, Mr. Ginsberg was dropped by Taxi Fleet Management and has now lost all of his leasing income as a result of the Accessible Conversion Rules, rendering his medallion worthless.

110.     As a result of Defendants' regulatory taking, as outlined herein, Plaintiff Ginsberg is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

111.     Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff Ginsberg has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

27

112.    Plaintiff Joseph Itzchaky is a seventy-three year old New York City taxicab medallion owner residing in Brooklyn, New York 11236.  Mr. Itzchaky purchased his taxicab medallion (license number 9C76) in 1983, and immediately began driving his own medallion yellow taxicab.  Mr. Itzchaky owns property for purposes of the Takings Clause and Article I, § 7 of the New York State Constitution, in the form of a medallion.

113.    Over the past thirty years, Mr. Itzchaky drove his own taxicab.  Now in retirement, Mr. Itzchaky is no longer able to regularly drive a taxicab, and instead relies on leasing out his medallion through Westway Brokerage, in order to provide essential retirement income.

114.    Before Defendants authorized the acceptance of on-demand E-Hails by all FHVs, Mr. Itzchaky was receiving more than $3,000 per month in medallion leasing income.  In the past twelve months, those payments have been reduced by almost a third, as leasing companies have been unable to attract enough drivers to lease all of the available medallion yellow taxicabs. Mr. Itzchaky received his last medallion leasing payment in September 2015, which totaled approximately $2,100.

115.    Mr. Itzchaky's medallion was selected by the TLC pursuant to the Accessible Conversion Rules to be converted to an accessible medallion. As a result, Mr. Itzchaky was dropped by Westway Brokerage and has now lost all of his medallion income, rendering his medallion worthless.

116.    As a result of Defendants' regulatory taking, as outlined herein, Plaintiff Itzchaky is owed just compensation in an amount to be determined at trial, but reasonably believed to be in excess of $75,000.

117.    Likewise, as a result of Defendants' ongoing violation of the Equal Protection Clause, as outlined herein, Plaintiff Itzchaky has been damaged in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

118.    Defendant City of New York is a municipal corporation duly incorporated and existing pursuant to the laws of New York.

119.    Defendant New York City Taxi & Limousine Commission is a New York City charter-mandated agency, responsible for licensing and regulating New York City's taxicabs and liveries, and implementing transportation initiatives in a manner consistent with law.

120.    Defendant Meera Joshi is the Chair and Chief Executive Officer of the TLC. She is responsible for taking the actions challenged in this proceeding.

## DETAILED FACTUAL BACKGROUND

### A.    THE REGULATORY FRAMEWORK

121.    Taxis have been part of transportation policy in New York City since the dawn of the modern age, and licensed medallion taxicabs have possessed the exclusive statutory right to accept hails for almost as long.

122.    Until recently, in exchange for the price paid to New York City for a taxicab medallion, and in exchange for subjecting the operation of their private transportation businesses to onerous regulation in service of the public interest, medallion owners were granted the exclusive, statutory right to hails.

123.    In 2011, the New York State legislature enacted the HAIL Act to ensure that some of New York's most vulnerable residents – disabled passengers – would have access to safe and reliable public transportation.  According to the legislative findings, "the public health, safety and

welfare of the residents of the state of New York traveling to, from and within the city of New York is a matter of substantial state concern, including access to safe and reliable mass transportation such as taxicabs." N.Y. Assemb. B. 8691, 235th Sess., at § 1 (2011).

124.    Among other things, the HAIL Act authorizes the issuance of up to two thousand new hail licenses for vehicles that are accessible to individuals with disabilities, to help ensure "adequate and reliable transportation [is] accessible to individuals with disabilities in the city of New York."[7]  N.Y. Assemb. B. 8691, 235th Sess., at § 1 (2011).

125.    In order to accomplish its legislative purpose, the HAIL Act expressly reaffirms the bargain struck with medallion owners in exchange for purchasing a medallion: i.e., the exclusive, statutory right to hails.  Specifically, the HAIL Act provides that: "it shall remain the exclusive right of existing and future taxicabs licensed by the TLC as a taxicab to pick up passengers via street hail in such areas of the city of New York wherein HAIL license holders are prohibited from accepting such passengers.  All vehicles licensed by the TLC as taxicabs shall be permitted to pick up passengers via street hail from any location within the city of New York . . ." N.Y. Assemb. B. 8691, 235th Sess., at § 11 (2011).

126.    Likewise, the HAIL Act provides that: "No driver of any for-hire vehicle shall accept a passenger within the city of New York by means other than pre-arrangement with a base unless said driver is operating either a (i) taxicab licensed by the TLC with a medallion affixed thereto, or (ii) a vehicle with a valid HAIL license and said passenger is hailing the vehicle from a location where street hails of such vehicles are permitted."  N.Y. Assemb. B. 8691, 235th Sess., at § 11 (2011).

---

[7] The HAIL Act does not address passenger accessibility with respect to existing medallion taxicabs, nor does it address accessibility with respect to any other type of FHV operating in New York City.

127.    The TLC was created in 1971 to regulate and improve taxi and livery services in New York City, within the confines of the Code and the New York City Charter.  The TLC is required to regulate and supervise the "business and industry of transportation of persons by licensed vehicles for hire in the city, pursuant to provisions of [Chapter 65]," and to adjudicate charges of violations of the "administrative code and rules promulgated thereunder."  N.Y.C. Charter § 2303 (2004).

128.    Taxicab medallions are sold in private transactions and at public auction, all of which are regulated and supervised by the TLC.  Once classified by type, new taxicab medallions are sold in lots and auctioned by sealed bids with the TLC Chairperson setting the minimum price for medallions sold.  Any bids below the minimum price set by the TLC are rejected.  All bids must comply with a strict set of TLC rules, including a letter of commitment, deposit, and required certifications.  Once the bidding period for a medallion auction has closed, the bids are opened in public and the winning bids are announced at the public sale and later published in the City Record and on the TLC's website.  *See generally* 35 R.C.N.Y. §§ 65-04 through 65-08 (2015).

129.    Medallion auctions have generated a tremendous amount of revenue for New York City.  Specifically, New York City auctioned taxicab medallions in 1996 and 1997, realizing approximately $85 million in revenue from the sale of 400 medallions.  Between 2006 and 2013, New York City auctioned approximately 1,050 medallions, generating approximately an additional $486 million in revenue.  Most recently, in fiscal year 2014, New York City sold approximately 400 taxicab medallions, generating nearly $338 million in revenue. New York City has also budgeted for new medallion sales between 2015 and 2019, anticipating approximately $1.6 billion in revenue for its budget, although it was recently forced to indefinitely suspend all auctions as a result of market conditions in the industry.

130.     New York City also receives a 5% transfer tax on secondary market sales of taxicab medallions, based on the consideration paid for the medallions. N.Y.C. Admin. Code §§ 11-1402(a) (2015).  The TLC determines the fair market value of medallions for purposes of the transfer tax collected by New York City based on the average sales price of the previous month's transfers, as posted on the TLC website.

## B.     THE DISPARATE MEDALLION TAXICAB RULES

131.     In accordance with its mandate, the TLC has promulgated rules and regulations covering every facet of taxi operations, including specifically, confirming hail exclusivity and reinforcing the requirement that FHVs "must not solicit or pick up Passengers other than by prearrangement." 35 R.C.N.Y. § 55-19(a) (2015).

132.     In exchange for hail exclusivity, taxicab medallion owners must comply with countless rules and regulations that no other FHVs are subject to, including, most importantly, that a medallion must be purchased from New York City, or in a private transaction, in order to operate a taxicab.  In addition to the medallion purchase requirement, taxicabs are subject to countless other Disparate Medallion Taxicab Rules that do not apply to any other FHVs.

133.     First, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must charge rates set by the TLC (35 R.C.N.Y. § 58-26 (2015)). FHVs are not subject to set rates and need only file a rate schedule with the TLC, and may set higher or lower rates compared with medallion taxicabs, including by means such as Uber's 'surge pricing,' which charges customers a multiple of the customers' ordinary fare at times of high demand.  Surge pricing unfairly allows companies like Uber to maximize profitability and efficiency in periods of high demand while retaining the flexibility to undercut pricing at other times.

32

134. Second, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must be leased within the lease caps set by the TLC (35 R.C.N.Y. § 58-21). FHVs are not subject to lease caps, which allows FHVs to be leased to drivers at supply and demand determined rates. This disparate treatment forces Plaintiffs to operate at a disadvantage as compared to similarly situated FHVs by restricting Plaintiffs from charging higher rates during times of high demand (e.g. on Friday), while charging lower rates during times of low demand (e.g. on Monday).

135. Third, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must pay a Taxi Accessibility Fee as set by the TLC (35 R.C.N.Y. § 58-16(f) (2015)). FHVs are not required to collect or pay many of the taxes and fees imposed on medallion taxicabs, unfairly allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs.

136. Fourth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must pay a surcharge of thirty cents per trip to subsidize taxicab accessibility (35 R.C.N.Y. § 58-16(g) (2015)). FHVs are not required to collect or pay an accessibility surcharge, unfairly allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs.

137. Fifth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must pay a tax of fifty cents per trip to fund MTA operations (35 R.C.N.Y. §§ 58-03(x), 58-26(a)(3) (2015)). FHVs are not required to collect or pay the MTA surcharge, unfairly allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs.

138. Sixth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must be one of the few vehicle models that the TLC has approved (35 R.C.N.Y. §§ 67-04 to 67-06 (2015)). FHVs are not limited to any particular vehicle model set by the TLC, thereby unfairly allowing companies such as Uber to permit drivers to use newer and higher quality vehicles, giving riders a better overall experience.

139. Seventh, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must comply with TLC requirements for a whole host of features, including paint, finish, lighting, upholstery, seats, windows, air conditioner, and roof lights (35 R.C.N.Y. §§ 67-06 to 67-17 (2015)). FHVs are not required to comply with the countless TLC-imposed specifications for vehicle features, thereby unfairly allowing FHVs like Uber to avoid the expense of "hacking" a vehicle, while retaining the flexibility to respond to evolving passenger preferences with a superior riding experience.

140. Eighth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must comply with TLC specifications for taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" taxicab technology (35 R.C.N.Y. §§ 67-09 to 67-15 (2015)).  FHVs are not required to be equipped with taximeters, partitions, or any other particular technology systems (*See* 35 R.C.N.Y. §§ 59A-31 to 59A-33), once again unfairly allowing FHVs to avoid the expense of "hacking" a vehicle, while retaining the flexibility to respond to evolving passenger preferences with a superior riding experience.

141. Ninth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must comply with the requirement that half of all taxis be accessible to persons with disabilities (35 R.C.N.Y. § 58-50 (2015)). FHVs are not

required to be accessible to persons with disabilities, unfairly allowing FHVs like Uber a number of tremendous advantages over medallion taxicabs, as discussed below. Some of these advantages include the ability to attract drivers and passengers that dislike accessible vehicles, and the freedom to avoid the expense of converting a vehicle to meet accessibility requirements or, in the alternative, purchasing an accessible vehicle, as well as the expense of driving and maintaining an accessible vehicle.

### C.    THE ACCESSIBLE CONVERSION RULES

142.    As outlined above, the TLC also recently implemented the Accessible Conversion Rules, which arose out of the *Noel* settlement,[8] mandating that 50% of all medallion taxicabs in New York City be made accessible to passengers with disabilities by 2020.  *See generally* 35 R.C.N.Y. § 58-50 (2015).

143.    Under the Accessible Conversion Rules, unrestricted medallions are given an Accessible Conversion Start Date, which is "the date on which there is available an Accessible Taxicab Model that meets the specifications of Section 67-05.2 of these Rules and the requirements of § 19-533 of the Administrative Code, as certified by the Chairperson," or, if no vehicle is available by January 1, 2016, then that date will serve as the Accessible Conversion Start Date. *See* 35 R.C.N.Y. § 58-03(a) (2015).

144.    Pursuant to the Accessible Conversion Rules Statement of Basis and Purpose, for unrestricted independent medallion owners, "[u]nrestricted medallions assigned to vehicles that

---

[8] In 2011, Christopher Noel and Simi Linton, along with three nonprofit organizations, filed a civil rights class action against the TLC alleging violations of Title II, subtitle A of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, Title II, subtitle B of the ADA, 42 U.S.C. § 12144, Section 504 of the rehabilitation Act of 1973, 29 U.S.C. 794 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq. See Noel v. New York City Taxi & Limousine Comm'n*, 837 F.Supp.2d 268 (S.D.N.Y. 2011), vacated, 687 F.3d 63 (2d Cir. 2012). The parties later entered into a settlement agreement, which stated that the TLC would begin rulemaking within 30 days of the execution of the settlement that would require medallion owners to progressively utilize accessible vehicles.

are scheduled to retire during the second six-month period following the Accessible Conversion Start Date will be placed into a lottery, in which one-half will be selected to be placed into service with an accessible vehicle." When the vehicles assigned to those medallions reach their retirement dates, "the medallions will be assigned on an alternating basis, first to non-accessible vehicles, then to accessible vehicles."

145.    As to the vehicles not selected in the lottery, upon reaching their respective retirement dates, "the medallions will be assigned on an alternating basis, first to accessible vehicles, then to non-accessible vehicles."  Thus, "a schedule of alternating assignments to accessible and non-accessible vehicles will be established for all medallions placed in this lottery." Unrestricted independent medallions are to be converted pursuant to 35 R.C.N.Y. § 58-50(c) (2015).

146.    For unrestricted mini-fleets of two medallions, "the medallion assigned to the first vehicle that is scheduled to retire after the effective date of these rules must be hacked-up with an accessible vehicle. Thereafter, at least one medallion (though not necessarily the same medallion) must be assigned to an accessible vehicle." Unrestricted mini-fleets of two medallions are to be converted pursuant to 35 R.C.N.Y. § 58-50(a) (2015).

147.    For unrestricted mini-fleets of more than two medallions, "every medallion scheduled to retire after the effective date of these rules must be hacked up with an accessible vehicle until one-half (or the nearest fraction exceeding one-half) of the mini-fleet's vehicles are accessible. Thereafter, at least one half of the mini-fleet's medallions (though not necessarily the same medallions) must be assigned to accessible vehicles."  Unrestricted mini-fleets of more than two medallions are to be converted pursuant to 35 R.C.N.Y. § 58-50(a) (2015).

148.    Additionally, "[u]nrestricted medallions assigned to vehicles that are scheduled to be retired during the third six-month period following the Accessible Conversion Start Date will be placed into another lottery, to be held six-months after the first lottery, in which one-half will be selected to be placed into service with an accessible vehicle."

149.    Any unrestricted medallions not selected in this lottery process "may be placed into service with a non-accessible vehicle," but "[a]s the successive vehicles to which medallions in this group are assigned reach their retirement dates, the same schedule of alternating assignments to accessible and non-accessible vehicles will apply for all medallions placed in this lottery."

150.    In addition to the surcharges and other costs associated with conversion to accessible vehicles, "[a]pplicants for a new Taxicab Driver's license must complete the Wheelchair Passenger Assistance Training as a condition of licensure." 35 R.C.N.Y. § 54-04(k)(6) (2015).  After the Accessible Conversion Start Date, "[a]pplicants for a renewal Taxicab Driver's License who have never attended and completed Wheelchair Passenger Assistance Training must attend and complete such training in order to renew the Taxicab Driver's License." 35 R.C.N.Y. § 54-04(k)(6) (2015).[9]

151.    In order to offset some of the costs of conversion of unrestricted medallions, the TLC created the Taxicab Improvement Fund pursuant to 35 R.C.N.Y. § 58-16(g), which is funded by the Taxicab Improvement Surcharge.

152.    The Taxicab Improvement Surcharge, as described by the Accessible Conversion Rules Statement of Basis and Purpose, is a "surcharge of $0.30 per taxicab ride, to be divided

---

[9] According to Chapter 51 of the TLC rules, "Wheelchair Passenger Assistance Training," is defined as "a course of training that contains instruction on the following: (i) the legal requirements that apply to transportation of People with Disabilities; (ii) passenger assistance techniques, including a review of various disabilities, disability etiquette, mobility equipment training (including direct hands-on familiarity with lift/ramp operations and various types of wheelchairs), and safety procedures; (iii) individual hands-on training with an actual person using a wheelchair; (iv) sensitivity awareness, including customer service and conflict resolution policies; and (v) the dispatch of vehicles by an accessible dispatcher." 35 R.C.N.Y. 51-03 (2015).

between medallion taxicab drivers and owners to pay for accessibility costs." For drivers, "5 cents from the Taxicab Improvement Surcharge on each trip will be paid into a portion of the Taxicab Improvement Fund which will be allocated to Drivers of Accessible Taxicabs." 35 R.C.N.Y. § 58-16(g)(4)(i) (2015). For medallion owners, "25 cents from the Taxicab Improvement Surcharge on each trip will be paid into a portion of the Taxicab Improvement Fund which will be used to make grants to persons required to place a vehicle that is required to be accessible under Section 58-50 of these Rules into use." 35 R.C.N.Y. § 58-16(g)(4)(ii) (2015).

153.    The TLC itself admitted that with the creation of the Taxicab Improvement Fund, owners of unrestricted medallions who are forced to convert to accessible medallions will necessarily incur far greater costs to continue operation as compared with the operating costs for the unrestricted medallions that were sold to them. Not only are there significant costs associated with hacking up a vehicle for accessibility, including the cost of adding a ramp, but accessible vehicles also break down more often and are less fuel-efficient.

154.    Putting aside the increased operating costs, one of the most significant burdens of an accessible medallion is that it is extremely difficult to lease accessible vehicles. "[T]he driver of a wheelchair-accessible cab may pick up non-disabled fares, but must always respond to calls for a disabled pickup if they're the closest wheelchair-accessible cab to the call and are dispatched. As a result, drivers sometimes travel multiple unpaid blocks to pick up a disabled fare." *See* Daniel Fitzsimmons, *Fare Access*, NY PRESS (Aug. 26, 2015). Thus, many drivers who have not already migrated to Uber are opting to drive non-accessible taxicabs, leaving accessible taxicabs "sitting there unleased." *See id.*

155.    In order to avoid the costs and burdens of operating accessible medallions altogether, medallion owners paid a higher price to purchase unrestricted medallions. Now,

because of the new Accessible Conversion Rules, they are being forced to convert those otherwise more valuable unrestricted medallions into less valuable and more burdensome accessible medallions.

156.    Indeed, the TLC was at all times aware that unrestricted medallions were more valuable, particularly since the TLC was responsible for determining the fair market value of each medallion in order to calculate the transfer tax, and the TLC likewise knew that the Credit Union Plaintiffs' underwriting guidelines assigned a higher loan value to unrestricted medallion collateral as compared with accessible medallion collateral.  By adopting the Accessible Conversion Rules, the TLC has knowingly and deliberately devalued Credit Unions Plaintiffs' unrestricted medallion collateral and impaired their security interests in those medallions.

### D.    THE REGULATORY TAKING OF HAIL EXCLUSIVITY

157.    As with all of the Disparate Medallion Taxicab Rules more generally, the only conceivable justification for requiring medallion taxicabs to comply with the Accessible Conversion Rules while not imposing comparable rules on FHVs was the medallion owners' exclusive right to hails—a right that has been eviscerated by the now ubiquitous acceptance of on-demand E-Hails by every category of FHV operating in New York City.

158.    By way of background, in late 2012, the TLC announced the creation of a pilot program to study the use of smartphone applications to electronically "hail" taxicabs. The program, offered to all taxicabs, allowed the TLC to study the real world impact of E-Hail applications, including patterns of passenger usage and any safety implications.

159.    The announcement of the E-Hail pilot program was initially met with opposition. Specifically, in *Black Car Assistance Corp. v. The City of New York*, 2013 WL 1808082 (N.Y.

Sup. Ct. 2013), *aff'd*, 110 A.D.3d 618 (App. Div. 1ˢᵗ Dep't 2013), the FHV industry challenged

the E-Hail pilot.

160.    As part of that case, on February 14, 2013, the TLC represented to the court that

"e-hail apps are just that; they're hails." Specifically, Corporation Counsel, acting on behalf of the

TLC, stated the following:

> Ms. Goldberg-Cahn:[10] at hotels, at apartments, they have lights that
> they could flash on to indicate to a cab that somebody wishes to be
> picked up.  So they're not waving (simulating) for their frantic hail;
> they're coming—
>
> The Court: That's essentially a hail.  It's equivalent.  I know those
> signs; I responded to those signs 40 years ago, whenever it was.
>
> Mrs. Goldberg-Cahn: But that's what we're saying this is.  These e-
> hail apps are just that; they're hails.  It's somebody indicating that
> they want to be picked up within a – within a prescribed area,
> without saying where they're going, without saying their race or
> gender or color, without saying what the fare will be and how much
> it will be; just, "I want a hail."
> ….
> And there's nothing in the TLC's rules that really define what a
> "hail" is and says that a hail is limited to sight.  What these e-hails
> are allowing to do is a sort of look to a little bit more, broader than
> your sight but not stray too far off the course.

161.    The TLC subsequently confirmed in its briefing that E-Hails are a product of

"newly available technology," that "allow passengers to hail a taxicab electronically," confirming

the obvious, common sense fact that electronic "hails" constitute a modern form of the traditional

street hail—and thus, belong exclusively to medallion taxicabs.

162.    The TLC ultimately prevailed and the pilot program was implemented on April 26,

2013.  Although originally scheduled to last for twelve months, the TLC subsequently extended

the pilot for another twelve months, setting a pilot end date for April 2015. According to the TLC,

---

[10] Michelle Goldberg-Cahn was the Assistant Corporation Counsel for the office of Michael A. Cardozo, appearing
on behalf of the TLC.

the pilot program was a success and confirmed that E-Hail applications benefit the transportation market in New York City, while posing no additional risk to passenger safety or taxicab ride accessibility.

163.    On January 29, 2015, the TLC adopted rules regarding the use of smartphone applications to hail rides, which became effective 30 days later (the "E-Hail Rules").  During the TLC meeting on January 29, 2015, in which the TLC adopted the E-Hail Rules, Mr. Ryan Wanttaja, Assistant General Counsel of the TLC, stated, "[f]or those of you who might be unfamiliar, e-hailing allows a passenger to make a taxi-pickup request through his or her smart phone. Basically it *extends a hand hail* allowing taxi drivers to see around corners and increases fare opportunities."  Transcript of the New York City Taxi & Limousine Commission, Taxi and Limousine Commission Meeting (Jan. 29, 2015) (emphasis added).

164.    In its Statement of Basis and Purpose for the E-Hail Rules, the TLC explained that the rules "will allow passengers to summon taxicabs and Street Hail Liveries in New York City by E-Hail and to make E-Payments."

165.    According to the TLC, its goal in adopting the E-Hail Rules was to "accommodate new technology into the taxi industry while taking into account the needs of E-Hail application developers, drivers, vehicle owners and passengers."

166.    As part of the E-Hail Rules, the TLC for the first time officially defined the term "Hail," and made the definition generally applicable to all TLC rules and regulations.  Specifically, the TLC defined the term "Hail" as follows:

> [a] request, either through a verbal (audio) action such as calling out, yelling, or whistling, and/or a visible physical action such as raising one's hand or arm, or through an electronic method such as an E-Hail App, for on-demand Taxicab or Street Hail Livery service at the metered rate of fare as set forth in §58-26 and §82-26 of these Rules by a person who is currently ready to travel.

41

35 R.C.N.Y. § 51-03 (2015).

167.    Thus, the TLC clearly recognized that the use of a smartphone application to electronically "hail" a driver "on-demand … by a person who is currently ready to travel," is simply a modern-day version of the traditional hail, precisely as the TLC argued to the Court in *Black Car Assistance Corp.*

168.    On April 3, 2015, Plaintiff Melrose wrote to the TLC and Mayor de Blasio, asking that the TLC affirm its commitment to enforcing medallion owners' exclusive right to hails, including with respect to on-demand E-Hails, and asking that, at a minimum, the TLC immediately suspend any smartphone application provider or base operator that continues to offer on-demand E-Hail service with FHVs, including companies like Uber.

169.    In response, the TLC advised Plaintiff Melrose that as far as the TLC was concerned, the same E-Hail could be used to hail a medallion yellow taxicab or to pre-arrange prompt FHV service, depending on the swipe of a finger on a passenger's smartphone.[11]  In other words, according to the TLC, the traditional meaning of the term "hail" as a regulatory structure for differentiating licensed medallion taxicab services from all other FHVs no longer exists—all FHVs are permitted to accept on-demand E-Hails.

170.    On May 27, 2015, in an effort to uphold the meaning of hail exclusivity, Credit Union Plaintiffs, as Petitioners, commenced an Article 78 proceeding in the Supreme Court of the State of New York by Order to Show Cause against Defendants the City of New York, Bill de Blasio in his official capacity as Mayor of the City of New York, the New York City TLC, Meera

---

[11] On the Uber application, a passenger can pay a charge to Uber and hail a medallion taxicab through the "UberT" service, which transmits the E-Hail to a medallion taxicab, or, with one swipe of the finger, switch to "UberX," and transmit the same E-Hail to an Uber FHV. Not surprisingly, almost all Uber E-Hails are transmitted to its FHVs.

Joshi in her official capacity as TLC Chair (collectively, "City Respondents"), and Eric T. Schneiderman in his official capacity as Attorney General of the State of New York, ("State Respondent").

171.    Defendants thereafter moved to dismiss and, on September 8, 2015, the Supreme Court dismissed the Verified Petition.  In doing so, the Supreme Court recognized that "[t]he use of a smartphone application to obtain a ride has blurred the distinction between a street hail and a pre-arrangement and has disturbed the balance of economic interests within the industry." Notwithstanding this, the Court ruled that the TLC had discretion to treat electronic communications as hails or pre-arrangements.[12]

### E.        THE IMPACT OF DISPARATE REGULATORY TREATMENT

172.    Astonishingly, even after Defendants took the legal position that medallion taxicabs must compete with all FHV companies in the market for on-demand E-Hails, which has quickly become a standard means for passengers in New York City to hail immediate transport, Defendants have continued to enforce disparate regulatory burdens on medallion taxicabs compared with other FHVs—specifically the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules.

173.    As a result of Defendants' disparate treatment of these similarly situated businesses, FHV companies like Uber have been able to quickly construct parallel black car taxi networks operating alongside with, and competing directly against, traditional New York City medallion yellow taxicabs, but without many of the significant regulatory burdens and expenses that

---

[12] Petitioners subsequently filed an Order to Show Cause for Leave to Renew its Opposition to City Respondents' Cross-Motion to Dismiss the Verified Petition on October 2, 2015, which was signed by Justice Weiss and made returnable November 12, 2015.  That motion remains pending.

medallion taxicabs are subject to, including costly medallion acquisition expenses, burdensome and in many respects antiquated vehicle and technology requirements, onerous accessibility requirements to equip vehicles for passengers with disabilities, and inflexible metered fare restrictions.

174.    Exploiting the disparate regulatory burdens imposed by New York City, companies such as Uber have captured market share from licensed medallion yellow taxicabs with stunning speed and success.  In just four years, Uber's parallel taxi network has alone reportedly grown to approximately 30,000 drivers, operating more than 22,000 Uber affiliated FHVs—almost double the number of licensed medallion yellow taxicabs in New York City—and accepting millions of now nearly instantaneous E-Hails each month.

175.    By way of background, passengers wishing to use Uber simply download the smartphone application, create an account, and input credit card information.  Once logged into the application, passengers are provided with a map showing the location of available cars and the approximate travel time of the closest car to the passenger's location.  When a passenger electronically hails an Uber FHV, the application sends the request directly to the closest available driver who must then accept or decline the request. If the Uber driver declines the request, it is then automatically forwarded to the next closest driver.

176.    Uber does not offer pre-arranged services.  Indeed, the *only* feature that Uber does not offer to passengers in New York City is the ability to pre-arrange a ride. Instead, Uber operates its business as an on-demand electronic hailing service. In other words, every ride provided by Uber is an on-demand E-Hail.

177.    Within the five boroughs of New York City, there are now approximately 22,000 Uber-affiliated cars. With the number of FHVs participating in Uber's network rising, and average

wait times dropping, the number of Uber rides taking place in New York City each day has surged. In September 2014, Uber vehicles were making approximately 34,000 trips in New York City per day, on average. By July 2015, Uber vehicles were picking up approximately 100,000 on-demand E-Hails per day, on average.

178.    Passenger wait times for Uber E-Hails have all but disappeared, as its network of linked FHVs has grown exponentially.  The average wait time for an Uber vehicle in Manhattan is now barely two minutes; actual response time is often faster than that. *See* Polly Mosendz and Hanna Sender, *Here's How Long It Takes to Get an Uber in U.S. Cities*, NEWSWEEK (Dec. 4, 2014).  With the steady stream of new FHVs being added to its network every day, there will soon be an Uber vehicle standing on every street corner in New York City, making response times to Uber's E-Hails virtually instantaneous.

179.    Not surprisingly, an October 2015 analysis comparing taxicab and Uber trip data for the period from April to June 2014 with the period from April to June 2015 revealed that the number of Uber pickups in the core of Manhattan, where taxicabs have been granted statutory hail exclusivity pursuant to the HAIL Act, increased by 3,818,179 rides, while medallion taxicab pickups in the core of Manhattan during the same period declined by 3,830,621.

180.    The data makes what is happening in the marketplace undeniable: Uber is operating a parallel taxicab network, but without any of the regulatory burdens that medallion taxicab owners must comply with.  The result has been a dramatic shift of business as medallion taxicab hails are unlawfully transferred to companies like Uber.

181.    The impact on medallion taxicabs has been devastating, and the pace of deterioration continues to accelerate, devastating the property value of the medallions.  The New York State Comptroller's Office sounded the alarm in its March 2015 Review of the Financial

Plan of the City of New York, stating that "the growing presence of new for-hire vehicle services like Lyft and Uber, which offer electronic hailing and payment through smartphone applications, have changed the market value of current medallions and could affect the value of new medallions at auction."

182.    Indeed, New York City's Comptroller reached the same conclusion in his own comments released in March 2015: "Growing competition from ridesharing companies such as Uber and Lyft is believed to be affecting the market value of existing taxi medallions. We believe the ripple effect in the industry poses a risk to the value of new taxi medallions at auction."

183.    TLC data through March 2015 confirms a steep decline in taxicab trips and meter revenue, with losses accelerating since the second half of 2014. Year over year data for March 2015, for example, shows that taxi trips are down almost 15% and meter revenue is down more than 9%.  Idle time for medallion taxicabs is therefore substantially higher, as much as 20%, leading to less income for medallion owners. James F. Hickman, *Why I'm Shorting a Taxi Medallion Lender*, CRAIN'S NEW YORK BUSINESS (April 3, 2015).

184.    Between June 2013 and March 2015, the total annual net pre-tax income for a medallion taxicab owner/operator reportedly went from $57,193 to $43,260, a 24% drop. James F. Hickman, *How Uber Is Actually Killing the Value of a New York City Taxi Medallion*, THESTREET (May 26, 2015). The annual pretax income for a taxicab medallion driver has decreased by 21%, going from $126 a shift to $100 a shift. James F. Hickman, *Taxi Farebox Declines A Harder Hit to Medallion Owner Bottom Lines*, SEEKING ALPHA (May 13, 2015).  For medallion owners, "every incremental 10% drop in fare box revenue translates into roughly a 25% decline in medallion owner net income." *See id.*  Earnings for owner-operators declined by "approximately 24%," between June 2013 and March 2015. *See id.*

185.    The downward trend continued through June 2015, wherein medallion taxicabs averaged approximately 410,000 daily trips, which constitutes an 11% drop from June 2014, while Uber averaged approximately 100,000 daily trips in July 2015, a fourfold increase from July 2014. Indeed, the decline "has significantly accelerated in the second half through October [2015], averaging minus 11.1%," and "[t]rips averaged a decline rate of minus 13.4% for the four months ending in October."  James Hickman, *New York City Taxi Revenue Declines Accelerate in Last Four Months*, THESTREET (Nov. 16, 2015).  Based on the five-month moving averages, "trips and meter revenue (farebox including credit card and TLC-estimate cash tips) are down by 24.9% and 18.4% from the post-2012-fare-increase peak, respectively."  *Id*.

186.    The precipitous decline in ridership and the value of the medallion is also harming the tens of thousands of members served by the Credit Union Plaintiffs.  Borrowers are falling behind on their monthly loan payments and performing loans are in danger of failing as they mature with balloon payments that medallion owners cannot afford to pay, as evidenced by the increase in loan delinquencies and troubled debt numbers, as outlined in detail above.

187.    The crisis with accessible medallions is further evidenced by the current status of the vast majority of the accessible medallions auctioned to the public by the TLC in November 2013. Plaintiff Melrose financed approximately 128 of the roughly 200 accessible medallions sold at the November 2013 auction. Today, 108 of the approximately 128 (or 84%) of the medallions sold in the November 2013 auction and financed by Plaintiff Melrose are now classified as either delinquent or troubled debt.

188.    Further evidencing the destruction of the industry is the drastic migration of taxicab drivers to Uber and the corresponding increase in unleased medallion taxicabs.  As recently as one year ago, McGuinness Management Corporation, a taxi dispatcher in New York, reportedly had

only 50 of its 341 associated medallions sitting idle on its lot. As of August 2015, that number has jumped to 171, and continues to increase every week. *See* Emma Whitford, *Greenpoint's Growing Taxi Graveyard*, GOTHAMIST (Aug. 21, 2015).

189.    Despite continuing their disparate treatment of medallion taxicabs, Defendants cannot possibly offer a plausible rational basis for such a difference in treatment.   Indeed, Defendant Meera Joshi, in her capacity as Chair of the TLC, has publicly acknowledged the intentional disparate burden imposed upon medallion taxicabs because of the Accessible Conversion Rules: "[The TLC is] looking at one segment [of the for-hire transportation industry] and demanding much, much, more from one small segment and there's lots of segments out there that don't have a similar requirement."

190.    Because medallion taxicabs and FHVs accepting on-demand E-Hails are operating identical businesses and servicing identical customers, there is no longer any rational basis for treating the two businesses differently.   Many of the rules and regulations imposed upon medallion taxicabs but not upon FHVs were intended to protect drivers and passengers involved in immediate transport.   Now that medallion taxicabs and FHVs provide identical services to identical passengers, and in fact directly compete with one another for business, there no longer exists a rational basis for a difference in treatment.

191.    For example, there is no rational basis for subjecting taxicabs to metered fare limitations, while permitting similarly situated FHVs to vary their rates as they see fit based on market demand.   One justification for this rule used to be that passengers calling ahead to schedule future rides with FHVs could negotiate with the company, or at least know the price in advance, while passengers hailing a taxicab in the street could not.

48

192. Now that FHVs accept on-demand E-Hails through smartphone applications, there is no such opportunity for passengers to negotiate with FHVs or even know the exact fare in advance.  More to the point, the fact that medallion taxicabs also accept on-demand E-Hails makes clear that there is no rational basis for the difference in treatment between medallion taxicabs and FHVs.

193. Likewise, there is no rational basis for limiting medallion taxicab owners and businesses to specific lease caps set by the TLC, while permitting similarly situated FHVs to fluctuate their lease rates as they see fit based on market demand.

194. In fact, Uber operates the "Uber NYC Marketplace," which is a website through which Uber facilitates FHV leasing to "make it as easy as possible for partners to fill vacancies in their vehicles as well as help prospective partners get started faster," with rental prices adjusted "on a per week basis."

195. As a result, Uber related businesses are able to engage in a market-based approach to leasing, driven by supply and demand, and are permitted to charge either as much or as little for leasing, depending upon driver availability.

196. There is no rational basis for requiring taxicabs to pay a Taxi Accessibility Fee, a surcharge of thirty cents per trip to subsidize taxicab accessibility, and a tax of fifty cents per trip to fund MTA operations, while at the same time not requiring similarly situated FHVs to pay any such fees or taxes.

197. There is no rational basis for requiring taxicabs to be limited to a few specific vehicles approved by the TLC, while permitting similarly situated FHVs to choose any car they desire.

198.    There is no rational basis for requiring taxicabs to comply with TLC requirements for features, including paint, finish, lighting, upholstery, seats, windows, air conditioners, and roof lights, while at the same time not requiring similarly situated FHVs to comply with any such requirements. Because FHVs are now permitted to service the exact same customers as medallion taxicabs, there is no longer a rational basis for the difference in treatment.

199.    There is no rational basis for requiring taxicabs to comply with TLC specifications for taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" taxicab technology, while at the same time not requiring similarly situated FHVs to comply with any such requirements. Again, because FHVs are now permitted to service the exact same customers as medallion taxicabs, there is no longer a rational basis for the difference in treatment.

200.    Finally, there is no rational basis for requiring taxicabs to comply with the Accessible Conversion Rules and reach 50% accessibility by 2020, while at the same time not subjecting FHVs to any accessibility requirement whatsoever.  While Defendants have suggested that the basis for the accessibility requirement is the government's interest in increasing accessible transportation, that basis is not rationally related to the disparate treatment.

201.    In fact, the effect of the disparate treatment has been to rapidly transfer hail market share to FHVs like Uber, which operate without any accessibility requirement, thereby significantly decreasing the overall number of vehicles being hailed by passengers that are accessible.  This will be further magnified as more and more accessible medallions are pulled off the road and Uber continues to increase its hail market share, free of any accessibility requirements.

F.    **THE CHICAGO TAXICAB MEDALLION LITIGATION**

202.    The reality of the marketplace makes plain that medallion taxicabs and FHVs accepting on-demand E-Hails, including Uber, are directly competing and providing passengers

50

with exactly the same transportation service, and are therefore necessarily similarly situated for purposes of Equal Protection, a conclusion supported by a recent ruling in the United States District Court for the Northern District of Illinois in *Illinois Transp. Trade Ass'n v. City of Chicago*, Case No. 14-cv-827 (N.D. Ill. Sep. 22, 2015).

203.    The plaintiffs in *Illinois Transp. Trade Ass'n,* are individuals and entities engaged in the taxi and livery industry in Chicago, Illinois, who are alleging that the City of Chicago arbitrarily violated, and continues to violate, their constitutional rights by subjecting them to burdensome and costly taxi regulations, while permitting Transportation Network Providers ("TNPs") like Uber to compete in the for-hire transportation industry without having to incur the same costs and comply with the same regulatory burdens as the plaintiffs.

204.    The City of Chicago moved to dismiss the complaint in that case, arguing that vehicles affiliated with companies like Uber are not similarly situated to taxis because they cannot be hailed on the street, rides are pre-arranged, there is a pre-existing contractual relationship between them and the consumer, the driver is not unknown to the consumer, and their fares are not set by the City of Chicago.

205.    The Court in *Illinois Transp. Trade Ass'n,* rejected every one of these supposed distinctions, explaining that "[e]ven a cursory examination of these purported differences demonstrates that these are not material differences justifying disparate treatment of taxis and TNPs," and "none of the supposed differences are rationally related to the differences in treatment under the [law]."  Likewise, "with respect to the manner of obtaining a ride, [there is] no material difference between raising your arm to hail a cab on a street corner and putting your location in an app with a request for immediate transport." Memorandum Opinion and Order at 9, *Illinois Transp. Trade Ass'n v. City of Chicago*, Case No. 14-cv-827 (N.D. Ill. Sep. 22, 2015).

206.    The Court in *Illinois Transp. Trade Ass'n,* concluded that it "fails to see how any of the purported differences relate to the [City's interest in increasing the availability and accessibility of cost-effective transportation and fostering diversity and consumer choice in the 'for-hire' market] such that it justifies maintaining substantially heavier burdens on taxis for training, qualifications, drug testing, vehicle condition, insurance, and fees. Both the purported differences between taxis and TNPs and their relationship to the stated rational appear utterly arbitrary to this Court." *Id.* at 10.

207.    In response to the ruling, on November 4, 2015, the City of Chicago filed a Notice of Legislative Amendments informing the Court of amendments to the City ordinances governing TNPs and taxis enacted on October 28, 2015. These newly enacted amendments purportedly include, among other things, lowering the costs and requirements for chauffeur and taxi licenses, increasing fare rates, approving the use of "surge pricing" when taxis are dispatched from an app or digital platform, reducing various administrative fees applicable to taxi operations, requiring annual inspections and various registrations for TNP vehicles, increasing taxes charged in connection with TNP rides, imposing regulations in connection with airport pickups, and charging administrative fees for each TNP ride.

208.    Although FHVs accepting on-demand E-Hails are functioning in all material respects as medallion taxicabs, and are in fact similarly situated to medallion taxicabs, Defendants have failed to require any of these companies to comply with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules.  Nor have Defendants leveled the playing field by relieving medallion taxicabs from their own obligation to comply with these rules and regulations.

209.    Defendants' disparate treatment of two similarly situated businesses without a rational justification constitutes a clear violation of Plaintiffs' Equal Protection rights under the Fourteenth Amendment to the United States Constitution.  Additionally, Defendants' conduct resulting in the diminution in value of Plaintiffs' property constitutes an unconstitutional taking in violation of the Takings Clause and Article I, § 7 of the New York State Constitution.

### G.    THE MANIPULATON OF TAXICAB MEDALLION VALUES

210.    Adding insult to injury, it now appears clear that prior to destroying the value of the New York City taxicab medallion by eviscerating the statutory right to hail exclusivity, the TLC deliberately manipulated the price of taxicab medallions by intentionally overstating the monthly average price of taxi medallions published on the TLC website until at least sometime in late 2014. The TLC's posted fair market value was relied upon by industry participants, including several of the Plaintiffs in this action, in deciding whether to purchase, hold, sell, or loan against New York City taxicab medallions.

211.    Specifically, documentary evidence makes indisputable that the TLC purposely omitted from its calculation of monthly average prices any taxicab medallion transfers that were more than 10% below the average price from the prior month—thereby driving higher transfer taxes and ultimately causing higher auction prices for medallions being purchased from New York City.

212.    The only plausible explanation for Defendants' "conscious" action was to intentionally inflate the reported fair market value of the medallion, which in turn allowed the TLC to auction medallions at higher prices, thereby increasing the prices paid to New York City for medallions and allowing the TLC to collect higher transfer taxes on behalf of New York City on private medallion sales.

213.    For example, on information and belief, the averages posted by the TLC in the spring of 2012, which were used by the TLC to determine fair market value and calculate the 5% transfer tax on the medallions purchased by Plaintiff KL Motors, were false and misleading.

214.    Likewise, the TLC reported average medallion prices in November 2013 of $1,050,000, while the actual average was only $900,000, approximately 14.3% lower than Commission's posted average.  Plaintiff Safini purchased two medallions in November 2013 in reliance on the TLC average for approximately $2 million, and the TLC used that average in calculating the 5% transfer tax on the medallions purchased by Plaintiff Safini.

215.    Similarly, in September 2014, the TLC reported a monthly average medallion price of $1,045,000, when in fact the only transfer that month apparently closed at $900,000.  The TLC used this posted monthly average medallion price to determine the fair market value of the medallion, and to calculate the 5% transfer tax paid on medallions purchased the following month.

216.    The TLC trapped medallion purchasers and financiers into using the TLC's posted average by basing its medallion transfer tax on that misrepresented and overstated average.  As outlined above, New York City receives a 5% transfer tax on secondary market sales of taxicab medallions, based on the consideration paid for the medallions. N.Y.C. Admin. Code § 11-1402(a) (2015).

217.    As set forth in the 2008 "Audit Report on the Taxi and Limousine Commission's Controls over Taxi Medallions" prepared by the City of New York, Office of the Comptroller, "[t]he tax is paid by the transferee (new medallion owner) and collected by TLC upon the approval of the transfer.  Currently, TLC requires transferees to obtain a tax waiver letter from DOF for all transfers that are $10,000 below fair market value. TLC calculates fair market value by determining the average sales price of the previous month's transfers."

218.    On information and belief, as a matter of practice, the TLC required medallion purchasers to secure a waiver from the New York City Department of Finance if the price of a taxicab medallion transfer was more than 5% below the fair market value of the medallion, as determined by the TLC based on its previous month's posted "average."

219.    By October 2013, Plaintiff Melrose had become concerned about the accuracy of the monthly average prices because many of the transactions that it was funding were closing at prices well below the monthly averages posted by the Commission.  Accordingly, Plaintiff Melrose reached out to the TLC in order to raise questions about how the posted medallion averages were being calculated.

220.    Specifically, Plaintiff Melrose wrote in an e-mail on October 2, 2013 to Allan Fromberg, Deputy Commissioner for Public Affairs of the Commission, that "[a]ccording to the 4 individual medallion transfers recorded last month, the highest price was $1,000,000 while the other 3 transfers were for between 925k and 950k…the average couldn't possibly be $1,050,000 as stated by your spreadsheet." Two days later, Mr. Fromberg responded, "the TLC long ago made a *conscious decision* to set aside any transactions below "fair market value" which I believe we define as within 10% of the high." (emphasis added).

221.    Despite admitting this to Melrose, Defendants took no action to advise the market of this policy or otherwise discontinue the practice until it was eventually reported in the press in late 2014.  Meanwhile, between 2012 and 2014, the rest of the Credit Union Plaintiffs, as well as Plaintiff KL Motors and Plaintiff Safini, continued to detrimentally rely on the TLC's intentional misrepresentations of the fair market value of the taxicab medallion in underwriting medallion sales and purchasing individual medallions.

222.    For example, Plaintiff Safini relied on the TLC's determination of fair market value based on the posted average monthly medallion prices in connection with the purchase of its medallions in November 2013.  Likewise, Plaintiff KL Motors relied on the TLC's determination of fair market value based on the posted average monthly medallion values prices in connection with the purchase of its medallions in March 2012.

223.    As part of the purchase process and acting on behalf of Plaintiff KL Motors and Plaintiff Safini, Mr. Lvovsky and Mr. Kreditor became aware of the TLC's webpage, which posted the monthly average sales price of the medallion and had long constituted the industry-accepted fair market value determination.

224.    Mr. Lvovsky and Mr. Kreditor relied upon the TLC's posted monthly average in making their decision to purchase their medallions.  Had Mr. Lvovsky and Mr. Kreditor known that the TLC's posted monthly averages significantly overstated and misrepresented the actual fair market value of the medallion, neither of them would have purchased the medallions.

225.    Incredibly, the TLC now claims that medallion prices were an "'artificial bubble' created by a few outsized transactions'"; a stunning contention given that it now appears from the evidence that any artificial bubble in taxicab medallion prices was actually created and orchestrated by the TLC itself.

226.    The TLC has also inexplicably claimed that the TLC "doesn't get into the business of valuing."  This cannot be true, however, because the TLC is specifically charged with setting the minimum upset price at auctions in accordance with TLC rules, which state that "[t]he Chairperson will set a minimum upset price for Medallions to be sold."  35 R.C.N.Y. § 65-05(b)(1) (2015).

227.     Moreover, the TLC is responsible for determining the fair market value of the medallion for purposes of the transfer taxes paid by medallion purchasers, rendering patently false and misleading any assertion that the TLC is not involved in setting values and prices for medallions.

228.     Accordingly, Plaintiffs also seek in this action to recover common law fraud damages for the losses incurred as a result of Defendants' misrepresentations and omissions concerning the fair market value of the medallion, in violation of principles of common law fraud.

## FIRST CAUSE OF ACTION

### (Violation of Equal Protection under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. §§ 1983, 1988) (All Plaintiffs)

229.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

230.     Defendants' actions in applying the TLC's Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, as to participants in the New York City medallion taxicab industry, including but not limited to Plaintiffs, while not applying those same rules and regulations to similarly situated FHV companies, including Uber, deny Plaintiffs the benefit of the equal protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

231.     Due to Defendants' evisceration of hail exclusivity, medallion taxicabs and FHVs are now similarly situated for purposes of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

232.     Defendants have not offered any rational justification for the unequal application of the TLC's Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules.  As

described herein, Defendants' decision to apply the TLC's Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, in a disparate and unequal fashion is not rationally related to any legitimate government interest.

233.    Plaintiffs are suffering and will continue to suffer direct and tangible injury and damages from Defendants' actions and inactions, in that, without limitation: (i) the market and collateral value of the medallions and their marketability are being and will continue to be impaired by the unequal application of the TLC's Disparate Medallion Taxicab Rules and Accessible Conversion Rules; (ii) all who own or operate taxis directly, or lease vehicles with medallions to drivers, including Plaintiffs, are being injured in that the revenues derived from their lawful operations have been and will continue to be reduced as a result of similarly situated FHVs, including Uber, operating a competing transportation business but without complying with the same costly and burdensome regulatory requirements as Plaintiffs; and (iii) all who own or operate medallion taxicabs in New York City, including Plaintiffs, are required to incur the time and expense of meeting and complying with numerous costly and burdensome TLC Disparate Medallion Taxicab Rules and Accessible Conversion Rules, while similarly situated FHVs, including Uber, are being allowed to compete against medallion taxicabs in the same market and for the same passengers, but without incurring the time and expense of complying with these costly and burdensome regulatory requirements.

234.    Defendants' actions and inaction are intentional.  Defendants are fully aware that numerous FHV services, including Uber, are operating similarly situated transportation businesses, and are unfairly competing against medallion taxicabs in the same market and for the same passengers, but are doing so free of the burdens of the TLC's Disparate Medallion Taxicab Rules and Accessible Conversion Rules.

235.     As a direct and proximate result of the misconduct and constitutional violations detailed above, all Plaintiffs other than Plaintiff TMODA and Plaintiff Mutual Taxi Owners have suffered damages in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

## SECOND CAUSE OF ACTION

### (Unconstitutional Taking under the Fifth Amendment to the United States Constitution pursuant to 42 U.S.C. §§ 1983, 1988) (Credit Union Plaintiffs and Medallion Owner Plaintiffs)

236.     Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

237.     The Takings Clause of the Fifth Amendment to the United States Constitution, applicable to the states under the Due Process Clause of the Fourteenth Amendment, provides that the Defendants may not take property unless it is for a public purpose and just compensation is paid to the property owner.

238.     New York City taxicab medallions, and the accompanying statutory right to hail exclusivity expressly granted to present and future medallion owners pursuant to New York State law, are property within the meaning of the Takings Clause.

239.     Credit Union Plaintiffs and Medallion Owner Plaintiffs are owners of property that may not be taken by Defendants without payment of just compensation.

240.     Credit Union Plaintiffs' and Medallion Owner Plaintiffs' reasonable, investment-backed expectations include relying on Defendants to enforce its own laws and regulations, including with respect to hail exclusivity, and to not take regulatory action that impairs the value of their property.

241.    Without just compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, Defendants have permitted and continue to permit FHVs such as Uber to usurp and trespass upon the exclusive property rights of Credit Union Plaintiffs and Medallion Owner Plaintiffs by accepting on-demand E-Hails, thereby operating as an on-demand taxicab service without buying or leasing taxicab medallions, and without complying with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules.

242.    Without just compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, Defendants have knowingly and intentionally diminished Credit Union Plaintiffs' and Medallion Owner Plaintiffs' property to the point of destroying the value of the New York City taxicab medallion by permitting and continuing to permit FHVs such as Uber to accept on-demand E-Hails, thereby operating as an on-demand taxicab service without buying or leasing taxicab medallions, and without complying with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, while requiring medallion owners to comply with these rules, thereby depriving Credit Union Plaintiffs and Medallion Owner Plaintiffs of their private property.

243.    Without just compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, Defendants have knowingly and intentionally destroyed the statutorily granted exclusive right to hails belonging to present and future medallion owners pursuant to New York State law by permitting and continuing to permit FHVs such as Uber to accept on-demand E-Hails, thereby operating as an on-demand taxicab service without buying or leasing taxicab medallions, and without complying with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, while requiring medallion owners to comply with these rules, thereby depriving Credit Union Plaintiffs and Medallion Owners Plaintiffs of their private property.

244.    As a result, Defendants have taken private property rights belonging to Credit Union Plaintiffs and Medallion Owner Plaintiffs and transferred them to FHV companies like Uber without paying any compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, let alone the just compensation required by the Takings Clause.

245.    As a direct and proximate result of the misconduct and constitutional violations detailed above, Credit Union Plaintiffs and Medallion Owner Plaintiffs are entitled to just compensation in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

### THIRD CAUSE OF ACTION

### (State Law - Fraud)
### (Credit Union Plaintiffs, Plaintiff KL Motors, Inc., and Plaintiff Safini)

246.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

247.    New York State law prohibits fraud, deceit, and intentional misrepresentations or omissions.

248.    Credit Union Plaintiffs, who hold security interests in thousands of New York City taxicab medallions, underwrite the purchase of medallions for value in a market created by and regulated by Defendant TLC, including hundreds of medallion transactions underwritten by Credit Union Plaintiffs between 2012 and 2014.

249.    Plaintiffs KL Motors and Safini, who collectively own five taxicab medallions, purchased their medallions for value in 2012 and 2013 in a market created by and regulated by Defendant TLC.

250.    Defendant TLC posted the "average" sale price for taxicab medallion transfers each calendar month until sometime in late 2014, when Defendants' fraudulent scheme to artificially

inflate the monthly "averages" was made public, causing the TLC to stop posting those monthly averages on its website.

251.    Credit Union Plaintiffs and Plaintiffs KL Motors and Safini, along with the rest of the medallion taxicab industry, reasonably relied on the accuracy of the TLC's posted average, which was used to determine the fair market value of the taxicab medallion in private transactions, because the TLC itself relied on its own posted monthly "averages" in order to determine the fair market value of a medallion for purposes of calculating the five percent transfer tax collected from the proceeds of every transaction on behalf of New York City, including hundreds of medallion transactions underwritten by the Credit Union Plaintiffs, as well as the transactions engaged in by Plaintiffs KL Motors and Safini.

252.    Defendant TLC made material misrepresentations and omissions of fact regarding the monthly average price of medallion transfers by intentionally and secretly excluding all medallion transfers that were priced more than 10% below the highest sale price from the prior month's transactions, when calculating the monthly average price of medallion transfers.

253.    Defendant TLC had a policy of "consciously" excluding medallion transfers that were priced more than 10% below the highest sale price from the prior month's transactions, and therefore knew of the misrepresentation.

254.    Defendant TLC intended to misrepresent the posted average monthly price on its website in order to artificially inflate the value of taxicab medallions, thereby artificially increasing the auction prices paid to the City of New York for new taxicab medallions and artificially increasing the amount of the transfer tax owed to the City of New York by medallion purchasers in private transactions.

255.    Credit Union Plaintiffs justifiably relied upon the posted average transfer prices of medallions determined by Defendant TLC in their decision to underwrite taxicab medallion purchases.

256.    Plaintiffs KL Motors and Safini justifiably relied upon the posted average transfer prices of medallions determined by Defendant TLC in their decision to purchase medallions in 2012 and 2013.

257.    Credit Union Plaintiffs, Plaintiff KL Motors, and Plaintiff Safini suffered injury in the form of economic loss.

258.    Credit Union Plaintiffs, Plaintiff KL Motors, and Plaintiff Safini's injuries were directly caused by Defendant TLC's misrepresentations and omissions concerning the monthly average medallion transfer prices posted to its website.

259.    As a direct and proximate result of Defendant TLC's misrepresentations and omissions, Credit Union Plaintiffs, Plaintiff KL Motors, and Plaintiff Safini have suffered damages in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

**FOURTH CAUSE OF ACTION**

**(Violation of the Due Process Clause under the Fourteenth Amendment to the United States Constitution pursuant to 42 U.S.C. §§ 1983, 1988) (Medallion Owner Plaintiffs and Credit Union Plaintiffs)**

260.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

261.    Defendants' actions in forcing Medallion Owner Plaintiffs to convert their unrestricted medallions to accessible medallions without notice or the opportunity to be heard violated the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

262.    Defendants' actions in requiring the conversion of unrestricted medallions to accessible medallions also devalued Credit Union Plaintiffs' unrestricted medallion collateral and impaired their security interests in those medallions without notice or the opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

263.    Defendants, acting under color of state and local law, acted without forewarning of a change in the law.

264.    By promulgating and implementing regulations pursuant to which Defendants have required Medallion Owner Plaintiffs to convert their unrestricted medallions to accessible medallions, and devalued Credit Union Plaintiffs' unrestricted medallion collateral, Defendants have deprived, and will continue to deprive, Medallion Owner Plaintiffs and Credit Union Plaintiffs of rights guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983.

265.    Defendants' actions were deliberate, reckless, and indifferent to the Medallion Owner Plaintiffs' and Credit Union Plaintiffs' legal rights.

266.    As a direct and proximate result of the misconduct and constitutional violations detailed above, Medallion Owner Plaintiffs and Credit Union Plaintiffs have suffered damages in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

## FIFTH CAUSE OF ACTION

### (Violation of Due Process under art. I, § 6 of the New York State Constitution)
### (Medallion Owner Plaintiffs and Credit Union Plaintiffs)

267.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

268.    Defendants' actions in forcing Medallion Owner Plaintiffs to convert their unrestricted medallions to accessible medallions without notice or the opportunity to be heard violated Article I, § 6 of the New York State Constitution.

269.    Defendants' actions in requiring the conversion of unrestricted medallions to accessible medallions also devalued Credit Unions Plaintiffs' unrestricted medallion collateral and impaired their security interests in those medallions without notice or the opportunity to be heard in violation of Article I, § 6 of the New York State Constitution.

270.    Defendants, acting under color of state and local law, acted without forewarning of a change in the law.

271.    By promulgating and implementing regulations pursuant to which Defendants required Medallion Owner Plaintiffs to convert their unrestricted medallions to accessible medallions, and devalued Credit Union Plaintiffs' unrestricted medallion collateral, Defendants have deprived, and will continue to deprive, Medallion Owner Plaintiffs and Credit Union Plaintiffs of the rights guaranteed by Article I, § 6 of the New York State Constitution.

272.    Defendants' actions were deliberate, reckless, and indifferent to the Medallion Owner Plaintiffs' and Credit Union Plaintiffs' legal rights.

273.    As a direct and proximate result of the misconduct and constitutional violations detailed above, Medallion Owner Plaintiffs and Credit Union Plaintiffs have suffered damages in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

## SIXTH CAUSE OF ACTION

### (Unconstitutional Taking under art. I, § 7 the New York State Constitution)
### (Credit Union Plaintiffs and Medallion Owners Plaintiffs)

274.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

275.    New York City taxicab medallions, and the accompanying statutory right to hail exclusivity expressly granted to present and future medallion owners pursuant to New York State law, are property within the meaning of Article I, § 7 of the New York State Constitution.

276.    Credit Union Plaintiffs and Medallion Owner Plaintiffs are owners of property that may not be taken by Defendants without payment of just compensation.

277.    Credit Union Plaintiffs' and Medallion Owner Plaintiffs' reasonable, investment-backed expectations include relying on Defendants to enforce its own laws and regulations, including with respect to hail exclusivity, and to not take regulatory action that impairs the value of their property.

278.    Without just compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, Defendants have permitted and continue to permit FHVs such as Uber to usurp and trespass upon the exclusive property rights of Credit Union Plaintiffs and Medallion Owner Plaintiffs by accepting on-demand E-Hails, thereby operating as an on-demand taxicab service without buying or leasing taxicab medallions, and without complying with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules.

279.    Without just compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, Defendants have knowingly and intentionally diminished Credit Union Plaintiffs' and Medallion Owner Plaintiffs' property to the point of destroying the value of the New York City taxicab medallion by permitting and continuing to permit FHVs such as Uber to accept on-demand

E-Hails, thereby operating as an on-demand taxicab service without buying or leasing taxicab medallions, and without complying with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, while requiring medallion owners to comply with these rules, thereby depriving Credit Union Plaintiffs and Medallion Owner Plaintiffs of their private property.

280.    Without just compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, Defendants have knowingly and intentionally destroyed the statutorily granted exclusive right to hails belonging to present and future medallion owners pursuant to New York State law by permitting and continuing to permit FHVs such as Uber to accept on-demand E-Hails, thereby operating as an on-demand taxicab service without buying or leasing taxicab medallions, and without complying with the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, while requiring medallion owners to comply with these rules, thereby depriving Credit Union Plaintiffs and Medallion Owners Plaintiffs of their private property.

281.    As a result, Defendants have taken private property rights belonging to Credit Union Plaintiffs and Medallion Owner Plaintiffs and transferred them to FHV companies like Uber without paying any compensation to Credit Union Plaintiffs and Medallion Owner Plaintiffs, let alone the just compensation required by the Takings Clause.

282.    As a direct and proximate result of the misconduct and constitutional violation detailed above, Credit Union Plaintiffs and Medallion Owner Plaintiffs are entitled to just compensation in an amount to be determined at trial but reasonably believed to be in excess of $75,000.

## SEVENTH CAUSE OF ACTION

### (Declaratory Judgment)
### (All Plaintiffs)

283.    Plaintiffs hereby incorporate each of the foregoing paragraphs as if fully set forth herein.

284.    Plaintiffs respectfully request that a declaratory judgment be entered against Defendants declaring that the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs.

285.    Plaintiffs respectfully request that a declaratory judgment be entered against Defendants prohibiting Defendants from promulgating and enforcing any rules or regulations that impose burdens on medallion taxicabs any greater than those burdens imposed upon similarly situated FHV companies including Uber, without a rational basis for such disparate treatment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendants as follows:

286.    A declaration that the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, are unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs;

287.    A declaration that the Accessible Conversion Rules are unconstitutional under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, as well as under Article I, § 6 of the New York State Constitution;

288.    An injunction enjoining Defendants from imposing any regulatory burdens on medallion taxicabs that are greater than those imposed on similarly situated FHVs including Uber, without a rational basis for such disparate treatment;

289.    Compensatory damages for Credit Union Plaintiffs and Medallion Owner Plaintiffs resulting from the Defendants' disparate treatment of medallion taxicabs as compared with FHVs such as Uber in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

290.    Compensatory damages for Credit Union Plaintiffs and Medallion Owner Plaintiffs resulting from the Defendants' violations of the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, § 6 of the New York State Constitution;

291.    Exemplary damages in an amount to be determined at trial;

292.    Compensatory and punitive damages for Credit Union Plaintiffs', Plaintiff KL Motors', and Plaintiff Safini's economic losses resulting from Defendants' fraudulent misrepresentations and omissions;

293.    Just compensation for Credit Union Plaintiffs and Medallion Owner Plaintiffs as a result of Defendants' unconstitutional taking of property rights concerning the New York City taxicab medallion and the accompanying statutory right to hail exclusivity guaranteed to present and future medallion owners by New York State law, in violation of Takings Clause of the Fifth Amendment to the United States Constitution applicable to the states through the Due Process

Clause of the Fourteenth Amendment to the United States Constitution and Article I, § 7 of the New York State Constitution;

294.    An award of Plaintiffs' attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988; and

295.    Such other relief as the Court deems appropriate.

## JURY DEMAND

296.    Plaintiffs hereby demand a trial by jury.

Dated: November 17, 2015
      New York, New York

Respectfully Submitted,

By: _____
Todd A. Higgins, Esq. (TH 7920)
Crosby & Higgins, LLP
477 Madison Avenue, 6th Floor
New York, NY 10022
(646) 452-2300
thiggins@crosbyhiggins.com

*Attorneys for Plaintiffs*