UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------------------- X
                                  :

MELROSE CREDIT UNION, PROGRESSIVE CREDIT   :    Civil Action No.: 15-cv-9042
UNION, LOMTO FEDERAL CREDIT UNION, TAXI   :
MEDALLION OWNER DRIVER ASSOCIATION, INC.,   :
LEAGUE OF MUTUAL TAXI OWNERS, INC., KL   :
MOTORS, INC., SAFINI TRANSPORT, INC., WHITE   :
& BLUE GROUP CORP., FIMA SERVICE CO., INC.,   :
CARL GINSBERG, and JOSEPH ITZCHAKY,   :
                                    :

     Plaintiffs,   :
                                    :
       -against-   :
                                    :
                                    :

THE CITY OF NEW YORK; THE NEW YORK CITY   :
TAXI & LIMOUSINE COMMISSION; and MEERA   :
JOSHI, in her Official Capacity as the Chair of the New   :
York City Taxi & Limousine Commission,   :
                                    :

     Defendants.   :
--------------------------------------------------------------------- X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

**CROSBY & HIGGINS LLP**
Todd A. Higgins, Esq.
477 Madison Avenue, 6th Floor
New York, NY 10022
(646) 452-2300

*Attorneys for Plaintiffs*

June 6, 2016

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................iv

I.     Preliminary Statement .................................................................................1

II.    Detailed Factual Background ......................................................................8

    A.    The Plaintiffs .................................................................................9

        i.    Plaintiff Melrose Credit Union ...........................................9

        ii.    Plaintiff Progressive Credit Union ....................................10

        iii.    Plaintiff LOMTO Federal Credit Union ............................11

        iv.    Plaintiff Taxi Medallion Owner Driver Association, Inc. ..................11

        v.    Plaintiff League of Mutual Taxi Owners, Inc. ...................12

        vi.    Plaintiffs KL Motors, Inc. and Safini Transport, Inc. .........................13

        vii.    Plaintiffs White & Blue Group Corp. and FIMA
            Service Co., Inc. ................................................................13

        viii.    Plaintiff Carl Ginsberg ......................................................15

        ix.    Plaintiff Joseph Itzchaky ...................................................16

    B.    The Regulatory Framework ........................................................17

    C.    The Disparate Medallion Taxicab Rules ...................................20

    D.    The Regulatory Taking of Hail Exclusivity ..............................27

    E.    Medallion Taxicabs and FHVs are Now Similarly Situated ................34

    F.    The Impact of Disparate Regulatory Treatment and the Regulatory

        Taking of Hail Exclusivity ........................................................40

    G.    The Manipulation of Taxicab Medallion Values ......................53

III.    Legal Standard ..........................................................................................57

IV.   Argument ....................................................................................................58

    A.   Plaintiffs Have Standing .......................................................................58

          i.   The Credit Union Plaintiffs Have Standing ............................60

          ii.   TMODA and Mutual Taxi Owners Have Standing ..............................62

          iii.   The Remaining Plaintiffs Have Standing ................................63

    B.   Plaintiffs' Claims Are Not Barred by Res Judicata ...............................65

    C.   Plaintiffs' Claims Are Not Barred by the Doctrine of Laches ............................68

    D.   Plaintiffs' Equal Protection Claim Is Well Pled .....................................71

          i.   Plaintiffs Properly Allege that Medallion Taxicabs and FHVs Accepting On-demand E-Hails Are Similarly Situated ............................................72

          ii.   Plaintiffs Properly Allege that there is No Rational Basis for Defendants' Disparate Treatment of Medallion Taxicabs and FHVs Accepting On-demand E-Hails ................................................................76

          iii.   Plaintiffs Properly Allege that the Similarity in Circumstances and Differences In Treatment Between Plaintiffs and FHVs Excludes Any Possibility that Defendants Acted on the Basis of a Mistake .................79

    E.   Plaintiffs' Takings Claim Is Well Pled .................................................80

          i.   Plaintiffs' Takings Claim Is Ripe for Judicial Review ............................83

          ii.   Plaintiffs' Takings Claim Is Well Pled .....................................88

              1.   Plaintiffs Properly Allege Protected Property Interests...............91

              2.   Plaintiffs Properly Allege a Non-Categorical Regulatory Taking for Which Just Compensation is Due ............................................96

a.    Plaintiffs Properly Allege Deprivation of
Economic Use.................................................................98

b.    Plaintiffs Properly Allege Reasonable Investment-
Backed Expectations.....................................................101

c.    Plaintiffs Properly Allege Defendants'
Wrongful Conduct .........................................................103

F.    Plaintiffs Due Process Claim is Well Pled .........................................106

G.    Plaintiffs' Common Law Fraud Claim Is Well Pled ...........................110

V.    Conclusion ......................................................................................................116

# TABLE OF AUTHORITIES

**United States Constitution**

U.S. Const.

    Amend. V ................................................................................................................2

    Amend. XIV ...........................................................................................................2

**United States Supreme Court Cases**

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ................................................................................................57

*Ark. Game & Fish Comm'n v. United States,*
133 S. Ct. 511 (2012) ......................................................................................101-03

*Armstrong v. United States,*
364 U.S. 40 (1960) .................................................................................................91

*Ass'n of Data Processing Service Orgs., Inc. v. Camp,*
397 U.S. 150 (1970) ...............................................................................................61

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
527 U.S. 666 (1999) ...............................................................................................91

*Bell Atl. Corp. v. Twombly*
550 U.S. 544 (2007) ...........................................................................................57-58

*Bennett v. Spear,*
520 U.S. 154 (1997) ...............................................................................................61

*Board of Regents of State Colleges v. Roth,*
408 U.S. 564 (1972) .........................................................................................91, 106

*Boddie v. Connecticut,*
401 U.S. 371 (1971) .............................................................................................107

*Concrete Pipe & Prods. of Cal., Inc.*,
508 U.S. 602 (1993) ........................................................................................97

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985) ........................................................................................72

*Clarke v. Sec. Indus. Ass'n*,
479 U.S. 388 (1987) ........................................................................................61

*Cleveland Bd. of Educ. v. Loudermill*,
470 U.S. 532 (1985) ...................................................................................107-08

*Goldberg v. Kelly*,
397 U.S. 254 (1970) ................................................................................107, 109

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) ........................................................................................91

*Louisville Joint Stock Land Bank v. Radford*,
295 U.S. 555 (1935) ........................................................................................91

*Lucas v. S.C. Coastal Council*,
505 U.S. 1003 (1992) .......................................................................................96

*Lujan v. Defs. of Wildlife*
504 U.S. 555 (1992) ....................................................................................59, 64

*Lynch v. United States*,
292 U.S. 571 (1934) ........................................................................................91

*Palazzolo v. Rhode Island*,
533 U.S. 606 (2001) ........................................................................................97

*Penn. Coal v. Mahon*,
260 U.S. 393 (1922) ........................................................................................96

*Penn Cent. Transp. Co. v. City of New York*,
438 U.S. 104 (1978). ...............................................................82, 88-89, 96-98, 104

*Phillips v. Wash. Legal Found.*,
524 U.S. 156, 164 (1998) ..................................................................................91

*Schweiker v. Wilson*,
450 U.S. 221 (1981) ....................................................................................................76

*Ruckelshaus v. Monsanto Co.*,
467 U.S. 986 (1984) ....................................................................................................91

*Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*,
535 U.S. 302 (2002) ....................................................................................................96

*United Mine Workers v. Gibbs,*
383 U.S. 715 (1966) ..................................................................................................111

**<u>Second Circuit Cases</u>**

*African Trade & Info. Ctr., Inc. V. Abromaitis*,
294 F.3d 355 (2d Cir. 2002) ......................................................................................72

*Aikens v. Royce*,
2015 WL 7758892, (S.D.N.Y. Dec. 1, 2015) ......................................................72-74

*Aurecchione v. Schoolman Transp. System, Inc.*
426 F.3d 635 (2d Cir. 2005) ......................................................................................58

*Baur v. Veneman*,
352 F.3d 625 (2d Cir. 2003) ......................................................................................60

*Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*,
448 F.3d 138 (2d Cir. 2006) ................................................................................59, 60

*Burgos v. Hopkins*,
14 F.3d 787 (2d Cir. 1994) ........................................................................................66

*Carter v. HealthPort Techs., LLC,*
2016 WL 2640989 (2d Cir. May 10, 2016) ...........................................59, 61, 63, 65

*Chase Manhattan Bank, N.A. v. Celotex Corp.*,
56 F.3d 343 (2d Cir. 1995) ........................................................................................66

Clubside, Inc. v. Valentin,
468 F.3d 144 (2d Cir. 2006) ................................................................................72, 80

*Day v. Moscow,*
955 F.2d 807 (2d Cir. 1992) ......................................................................65

*Denney v. Deutsche Bank AG,*
443 F.3d 253 (2d Cir. 2006) .....................................................................59

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,*
282 F.3d 83, 88 (2d Cir. 2002) .................................................................84

*Fahs Const. Group, Inc. v. Gray,*
725 F.3d 289 (2d Cir. 2013) .....................................................................69

*Ford Motor Credit Co. v. N.Y.C. Police Dep't,*
503 F.3d 186 (2d Cir. 2007) ...................................................................108

*Interoceanica Corp. v. Sound Pilots, Inc.,*
107 F.3d 86 (2d Cir. 1997) .......................................................................66

*Ivani Contracting Corp. v. City of New York,*
103 F.3d 257 (2d Cir. 1997) .....................................................................69

*Lerner v. Fleet Bank, N.A.,*
459 F.3d 273 (2d Cir. 2006) .......................................................110-11, 113

*Liberty Cable Co. v. City of New York,*
60 F.3d 961 (2d Cir. 1995) .....................................................................109

*Mills v. Polar Molecular Corp.,*
12 F.3d 1170 (2d Cir. 1993) ...................................................................111

*Monahan v. N.Y. City Dep't of Corr.,*
214 F.3d 275 (2d Cir. 2000) .....................................................................66

*Nat'l Org. For Women v. Pataki,*
261 F.3d 156 (2d Cir. 2001) ...................................................................109

*Nnebe v. Daus,*
644 F.3d 147 (2d Cir. 2011) .................................................................62-63

*Noel v. New York City Taxi and Limousine Comm'n,*
687 F.3d 63 (2d Cir. 2012) ...............................................................23, 110

viii

*People ex rel. Abrams v. Terry,*
45 F.3d 17 (2d Cir. 1995) ...............................................................................111

*Pharr v. Evergreen Garden, Inc.,*
123 Fed.Appx. 420 (2d Cir. 2005) ...............................................................66, 68

*Pompa Constr. Corp. v. City of Saratoga Springs,*
706 F.2d 418 (2d Cir. 1983)) ..............................................................................98

*Promisel v. First Am. Artificial Flowers, Inc.,*
943 F.2d 251 (2d Cir. 1991) .............................................................................111

*See Rent Stabilization Ass'n of N.Y.C., Inc. v. Dinkins,*
805 F. Supp. 159 (S.D.N.Y. 1992) .................................................................98-99

*RRI Realty Corp. v. Inc. Vill. of Southampton,*
870 F.2d 911 (2d Cir. 1989) ...............................................................................92

*Sadowsky v. City of New York,* 732 F.2d 312 (2d Cir. 1984) .................................98-99

*Schweiker v. Wilson,*
450 U.S. 221 (1981) ...........................................................................................76

*Sherman v. Town of Chester,*
752 F.3d 554 (2d Cir. 2014) .........................................................70, 84, 101, 103

*Shields v. Citytrust Bancorp, Inc.,*
25 F.3d 1124 (2d Cir.1994),
*superseded by statute on other grounds, as stated in In re Paracelsus Corp. Sec. Litig.,*
61 F.Supp. 2d 591 (S.D. Tex. 1998) ................................................................111

*Shumway v. United Parcel Serv., Inc.,*
118 F.3d 60 (2d Cir. 1997) ...........................................................................72, 74

*Statharos v. NYC Taxi and Limousine Comm'n,*
198 F.3d 317 (2d Cir. 1999) .............................................................................108

*Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.,*
17 F.3d 38 (2d Cir. 1994) ...................................................................................69

*W.E. Hedger Transp. Corp. v. Ira S. Bushey & Sons,*

186 F.2d 236 (2d Cir. 1951) .......................................................................................65

*Williamson Cty. Regional Planning Comm'n v. Hamilton Bank of Johnson City*,
473 U.S. 172 (1985) ...................................................................................................85

*Windsor v. United States*,
699 F.3d 169 (2d Cir. 2012) .....................................................................................76

*Villager Pond, Inc. v. Town of Darien*,
56 F.3d 375 (2d Cir. 1995) .......................................................................................85

*1256 Hertel Ave. Assocs., LLC v. Calloway*,
761 F.3d 252 (2d Cir. 2014) ...................................................................................101

## <u>Southern District of New York Cases</u>

*Alexandre v. TLC*,
No. 07 Civ. 8175(RMB), 2007 WL 2826952 (S.D.N.Y. Sept. 28, 2007)....................99

*Sanitation & Recycling Indus. Inc. v. City of New York*,
928 F. Supp. 407 (S.D.N.Y. 1996) ...........................................................................99

*Ashley v. Eastchester Police Dept.*,
2012 WL 234399 (S.D.N.Y. Jan. 6, 2012) ................................................................70

*Brooklyn School for Special Children v. Crew*,
1997 WL 539775 (S.D.N.Y. 1997) ...............................................................114, 115

*Doe v. Hagenbeck*, 98 F. Supp. 3d 672
(S.D.N.Y. 2015) ........................................................................................................73

*Ford Motor Credit Co. v. NYC Police Dep't*,
394 F. Supp. 2d 600 (S.D.N.Y. 2005) ...............................................................108-09

*Ganci v. N.Y.C. Transit Auth.*,
420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005). ...................................................88-89, 97

*Hidalgo v. Johnson & Johnson Consumer Companies, Inc.*,
2015 WL 8375196 (S.D.N.Y. Dec. 8, 2015) ............................................59, 61, 63, 65

*International Motor Sports Group, Inc. v. Gordon*,
1999 WL 619633 (S.D.N.Y. 1999) .........................................................................111

*Jordan v. Goord,*
00 CV 1294, 2001 WL 1286977 (S.D.N.Y. Oct. 22, 2001) ......................................................106

*Karlen v. New York Univ.,*
464 F. Supp. 704 (S.D.N.Y. 1979) .........................................................................................69

*Lennon v. Seaman,*
63 F. Supp. 2d 428 (S.D.N.Y. 1999) ..............................................................................69, 71

*Madison Maidens, Inc. v. American Mfrs. Mut. Ins. Co.,*
2006 WL 785270 (S.D.N.Y. 2007) .........................................................................................111

*McDermott v. New York Metro LLC,*
664 F. Supp. 2d 294 (S.D.N.Y. 2009) ..................................................................................59

*Mejia v. City of New York,*
No. 01 Civ. 3381 (GBD), 2004 WL 2884407 (S.D.N.Y. Dec. 10, 2004) ..............................86, 92

*New York City Managerial Employees Ass'n v. Dinkins,*
807 F. Supp. 958 (S.D.N.Y. 1992) .........................................................................................76

*R-Goshen LLC v. Vill. of Goshen,*
289 F. Supp. 2d 441 (S.D.N.Y. 2003) ..................................................................................85

*Ross v. AXA Equitable Life Ins. Co.,*
2015 WL 4461654 (S.D.N.Y. 2015) .........................................................................................59

*Russell Pipe & Foundry Co. v. City of New York,*
1997 WL 80601 (S.D.N.Y. 1997) .........................................................................................115

*Seabrook v. City of New York,*
509 F. Supp. 2d 393 (S.D.N.Y. 2007) ..................................................................................76

*Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.,*
342 F. Supp. 2d 160 (S.D.N.Y. 2004) ..............................................................................57, 58

*TZ Manor, LLC v. Daines,*
815 F. Supp. 2d 726 (S.D.N.Y. 2011). ..................................................................................86

*Vaher v. Town of Orangetown, N.Y.,*
916 F. Supp. 2d 404 (S.D.N.Y. 2013) .........................................................................72, 74, 76

**Eastern District of New York Cases**

*Singh v. Joshi*,
15-CV-5496, 2016 WL 304761 (E.D.N.Y. Jan. 26, 2016) ........................................................110

**Other Circuit Court Cases**

*Cienga Gardens v. United States*,
331 F.3d 1319, 1340 (Fed. Cir. 2003) ...........................................................................................98

*DLX, Inc. v. Kentucky*,
381 F.3d 511, 519 (6th Cir. 2004) .................................................................................................86

*Loesel v. City of Frankenmuth*,
692 F.3d 452, 462 (6th Cir. 2012) .................................................................................................72

*Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*,
575 F.3d 502 (8th Cir. 2008) ...................................................................................................93, 95

**Other Federal District Cases**

*Boston Taxi Owners Ass'n v. City of Boston*,
84 F.Supp.3d 72 (D. Mass. 2015) ....................................................................................80, 95, 109

*Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*,
No. 13-10769-NMG, 2014 WL 1338144 (D. Mass. Feb. 28, 2014) ..............................................96

*Illinois Transp. Trade Ass'n v. City of Chicago*,
Case No. 14-cv-827 (N.D. Ill. Sep. 22, 2015) ...........................................................79, 93, 95, 107

*Gebresalassie v. Dist. of Columbia*,
No. 15-762 (CKK), 2016 WL 1089219 (D.D.C. Mar. 18, 2016) ............................................93, 95

*Mekuria v. Wash. Metro. Area Transit Auth.*,
975 F. Supp. 1 (D.D.C. 1997) ......................................................................................................97

*Swartz v. Beach*,
229 F. Supp. 2d 1239 (D. Wyo. 2002) ....................................................................................89, 97

**Federal Court of Claims Cases**

*Aureus Asset Mgmt., Ltd. v. United States*,

121 Fed. Cl. 206 (2015) ............................................................................89, 92, 97

*Colonial Chevrolet Co., Inc. v. United States,*
123 Fed. Cl. 134..................................................................................92, 101

*Estate of Hage v. United States,*
687 F.3d 1281 (Fed. Cir. 2012) ............................................................92

*Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440................................................98, 101, 104

## New York Court of Appeals Cases

*Davidson v. Bronx Mun. Hosp.,*
484 N.Y.S.2d 533 (1984) .......................................................................114

*Gross v. Perales*, 72 N.Y.2d 231 (1988) ...............................................67, 85

## New York Appellate Court Cases

*City of New York v. 611 West 152nd St., Inc.,*
273 A.D.2d 125 (1st Dep't 2000) ...........................................................113

*Deposit Cent. School Dist. v. Public Employment Relations Bureau,*
214 A.D.2d 288 (3d Dep't 1995) ........................................................114, 115

*Hygrade Insulators, Inc. v. Board of Educ.,*
207 A.D.2d 430 (2d Dep't 1994) ............................................................115

*Kaufman v. Cohen,*
307 A.D.3d 113 (1st Dep't 2003) ...........................................................110

*Pope v. Hempstead Union Free School Dist. Bd. Of Educ.,*
194 A.D.2d 654 (2d. Dep't 1993) ..........................................................115

## New York Supreme Court Cases

*Black Car Assistance Corp. v. The City of New York*,
2013 WL 1808082 (N.Y. Sup. Ct. 2013),
*aff'd*, 110 A.D.3d 618 (App. Div. 1st Dep't 2013) ...............................................27, 29

*Melrose Credit Union v. City of New York*,
No. 6443/15 (N.Y. Sup. Ct. Queens Cty. Sept. 8, 2015) ..............................................87

*Metro. Taxicab Bd. of Trade v. N.Y.C. Taxi & Limousine Comm'n*,
958 N.Y.S.2d 569 (Sup. Ct. N.Y. Cty. 2013),
*aff'd*, 115 A.D.3d 521 (1st Dep't 2014),
*leave to appeal summarily denied by* 24 N.Y.3d 911 (2014) .................................67, 85

*Glyca Trans LLC v. City of New York*,
No. 8962/15 (N.Y. Sup. Ct. Queens Cty. Sept. 8, 2015) .......................................87-88

*XYZ Two Way Radio Serv. v. City of New York*,
No. 100578/2015 (N.Y. Sup. Ct. Queens Cty. Sept. 8, 2015) ...................................87

**Other State Supreme Court Cases**

*Boston Neighborhood Taxi Assoc. v. Department of Pub. Utils.*,
410 Mass. 686 (Mass. 1991) ...........................................................................95

*Town Taxi Inc. v. Police Comm'r of Boston*,
377 Mass. 576 (1979) ....................................................................................95

**New York City Court Cases**

*Ferrara v. City of New York*,
65 N.Y.S.2d 327 (N.Y. City Ct. Bronx County 1946) ...........................................114

**United States Code**

28 U.S.C. § 1331 .........................................................................................111

28 U.S.C. § 1367 .........................................................................................111

42 U.S.C. § 1983 ...................................................1, 3, 16, 62, 69, 98, 106

**Federal Rules of Civil Procedure**

Rule 8(c)(1) ..................................................................................................65

Rule 9(b) ...............................................................................................111, 113

Rule 12(b)(1) ...............................................................................................60, 83

Rule 12(b)(6) ...............................................................................57, 65, 92, 106

**Rules of the United States Court of Federal Claims**

Rule 12(b)(6) ...........................................................................................92

**New York State Constitution**

N.Y.S. CONST.

Article I, § 7 ...........................................................................................2

**New York State and City Statutes and Rules**

N.Y. Assemb. B. 8691, 235th Sess., (2011) .................................................

Section 1 ...............................................................................................18

Section 11 .............................................................................................19

N.Y.C. Admin. Code (2015) ...........................................................................

Section 7-201 ...............................................................7, 113, 114, 115

Section 11-1402 ...............................................................................20, 55

Section 19-533 .....................................................................................23

N.Y. C.P.L.R. (2015) ...................................................................................

Section 213 ...........................................................................................70

Section 7801 .........................................................................................85

Section 7806 ...................................................................................67, 85

35 R.C.N.Y. (2015) ........................................................................................................

    Section 51-03 ...................................................................................25, 29

    Section 54-04 ........................................................................................25

    Section 55-19 ........................................................................................20

    Section 58-03 ...................................................................................22, 24

    Section 58-16 ........................................................................................21

    Section 58-21 ........................................................................................21

    Section 58-26 .............................................................................20, 22, 29

    Section 58-50 ........................................................................................23

    Section 59A-31 .................................................................................22, 51

    Section 59A-32 .................................................................................22, 51

    Section 59A-33 .................................................................................22, 51

    Section 65-04 ........................................................................................19

    Section 65-05 ...................................................................................19, 57

    Section 65-06 ........................................................................................19

    Section 65-07 ........................................................................................19

    Section 65-08 ........................................................................................19

    Section 67-04 ........................................................................................22

    Section 67-05 ...................................................................................22, 23

    Section 67-06 ........................................................................................22

Section 67-07 ...................................................................................................22

Section 67-08 ...................................................................................................22

Section 67-09 ...................................................................................................22

Section 67-10 ...................................................................................................22

Section 67-11 ...................................................................................................22

Section 67-12 ...................................................................................................22

Section 67-13 ...................................................................................................22

Section 67-14 ...................................................................................................22

Section 67-15 ...................................................................................................22

Section 67-16 ...................................................................................................22

Section 67-17 ...................................................................................................22

## I.   <u>PRELIMINARY STATEMENT</u>

Plaintiffs Melrose Credit Union ("Melrose"), Progressive Credit Union ("Progressive"), LOMTO Federal Credit Union ("LOMTO"), Taxi Medallion Owner Driver Association, Inc. ("TMODA"), League of Mutual Taxi Owners, Inc. ("Mutual Taxi Owners"), KL Motors, Inc. ("KL Motors"), Safini Transport, Inc. ("Safini"), White & Blue Group Corp. ("White & Blue Group"), FIMA Service Co., Inc. ("FIMA"), Carl Ginsberg, and Joseph Itzchaky respectfully submit this memorandum of law in opposition to Defendants, the City of New York, the New York City Taxi & Limousine Commission ("TLC"), and Meera Joshi, in her Official Capacity as the Chair of the New York City Taxi & Limousine Commission's *Motion to Dismiss the Amended Complaint*.  As alleged in Plaintiffs' Amended Complaint, this dispute arises from the collapse of the regulatory structure governing for-hire transportation in New York City, amidst the government-sanctioned proliferation of smartphone technology being used by companies like Uber Technologies, Inc. ("Uber") to bypass the purchase of taxicab medallions and allow passengers to electronically hail a parallel network of unlicensed on-demand vehicles ("E-Hails").  Defendants' deliberate evisceration of taxicab hail exclusivity, a property right expressly guaranteed *to present and future medallion owners* by the New York State legislature, and their ongoing arbitrary, disparate regulatory treatment of the medallion taxicab industry, continues to inflict catastrophic damages on this once iconic industry, and the tens of thousands of hardworking men and women that depend on it for their livelihood.

Accordingly, pursuant to 42 U.S.C. § 1983, Plaintiffs seek injunctive relief ordering an end to Defendants' disparate regulatory treatment of the medallion taxicab industry, reflected in the countless regulatory burdens that medallion taxicabs are still being drowned in, while similarly situated companies like Uber are allowed to operate and compete in the same market

free of those burdens. Defendants' continuing disparate treatment of similarly situated individuals and entities, with no rational basis for engaging in such disparate treatment, violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (the "Equal Protection Clause").  Plaintiffs also seek to recover compensatory damages caused by Defendants' ongoing equal protection and due process violations, as well as just compensation for Defendants' illegal taking of Plaintiffs' vested property interests in the taxicab medallion, *and in the statutory right to hail exclusivity that accompanies it*, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution (the "Takings Clause") and Article I, § 7 of the New York State Constitution.  Finally, Plaintiffs seek to recover compensatory damages caused by Defendants' fraudulent misrepresentations and omissions concerning the fair market value of the New York City taxicab medallion, as reflected in the false and misleading monthly "average" medallion transfer prices published each month on the Taxi and Limousine Commission ("TLC")'s website until late 2014, which was used by the TLC to determine the fair market value of the medallion and calculate the 5% transfer tax collected for New York City on every taxicab medallion transfer.  Defendants' actions could only have been intended to artificially inflate the price of medallions sold at auction by New York City, further compounding the harm to Plaintiffs and the entire medallion taxicab industry.

Notwithstanding the detailed factual allegations set forth in Plaintiff's Amended Complaint, which include Defendants' own prior statements concerning the meaning of "hails" and "E-Hails" as well as documented admissions concerning the collapsed regulatory structure and the irrational harm being caused by continuing disparate regulatory treatment in the for-hire transportation industry, and despite the overwhelming and unrelenting stream of data making painfully clear the resulting decline in taxicab ridership and the collapse of taxicab medallion

values—as much as 70% of the value of the medallion destroyed and still no bottom in sight, and without so much as even acknowledging the destruction of countless small businesses that are innocent victims in this tragic story no matter what the law may ultimately say about it, Defendants now move to dismiss each and every one of the claims set forth in the Amended Complaint based on a collection of supposed jurisdictional, procedural and equitable affirmative defenses, including standing, res judicata and laches.  According to Defendants, Plaintiffs have no right to be heard, have already been heard, are too early to be heard, and are too late to be heard. Alternatively, Defendants move to dismiss the Amended Complaint for failure to state a claim because, as Defendants see it, the deliberate collapse of an eighty year old industry, and the regulatory taking of billions of dollars in paid for property interests, does not even plausibly give rise to a right to relief.

None of this has merit.  To summarize, Defendants first argue that Plaintiffs have no standing to bring any of the claims alleged in the Amended Complaint.  *See Defendants' Memorandum Of Law In Support of Defendants' Motion To Dismiss The Amended Complaint* (Defendants' "Opening Memorandum") at 5-12.  Among other things, Defendants claim that Plaintiffs Melrose, Progressive, and LOMTO (collectively, the "Credit Union Plaintiffs"), "have not established injury in fact, nor have they established that they are even within the zone of interest of the challenged regulations;" Plaintiffs TMODA and Mutual Taxi Owners fail to "establish independently that they meet the constitutional standing test for § 1983 lawsuits;" and all of the remaining Plaintiffs lack standing because they have failed "to adequately plead the required injury in fact." *See id*. at 8-10.  All of this is false.  For one thing, the Credit Union Plaintiffs have long played an essential role in providing financing to the medallion taxicab industry, including underwriting countless taxicab medallions sold directly by Defendants at

auction.  More to the point, the Credit Union Plaintiffs have alleged security interests in thousands of taxicab medallions, collateralizing more than two billion dollars in loans, every one of which is being horrifically impaired by Defendants' unconstitutional actions. Likewise, Plaintiffs TMODA and Mutual Taxi Owners have clearly alleged injury personal to their organizations, including by expending resources advocating on behalf of member medallion owners concerning the unfair and unequal application of TLC rules in the for-hire industry, and both submitted affidavits illustrating direct harm, and the remaining Plaintiffs have likewise all alleged direct, personal injury-in-fact caused by Defendants' actions.  Plaintiffs not only alleged general factual allegations of injury resulting from Defendants' illegal and unconstitutional actions—which is all that is required to survive a motion to dismiss—but they also alleged specific detailed facts necessary and attested to those facts in sworn affidavits.  In sum, Plaintiffs collectively represent a broad cross-section of the entire New York City medallion taxicab industry, so if Defendants believe that none of these Plaintiffs have standing to be heard then apparently nobody does.

Next, Defendants argue that all of Plaintiffs' claims set forth in the Amended Complaint are barred by the doctrine of *res judicata* simply because the Credit Union Plaintiffs commenced an Article 78 proceeding in Supreme Court, Queens County in May 2015, in response to the E-Hail Rules, a proceeding which was subsequently dismissed on September 8, 2015.  *See* Opening Memorandum at 12-18.  Defendants' reliance on the doctrine of *res judicata* is entirely misplaced.  Indeed, the Credit Union Plaintiffs specifically limited their Verified Petition in the Article 78 proceeding to the single issue of whether E-Hails fall within medallion owners' exclusive statutory right to hails, and specifically excluded constitutional claims—a point that Defendants themselves actually agreed with and relied on in their own briefing in those

proceedings.  Incredibly, Defendants even have the gumption to raise the defense of *res judicata* on the basis of the Article 78 proceeding, while in the next breath claiming that Plaintiffs' takings claim is not even ripe yet because they failed to exhaust available state remedies for claims seeking just compensation.  Defendants' contradictory assertions of *res judicata* and ripeness are pure legal gibberish.

Third, Defendants assert that for-hire vehicles ("FHVs") have been authorized to use electronic applications since 2011, TLC rules regarding medallion taxicab accessibility were enacted in 2014, and the remaining regulations challenged by Plaintiffs have been in place for decades.  *See* Opening Memorandum at 19-21.  Therefore, Defendants argue that Plaintiffs' claims should be barred by the doctrine of laches.  *See id*.  Defendants once again miss the point because it was not until the adoption of the E-Hail Rules that Defendants reversed their own prior determination that E-Hails were "Hails," and took the position that E-Hails were authorized for use by all for-hire vehicles in New York City, that the regulatory structure governing the for-hire industry collapsed, leaving a wake of constitutional claims in its aftermath.  Moreover, the accessibility requirements being imposed solely on medallion taxicabs did not even go into effect until January 1, 2016, and the TLC has still not finalized the details concerning the TLC's supposed reimbursement to medallion owners from the Taxicab Improvement Fund for the costs associated with converting and operating an accessible vehicle.

With respect to the substance of Plaintiffs' claims, Defendants next argue that, "plaintiffs' Equal Protection claims fail as a matter of law."  *See* Opening Memorandum at 22.  According to Defendants, medallion taxicabs and FHVs accepting E-Hails operate under entirely different business models and are not similarly situated for purposes of Equal Protection.  *See id*. at 22-27.  Defendants also argue that even if medallion taxicabs and FHVs were similarly

situated, the regulatory burdens placed on medallion taxicabs remain presumptively valid and rational. *See id.* at 28-44. Contrary to Defendants' factual contentions, which are of no consequence at the pleading stage, Plaintiffs have properly alleged that medallion taxicabs and FHVs are now similarly situated for purposes of Equal Protection as both are operating business models that are identical in all material respects. *See* Amended Complaint at ¶¶ 185-211, 312.[1] Indeed, all of these businesses now provide precisely the same on-demand hailing service to the same customers using the same pool of drivers. Likewise, Plaintiffs have properly alleged that the disparate treatment of medallion taxicabs is not rationally related to any legitimate governmental interests, and Plaintiffs have even pled concrete facts, including documented admissions by Defendants, which plausibly negate any such possible rational basis—more than sufficiently at the pleading stage. *See id.* at ¶¶ 212-81, 313-14.

As to Plaintiffs' claims for violations of the Takings Clause, Defendants move to dismiss by asserting that, "[b]ecause plaintiffs fail to allege that they have sought just compensation in state court, any alleged takings claims are not ripe and must be dismissed." *See id.* at 46. Alternatively, Defendants argue that Plaintiffs' takings claims fail as a matter of law because Plaintiffs have not been denied all economically viable use of their medallions. *See id.* at 46-51. Contrary to Defendants' contentions, Plaintiffs' taking claims are ripe and otherwise well pled. For one thing, the Credit Union Plaintiffs and numerous other medallion industry participants filed not one, but rather three separate proceedings against Defendants, in the only available means of procedure that New York State provides for relief compelling a municipality to enforce mandatory state law—an Article 78 action in New York State Supreme Court. One of

---

[1] Plaintiffs' Amended Complaint (Docket No. 47) is also attached as <u>Exhibit 1</u> to the *Affirmation Of Todd A. Higgins, Esq. In Opposition To Defendants' Motion To Dismiss The Amended Complaint* (hereinafter referred to as the "Higgins Aff. at ¶ ___").

those three proceedings expressly raised the constitutional takings claim and all three were transferred to Justice Weiss for determination.  Justice Weiss in turn dismissed all three cases, specifically denying any of the relief sought, including with respect to a regulatory taking, leading to the filing of this action. Moreover, Plaintiffs have properly and carefully alleged a property interest in the medallion, and in the statutory right to hail exclusivity belonging to present and future medallion owners that expressly accompanies it, and they have properly alleged a regulatory taking of that property interest and resulting catastrophic harm.  That is what was required of Plaintiffs at the pleading stage.

Next, Defendants claim that Plaintiffs' due process claims "fail as a matter of law because the accessibility rule does not deprive plaintiffs of a protected property interest," and "plaintiffs did have ample notice and opportunity to be heard prior to the adoption of the TLC rules requiring unrestricted medallion owners to place accessible vehicles into service on an alternating basis."  *See* Opening Memorandum at 51-53.  Defendants' argument amounts to nothing more than semantics.  The Accessible Conversion Rules do in fact convert unrestricted medallions—*i.e.* a medallion that was never required to be placed on an accessible vehicle—into a restricted medallion—*i.e.* a medallion that is required to be placed on an accessible vehicle on an alternating basis.  *See* Amended Complaint at ¶¶ 145-60, 342-55.  Defendants are well aware of the fact that unrestricted medallions were more expensive than restricted medallions precisely because Defendants themselves marketed them that way and sold them for higher prices at medallion auctions. Arbitrarily divesting unrestricted medallion owners of the premium that they paid for those medallions violates due process and is just plain wrong.

Finally, with respect to Plaintiffs' claim for fraudulent misrepresentation, Defendants argue that "[t]his Court should decline to exercise supplemental jurisdiction," over the claim or

dismiss the claim for failing to "affirmatively plead that they filed a notice of claim," in accordance with N.Y.C. Admin. Code § 7-201(a).   *See* Opening Memorandum at 55-56. Defendants are wrong on both counts. For one thing, this Court should exercise supplemental jurisdiction because the claim arises out of the same facts and forms part of the same case or controversy as the rest of the claims set forth in the Amended Complaint.   Moreover, Defendants' supplemental jurisdiction argument relies on this Court dismissing each and every one of Plaintiffs' federal claims, which, as demonstrated below, should not occur.   Likewise, Plaintiffs sufficiently alleged facts necessary to state a claim for fraudulent misrepresentation based on Defendant TLC's systematic and purposeful, material misrepresentations of medallion values—indeed it remains telling that Defendants have still not articulated any explanation for their conduct.  Of course, there is no explanation, other than fraud.

In sum, Plaintiffs respectfully submit that they have earned the right to prove the claims set forth in the Amended Complaint.   Each and every one of their claims is carefully pled and backed by detailed factual allegations and corroborating evidence—far more evidence than one could ever expect from a plaintiff at the pleading stage.  Plaintiffs deserve the opportunity to test their allegations in discovery and Defendants in turn should be made to answer them on the merits.  Accordingly, Plaintiffs respectfully request that this Court deny Defendants' *Motion to Dismiss the Amended Complaint* in its entirety.

## II.    DETAILED FACTUAL BACKGROUND

The factual background relevant to this dispute is set forth in detail in Plaintiffs' Amended Complaint (Docket No. 47), as well as the sworn affidavits previously filed with the Court in support of *Plaintiffs' Motion for Preliminary Injunction* by Plaintiffs Melrose (Docket

No. 23), Progressive (Docket No. 24), LOMTO (Docket No. 25),[2] TMODA (Docket No. 26),

Mutual Taxi Owners (Docket No. 25), KL Motors (Docket No. 27), Safini (Docket No. 27),

White & Blue Group (Docket No. 28), FIMA (Docket No. 28), Carl Ginsberg (Docket No. 29),

and Joseph Itzchaky (Docket No. 30).[3]   To summarize, this dispute arises from Defendants'

deliberate collapse of the regulatory structure governing for-hire transportation in New York

City, brought about by the government-sanctioned proliferation of smartphone technology being

used by companies like Uber to bypass taxicab medallions and allow passengers to electronically

hail a parallel network of unlicensed vehicles.   As set forth below, Plaintiffs allege that

Defendants' deliberate evisceration of medallion owners' statutory right to hail exclusivity, and

their ongoing arbitrary, disparate regulatory treatment of the medallion taxicab industry, has and

continues to inflict catastrophic harm.

### A.   The Plaintiffs

#### i.   *Plaintiff Melrose Credit Union*

Plaintiff Melrose is a federally insured, non-profit corporation duly organized under the

laws of New York with its principal place of business located at 139-30 Queens Boulevard,

Briarwood, NY 11435. *See* Amended Complaint at ¶ 50.  As of December 28, 2015, Melrose

held a security interest in approximately 3,110 New York City taxicab medallions, serving as

collateral for more than 3,000 medallion loans totaling approximately $1.56 billion. As of

December 28, 2015, Melrose's membership stood at approximately 24,322.  *See* Amended

---

[2] Plaintiffs Melrose, Progressive, and LOMTO may hereinafter be referred to collectively as the "Credit Union Plaintiffs."

[3] Plaintiffs KL Motors, Safini, FIMA, Carl Ginsberg, and Joseph Itzchaky may hereinafter be referred to collectively as the "Medallion Owner Plaintiffs."  Additionally, Plaintiffs KL Motors, Inc., Safini Transport, Inc., White & Blue Group Corp., and FIMA Service Co. may hereinafter be referred to collectively as the "Corporate Plaintiffs."

Complaint at ¶ 51; *see also* Docket No. 23 at ¶¶ 1-2.  As alleged in detail in Plaintiffs' Amended Complaint, Defendants' actions have caused serious injury to Melrose, including by collapsing the value of its loan collateral—*i.e.* the taxicab medallion.  *See* Amended Complaint at ¶¶ 28-29, 50-55; *see also* Docket No. 23 at ¶¶ 7-15.  In fact, since the filing of the Amended Complaint, the injury caused to Melrose and its membership as a result of Defendants' actions has only accelerated.  For the first Quarter of 2016, Melrose's total medallion delinquency has reportedly increased to approximately 40% of medallion loan balances, almost double its fourth quarter 2015 level of 22%, and almost seven times its first quarter 2015 level of 6%.  *See* Higgins Aff. at ¶ 4.  Moreover, approximately 87% of the total delinquencies are reportedly over 60 days past due, and troubled debt restructurings reportedly rose from 1.5% in the fourth quarter of 2015 to over 10% in the first quarter of 2016.  *See id.*

ii.    *Plaintiff Progressive Credit Union*

Plaintiff Progressive is a federally insured, non-profit corporation duly organized under the laws of New York with its principal place of business located at 131 West 33rd Street, Suite 700, New York, New York 10001-2908.  *See* Amended Complaint at ¶ 56; *see also* Docket No. 24 at ¶¶ 1-2.  As of December 28, 2015, Progressive held a security interest in approximately 1,432 taxicab medallions, as collateral for 928 medallion loans totaling approximately $722 million.  As of December 28, 2015, Progressive's membership stood at 3,860.  *See* Amended Complaint at ¶ 57.  As alleged in detail in Plaintiffs' Amended Complaint, Defendants' actions have caused serious injury to Progressive, including by collapsing the value of its collateral—*i.e.* the taxicab medallion.  *See* Amended Complaint at ¶¶ 46-61, 231; *see also* Docket No. 24 at ¶¶ 4-11. As of December 31, 2014, Progressive had no troubled debt restructurings or loan workouts for New York City taxicab medallion loans. *See* Amended Complaint at ¶ 231; *see also*

Docket No. 24 at ¶ 4.  As of December 21, 2015, Progressive's troubled debt restructurings and loan workouts for New York City medallion loans grew from zero to $4,391,105.  *See* Amended Complaint at ¶ 231; *see also* Docket No. 24 at ¶ 6.  Since the filing of the Amended Complaint, the harm caused to Progressive and its membership has only accelerated.  For the 1st Quarter 2016, Progressive's non-performing loans reportedly doubled to 28% as a percentage of outstanding loans.  *See* Higgins Aff. at ¶ 3.

### iii.   *Plaintiff LOMTO Federal Credit Union*

Plaintiff LOMTO is a federally insured, non-profit corporation duly organized under the laws of the United States with its principal place of business located at 50-24 Queens Boulevard, Woodside, New York 11377.  *See* Amended Complaint at ¶ 62; *see also* Docket No. 25 at ¶¶ 1-2. As of December 24, 2015, LOMTO held a security interest in approximately 647 taxicab medallions, as collateral for 628 medallion loans totaling approximately $138 million.  As of December 24, 2015, LOMTO's membership stood at approximately 3,250.  *See* Amended Complaint at ¶ 63; *see also* Docket No. 25 at ¶ 3.  As alleged in Plaintiffs' Amended Complaint, Defendants' actions have caused serious injury to LOMTO, including by collapsing the value of its collateral—*i.e.* the taxicab medallion.  *See* Amended Complaint at ¶¶ 62-67, 229-30; *see also* Docket No. 25 at ¶ 4-11. Since the filing of the Amended Complaint, the harm caused to LOMTO and its membership has only accelerated.  For the first Quarter of 2016, LOMTO's non-performing loans reportedly increased to 32% as a percentage of outstanding loans, up from 23% in the 4th Quarter of 2015.  *See* Higgins Aff. at ¶ 3.

### iv.   *Plaintiff Taxi Medallion Owner Driver Association, Inc.*

Plaintiff TMODA is a not-for-profit corporation duly incorporated and existing pursuant to the laws of New York with its principal place of business located at 132-22 Rockaway

Boulevard, South Ozone Park, New York 11420. *See* Amended Complaint at ¶ 70; *see also* Docket No. 26 at ¶¶ 1-2. As alleged in Plaintiffs' Amended Complaint, TMODA advocates on behalf of the interests of approximately 975 independent taxicab medallion owner drivers in New York City, approximately 65 of which own accessible medallions. *See* Amended Complaint at ¶ 71; *see also* Docket No. 26 at ¶ 3. TMODA expends significant time and resources advocating on behalf of its taxicab medallion owner members ("TMODA Members") concerning the unfair and unequal application of TLC rules in the for-hire transportation industry, including with respect to fare rate restrictions, fees and surcharges, vehicle requirements and wheelchair accessibility requirements. *See* Amended Complaint at ¶ 72; *see also* Docket No. at ¶ 4. As of December 28, 2015, approximately 45 TMODA Members had been selected by the TLC to convert their unrestricted medallions to accessible medallions in 2016 pursuant to the Accessible Conversion Rules. *See* Amended Complaint at ¶ 71; *see also* Docket No. 26 at ¶ 18.

       *v.*    *Plaintiff League of Mutual Taxi Owners, Inc.*

Plaintiff Mutual Taxi Owners is a not-for-profit corporation duly organized under the laws of New York, with its principal place of business located at 50-24 Queens Boulevard, Woodside, New York 11377. *See* Amended Complaint at ¶ 74; *see also* Docket No. 25 at ¶ 12. As alleged in Plaintiffs' Amended Complaint, Mutual Taxi Owners expends significant time and resources advocating on behalf of the interests of thousands of medallion owners, drivers and for-hire industry participants ("Mutual Taxi Owners Members") concerning, among other things, the grossly unfair and unequal application of TLC rules and regulations in the for-hire transportation industry, including with respect to medallion taxicab fare restrictions, fees and surcharges, vehicle requirements and wheelchair accessibility. *See* Amended Complaint at ¶ 75-76; *see also* Docket No. 25 at ¶ 13.

vi.     *Plaintiffs KL Motors, Inc. and Safini Transport, Inc.*

Plaintiffs KL Motors and Safini are both mini-fleet corporations duly incorporated and existing pursuant to the laws of New York with their principal places of business located in New York City. *See* Amended Complaint at ¶¶ 80, 89; *see also* Docket No. 27 at ¶¶ 3, 5.  As alleged in Plaintiffs' Amended Complaint, Plaintiff Safini is owned by Maxim Kreditor and has three medallions (license numbers 6K26, 6K27, and 6K28), which it purchased in the secondary market on November 7, 2013, for approximately $3,600,000. *See* Amended Complaint at ¶ 90; *see also* Docket No. 27 at ¶ 6.  Plaintiff KL Motors is jointly owned by Maxim Kreditor and Paul Lvovsky and has two medallions (license numbers 7N38 and 7N39), which it purchased in the secondary market on March 27, 2012, for approximately $2,000,000. *See* Amended Complaint at ¶¶ 80, 84; *see also* Docket No. 27 at ¶ 4.  Mr. Kreditor is in private practice as a board certified oncologist and had no previous experience in the taxi industry, prior to purchasing the New York City taxicab medallions through KL Motors and Safini. *See* Amended Complaint at ¶¶ 81, 87-88, 302-04; *see also* Docket No. 27 at ¶ 7.  Prior to purchasing those medallions, Mr. Kreditor relied upon the TLC website's posted monthly medallion average sale prices in making the decision to purchase the medallions in 2012 and 2013. *See* Amended Complaint at ¶¶ 87-88, 302-04; *see also* Docket No. 27 at ¶ 8.  Had Mr. Kreditor known that the TLC's posted monthly averages significantly overstated the actual fair market value of the medallion, he would not have purchased the medallions at their respective prices. *See* Amended Complaint at ¶¶ 87-88, 302-04; *see also* Docket No. 27 at ¶ 9.

vii.    *Plaintiffs White & Blue Group Corp. and FIMA Service Co., Inc.*

Plaintiff White & Blue Group is a corporation duly incorporated and existing under the laws of New York, with its principal place of business located at 35-11 43rd Avenue, Long Island

City, New York 11101. *See* Amended Complaint at ¶ 95; *see also* Docket No. 28 at ¶ 6.  As alleged in Plaintiffs' Amended Complaint, White & Blue Group is a TLC licensed agent (Agent No. A0327) that manages the single largest fleet of medallion taxicabs leased by shift in New York City, consisting of approximately 350 medallion taxicabs being leased each day to a pool of approximately 2,000 TLC licensed taxicab drivers, roughly 600-700 of which are active.  *See* Amended Complaint at ¶ 95-96; *see also* Docket No. 28 at ¶ 7.  As of November 2015, approximately 200 vehicles in White & Blue Group's fleet were scheduled to convert to accessible vehicles because of the mandate in the Accessible Conversion Rules that half of all mini-fleet medallions be made accessible starting on January 1, 2016. *See* Amended Complaint at ¶ 102; *see also* Docket No. 28 at ¶ 40. As a result of Defendants' actions, White & Blue Group has seen its leasing income drop as much as 50% in a given month over the past year, as it has been forced at times to idle as much as 20% of its taxicab medallion fleet on a given day. *See* Amended Complaint at ¶ 97; *see also* Docket No. 28 at ¶ 41.  White & Blue Group has also been forced to repeatedly slash its daily lease rates to compete with companies such as Uber, which in turn has resulted in reduced leasing payments to medallion owners.  *See* Amended Complaint at ¶ 98; Docket No. 28 at ¶ 41.

Plaintiff FIMA is a corporation and a mini-fleet that owns two medallions purchased at a TLC auction in 2004 (license numbers 3V48 and 3V49).  *See* Amended Complaint at ¶ 105; *see also* Docket No. 28 at ¶ 3.  FIMA has suffered damages from Defendants' regulatory taking and ongoing violation of the Equal Protection Clause, including from increased expenses and declining revenues, stemming directly from the disparate burdens placed upon medallion taxicab owners, including the Accessible Conversion Rules.  *See* Amended Complaint at ¶ 106-07; *see also* Docket No. 28 at ¶ 4.  FIMA's Chief Executive Officer, Floren Peremen, also owns 10

14

additional unrestricted medallions purchased at TLC auctions over the years, through various mini-fleet corporations. *See* Docket No. 28 at ¶ 5. In making the decision to purchase unrestricted medallions, Mr. Peremen deliberately chose to avoid purchasing any accessible medallions because he did not want to operate accessible medallions in light of the significant costs and burdens that come with it. *See id.* Now, as a result of the Accessible Conversion Rules, FIMA and Mr. Peremen are being forced to convert half of their medallions to accessible vehicles starting in January 2016, pursuant to the Accessible Conversion Rules.[4] *See id.*

     *viii.    Plaintiff Carl Ginsberg*

Plaintiff Carl Ginsberg is an eighty-two-year-old New York City taxicab medallion owner who purchased his taxicab medallion (license number 3F24) in 1962, and immediately began driving his own taxicab. *See* Amended Complaint at ¶ 108; *see also* Docket No. 29 at ¶ 2. Over the past thirty years, Mr. Ginsberg supplemented his driving income by leasing his medallion to other yellow taxicab drivers through Taxi Fleet Management, LLC ("Taxi Fleet Management"). *See* Amended Complaint at ¶ 109; *see also* Docket No. 29 at ¶ 3. Since Mr. Ginsberg is now retired, he has been relying on leasing out his medallion for supplemental retirement income. *See* Amended Complaint at ¶ 109; *see also* Docket No. 29 at ¶ 4. As alleged in Plaintiffs' Amended Complaint, Mr. Ginsberg was previously earning approximately $3,300 per month from leasing his medallion with Taxi Fleet Management. *See* Amended Complaint at ¶ 110; *see also* Docket No. 29 at ¶ 5. Over the course of 2015, however, his medallion leasing income was reduced by almost a third, and Mr. Ginsberg was advised by Taxi Fleet Management

---

[4] Auction results published on the TLC website from October 2004, when Mr. Peremen purchased 5 unrestricted mini-fleets, clearly shows that unrestricted mini-fleets were sold for approximately $700,000 to $800,000, while accessible mini-fleets were sold for approximately $200,000 to $350,000. *See Affirmation of Todd A. Higgins, Esq. In Support Of Plaintiffs' Motion For Preliminary Injunction* (Docket Nos. 20-21) at ¶ 46.

that if his unrestricted medallion was selected for conversion, it would have no choice but to drop his medallion altogether because drivers do not want to drive accessible vehicles. *See* Amended Complaint at ¶ 110-111; *see also* Docket No. 29 at ¶ 5-6.

Thereafter, Mr. Ginsberg was selected to convert his unrestricted medallion to an accessible medallion pursuant to the Accessible Conversion Rules. *See* Amended Complaint at ¶ 111; *see also* Docket No. 29 at ¶ 7. As a result, Taxi Fleet Management dropped his medallion and Mr. Ginsberg stopped receiving leasing payments in the summer of 2015. *See* Amended Complaint at ¶ 240; *see also* Docket No. 29 at ¶ 7. In explaining its decision to drop him, Taxi Fleet Management advised Mr. Ginsberg that "[the] industry is going through many challenges right now in terms of competition not only for fares but for drivers. With the advent of e-hails, companies such as Uber have taken many of [Taxi Fleet Management's] drivers and have begun to take rideshare away from [the] industry . . . As a result, the banks have curtailed their lending, market prices of medallions are down, and availability of drivers is down." *See* Amended Complaint at ¶ 240; *see also* Docket No. 29 at ¶ 7. Mr. Ginsberg asked Taxi Fleet Management whether he could sell his medallion to them or to a third party, but was informed that they will not even attempt to conduct a sale of a medallion that has been selected for conversion because there are no interested purchasers and there are no interested financiers. *See* Docket No. 29 at ¶ 9. Given this, Mr. Ginsberg cannot sell his medallion, rendering it worthless. *See* Amended Complaint at ¶ 112; *see also* Docket No. 29 at ¶ 10.

ix. *Plaintiff Joseph Itzchaky*

Plaintiff Joseph Itzchaky is a seventy-three-year-old New York City taxicab medallion owner who purchased his medallion (license number 9C76) in 1983, and immediately began driving his own medallion taxicab. *See* Amended Complaint at ¶ 115; *see also* Docket No. 30 at

¶ 2.  Now in retirement, Mr. Itzchaky is no longer able to regularly drive a taxicab, and instead relies on leasing his medallion in order to provide essential retirement income. *See* Amended Complaint at ¶ 116; *see also* Docket No. 30 at ¶ 5.   As alleged in Plaintiffs' Amended Complaint, Mr. Itzchaky has been leasing his medallion through Westway Brokerage of New York, Inc. ("Westway Brokerage"). *See* Amended Complaint at ¶ 116; *see also* Docket No. 30 at ¶ 4.  In the past 18 months, Mr. Itzchaky's medallion leasing income was slashed from $3,100 per month, to $2,600, and ultimately to $2,100. Mr. Itzchaky ultimately stopped receiving payments altogether in September 2015. *See* Amended Complaint at ¶ 117-18; *see also* Docket No. 30 at ¶ 6.

Mr. Itzchaky was selected to convert his unrestricted medallion to an accessible medallion in 2016, as part of the Accessible Conversion Rules. As a result, Westway Brokerage informed Mr. Itzchaky that because it could not find drivers for his medallion, it would be placed in storage with the TLC. *See* Amended Complaint at ¶ 118; *see also* Docket No. 30 at ¶ 8.  Mr. Itzchaky reached out to several other medallion brokers in an attempt to lease out his medallion, all of which informed him that his medallion simply could not be leased, because there are not enough drivers willing to drive accessible taxicabs. *See* Docket No. 30 at ¶ 9.  In turn, Mr. Itzchaky reached out to several medallion brokers in an attempt to sell his medallion, all of which informed him that lenders refuse to finance purchases of medallions and the market is frozen.  *See id.* at ¶ 10.  Since he is no longer physically capable of handling wheelchairs and cannot regularly drive a taxicab, his medallion has been rendered worthless. *See* Amended Complaint at ¶ 118; *see also* Docket No. 30 at ¶ 11.

### B.     The Regulatory Framework

As outlined in detail in Plaintiffs' Amended Complaint, medallion taxicabs have been part of transportation policy in New York City since the dawn of the modern age, and licensed medallion taxicabs have possessed the exclusive statutory right to accept hails for almost as long. *See* Amended Complaint at ¶ 124.  Until recently, in exchange for the price paid to New York City for a taxicab medallion, and in exchange for subjecting the operation of their private transportation businesses to onerous regulation in service of the public interest, medallion owners were granted the exclusive, statutory right to hails.  *See id.* at ¶ 125. In 2011, the New York State legislature enacted the HAIL Act to ensure that some of New York's most vulnerable residents – disabled passengers – would have access to safe and reliable public transportation. *See* Amended Complaint at ¶ 126.  According to the legislative findings, "the public health, safety and welfare of the residents of the state of New York traveling to, from and within the city of New York is a matter of substantial state concern, including access to safe and reliable mass transportation such as taxicabs." *See* Amended Complaint at ¶ 126; *see also* N.Y. Assemb. B. 8691, 235th Sess., at § 1 (2011).

Among other things, the HAIL Act authorizes the issuance of up to two thousand new hail licenses for vehicles that are accessible to individuals with disabilities, to help ensure "adequate and reliable transportation [is] accessible to individuals with disabilities in the city of New York." *See* Amended Complaint at ¶ 127; *see also* N.Y. Assemb. B. 8691, 235th Sess., at § 1 (2011).  In order to accomplish its legislative purpose, the HAIL Act expressly reaffirms the bargain struck with taxicab medallion owners in exchange for purchasing a medallion: i.e., the exclusive, statutory right to hails.  *See* Amended Complaint at ¶ 128.  Specifically, the HAIL Act provides that: "*it shall remain the exclusive right of existing and future taxicabs licensed by the*

*TLC* as a taxicab to pick up passengers via street hail in such areas of the city of New York wherein HAIL license holders are prohibited from accepting such passengers.   All vehicles licensed by the TLC as taxicabs shall be permitted to pick up passengers via street hail from any location within the city of New York . . ."  *See id.*; *see also* N.Y. Assemb. B. 8691, 235th Sess., at § 11 (2011) (emphasis added).   Correspondingly, the HAIL Act expressly provides that: "No driver of any for-hire vehicle shall accept a passenger within the city of New York by means other than pre-arrangement with a base unless said driver is operating either a (i) taxicab licensed by the TLC with a medallion affixed thereto, or (ii) a vehicle with a valid HAIL license and said passenger is hailing the vehicle from a location where street hails of such vehicles are permitted."  *See* Amended Complaint at ¶ 129; *see also* N.Y. Assemb. B. 8691, 235th Sess., at § 11 (2011).

Taxicab medallions are sold in private transactions and at public auction, all of which are regulated and supervised by the TLC.  *See* Amended Complaint at ¶ 131.   Once classified by type, new taxicab medallions are sold in lots and auctioned by sealed bids with the TLC Chairperson setting the minimum price for medallions sold.   *See id.*   Any bids below the minimum price set by the TLC are rejected.   *See id.*   All bids must comply with a strict set of TLC rules, including a letter of commitment from a lender such as the Credit Union Plaintiffs, a deposit, and required certifications.   *See id.*   Once the bidding period for a medallion auction has closed, the bids are opened in public and the winning bids are announced at the public sale and later published in the City Record and on the TLC's website.   *See id.*; *see also* 35 R.C.N.Y. §§ 65-04 through 65-08 (2015).

Medallion auctions have generated a tremendous amount of revenue for New York City.  *See id.* at ¶ 132. Between 2006 and 2013, New York City auctioned approximately 1,050

19

medallions, generating approximately $486 million in revenue. *See id.* Most recently, in fiscal year 2014, New York City sold approximately 400 taxicab medallions, generating nearly $338 million in revenue. *See id.* New York City has also previously budgeted for new medallion sales between 2015 and 2019, anticipating approximately $1.6 billion in revenue for its budget, although it has been forced to indefinitely suspend all auctions. *See id.* New York City also receives a 5% transfer tax on private secondary market sales of taxicab medallions, based on the consideration paid for the medallions. *See id.* at ¶ 133; *see also* N.Y.C. Admin. Code §§ 11-1402(a) (2015). The TLC determines the fair market value of medallions for purposes of the transfer tax collected by New York City based on the average sales price of the previous month's medallion transfers, as posted on the TLC's website. *See id.* at ¶ 133.

### C.      The Disparate Medallion Taxicab Rules

In accordance with its mandate, the TLC has promulgated rules and regulations covering every facet of medallion taxicab operations, including specifically, confirming hail exclusivity and reinforcing the requirement that FHVs "must not solicit or pick up Passengers other than by prearrangement." *See* Amended Complaint at ¶ 134; *see also* 35 R.C.N.Y. § 55-19(a) (2015). In exchange for purchasing the statutory right to hail exclusivity, taxicab medallion owners must comply with countless rules and regulations that no other FHVs have been subject to, including, most importantly, that a medallion must be purchased from New York City, or in a private transaction, in order to operate a taxicab. *See* Amended Complaint at ¶ 135. In addition to the medallion purchase requirement, taxicabs are subject to countless other Disparate Medallion Taxicab Rules that do not apply to any other FHVs. *See id.*

First, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must charge rates set by the TLC (35 R.C.N.Y. §

58-26 (2015)).  *See* Amended Complaint at ¶ 136.  FHVs are not subject to set rates and need only file a rate schedule with the TLC, and may set higher or lower rates compared with medallion taxicabs, including by means such as Uber's "surge pricing," which charges customers a multiple of the customers' ordinary fare at times of high demand.  *See id.*  Surge pricing allows companies like Uber to maximize profitability and efficiency in periods of high demand while retaining the flexibility to undercut pricing at other times.  *See id.*

Second, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must be leased within the lease caps set by the TLC (35 R.C.N.Y. § 58-21 (2015)).  *See* Amended Complaint at ¶ 137.  FHVs are not subject to lease caps, which allows FHVs to be leased to drivers at rates determined by supply and demand.  *See id.*  This disparate treatment forces Plaintiffs to operate at a disadvantage as compared to similarly situated FHVs by restricting Plaintiffs from charging higher rates during times of high demand (e.g. on Friday), while charging lower rates during times of low demand (e.g. on Monday).  *See id.*

Third, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must pay a Taxi Accessibility Fee as set by the TLC (35 R.C.N.Y. § 58-16(f) (2015)).  *See* Amended Complaint at ¶ 138.  FHVs are not required to collect or pay many of the taxes and fees imposed on medallion taxicabs, thereby allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs.  *See id.*

Fourth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must pay a surcharge of thirty cents per trip to subsidize taxicab accessibility (35 R.C.N.Y. § 58-16(g) (2015)).  *See id.* at ¶ 139.  FHVs are not

required to collect or pay an accessibility surcharge, thereby allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs. *See id.*

Fifth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must pay a tax of fifty cents per trip to fund MTA operations (35 R.C.N.Y. §§ 58-03(x), 58-26(a)(3) (2015)). *See id.* at ¶ 140. FHVs are not required to collect or pay the MTA surcharge, thereby allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs. *See id.*

Sixth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must be one of the few vehicle models that the TLC has approved (35 R.C.N.Y. §§ 67-04 to 67-06 (2015)). *See id.* at ¶ 141. FHVs are not limited to any particular vehicle model set by the TLC, thereby allowing companies such as Uber to permit drivers to use newer and higher quality vehicles, giving riders a better overall passenger experience. *See id.*

Seventh, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must comply with TLC requirements for a whole host of features, including paint, finish, lighting, upholstery, seats, windows, air conditioner, and roof lights (35 R.C.N.Y. §§ 67-06 to 67-17 (2015)). *See id.* at ¶ 142. FHVs are not required to comply with the countless TLC-imposed specifications for vehicle features, thereby allowing companies like Uber to avoid the expense of "hacking" a vehicle, while retaining the flexibility to respond to evolving passenger preferences with a superior riding experience. *See id.*

Eighth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must comply with TLC specifications for taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" taxicab

22

technology (35 R.C.N.Y. §§ 67-09 to 67-15 (2015)).  *See id.* at ¶ 143.  FHVs are not required to be equipped with taximeters, partitions, or any other particular technology systems (35 R.C.N.Y. §§ 59A-31 to 59A-33 (2015)), once again allowing companies like Uber to avoid the expense of "hacking" a vehicle, while retaining the flexibility to respond to evolving passenger preferences with a superior riding experience.  *See id*.

Ninth, medallion taxicabs, including those operated and leased by Medallion Owner Plaintiffs and Plaintiff White & Blue Group, must comply with the requirement that half of all taxis be accessible to persons with disabilities pursuant to the TLC's Accessible Conversion Rules (35 R.C.N.Y. § 58-50 (2015)).  *See id.* at ¶ 144. FHVs are not required to be accessible to persons with disabilities, thereby allowing companies like Uber a number of tremendous advantages over medallion taxicabs, as discussed below.  *See id*. Some of these advantages include the ability to attract drivers and passengers that dislike accessible vehicles, and the freedom to avoid the expense of converting a vehicle to meet accessibility requirements or, in the alternative, purchasing an accessible vehicle, as well as the expense of driving and maintaining an accessible vehicle.  *See id*. The Accessible Conversion Rules, which arose out of the *Noel* settlement,[5] mandate that 50% of all medallion taxicabs in New York City be made accessible to passengers with disabilities by 2020.  *See id.* at ¶ 145; *see also* 35 R.C.N.Y. § 58-50 (2015). Under the Accessible Conversion Rules, unrestricted medallions are given an Accessible

---

[5] In 2011, Christopher Noel and Simi Linton, along with three nonprofit organizations, filed a civil rights class action against the TLC alleging violations of Title II, subtitle A of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, Title II, subtitle B of the ADA, 42 U.S.C. § 12144, Section 504 of the rehabilitation Act of 1973, 29 U.S.C. 794 *et seq.*, the New York City Human Rights Law ("NYCHRL"), and the N.Y.C. Admin. Code § 8-101 *et seq. See Noel v. New York City Taxi & Limousine Comm'n*, 837 F. Supp. 2d 268 (S.D.N.Y. 2011), *vacated*, 687 F.3d 63 (2d Cir. 2012). The parties later entered into a settlement agreement, which stated that the TLC would begin rulemaking within 30 days of the execution of the settlement that would require medallion owners to progressively utilize accessible vehicles.

Conversion Start Date, which is "the date on which there is available an Accessible Taxicab Model that meets the specifications of Section 67-05.2 of these Rules and the requirements of § 19-533 of the Administrative Code, as certified by the Chairperson," or, if no vehicle is available by January 1, 2016, then that date will serve as the Accessible Conversion Start Date. *See* Amended Complaint at ¶ 146; *see also* 35 R.C.N.Y. § 58-03(a) (2015).

Pursuant to the Accessible Conversion Rules Statement of Basis and Purpose, "[u]nrestricted medallions assigned to vehicles that are scheduled to retire during the second six-month period following the Accessible Conversion Start Date will be placed into a lottery, in which one-half will be selected to be placed into service with an accessible vehicle." *See* Amended Complaint at ¶ 147.  When the vehicles assigned to those medallions reach their retirement dates, "the medallions will be assigned on an alternating basis, first to non-accessible vehicles, then to accessible vehicles."  *See id.* at ¶ 147.  As to the vehicles not selected in the lottery, upon reaching their retirement dates, "the medallions will be assigned on an alternating basis, first to accessible vehicles, then to non-accessible vehicles." *See id.* at ¶ 149.  Thus, "a schedule of alternating assignments to accessible and non-accessible vehicles will be established for all medallions placed in this lottery." *See id.*  For unrestricted mini-fleets of two medallions, "the medallion assigned to the first vehicle that is scheduled to retire after the effective date of these rules must be hacked-up with an accessible vehicle." *See id.* at ¶ 150.  Thereafter, "at least one medallion (though not necessarily the same medallion) must be assigned to an accessible vehicle." *See id.* at ¶ 150.  For unrestricted mini-fleets of more than two medallions, "every medallion scheduled to retire after the effective date of these rules must be hacked up with an accessible vehicle until one-half (or the nearest fraction exceeding one-half) of the mini-fleet's vehicles are accessible. Thereafter, at least one half of the mini-fleet's medallions (though not

necessarily the same medallions) must be assigned to accessible vehicles." *See id.* at ¶ 151. Additionally, "[u]nrestricted medallions assigned to vehicles that are scheduled to be retired during the third six-month period following the Accessible Conversion Start Date will be placed into another lottery, to be held six-months after the first lottery, in which one-half will be selected to be placed into service with an accessible vehicle." *See id.* at ¶ 152.  Any unrestricted medallions not selected in this lottery process "may be placed into service with a non-accessible vehicle," but "[a]s the successive vehicles to which medallions in this group are assigned reach their retirement dates, the same schedule of alternating assignments to accessible and non-accessible vehicles will apply for all medallions placed in this lottery."  *See id.* at ¶ 153.

In addition to the surcharges and other costs associated with conversion to accessible vehicles, "[a]pplicants for a new Taxicab Driver's license must complete the Wheelchair Passenger Assistance Training as a condition of licensure." *See id.* at ¶ 154; *see also* 35 R.C.N.Y. § 54-04(k)(6) (2015).  After the Accessible Conversion Start Date, "[a]pplicants for a renewal Taxicab Driver's License who have never attended and completed Wheelchair Passenger Assistance Training must attend and complete such training in order to renew the Taxicab Driver's License."  *See id.* at ¶ 154; *see also* 35 R.C.N.Y. § 54-04(k)(6) (2015).[6]  The TLC has itself admitted that with the creation of the Taxicab Improvement Fund, owners of unrestricted medallions who are forced to convert to accessible medallions will necessarily incur far greater costs to continue operation as compared with the operating costs for the unrestricted medallions

---

[6] According to Chapter 51 of the TLC rules, "Wheelchair Passenger Assistance Training," is defined as "a course of training that contains instruction on the following: (i) the legal requirements that apply to transportation of People with Disabilities; (ii) passenger assistance techniques, including a review of various disabilities, disability etiquette, mobility equipment training (including direct hands-on familiarity with lift/ramp operations and various types of wheelchairs), and safety procedures; (iii) individual hands-on training with an actual person using a wheelchair; (iv) sensitivity awareness, including customer service and conflict resolution policies; and (v) the dispatch of vehicles by an accessible dispatcher." 35 R.C.N.Y. 51-03 (2015).

that were sold to them.  *See* Amended Complaint at ¶ 157.  Not only are there significant costs associated with hacking up a vehicle for accessibility, including the cost of adding a ramp, but accessible vehicles also break down more often and are less fuel-efficient.  *See id.*

Putting aside the increased operating costs associated with an accessible vehicle, one of the most significant burdens of an accessible medallion is that it is extremely difficult to lease accessible vehicles.  *See* Amended Complaint at ¶ 158.  "[T]he driver of a wheelchair-accessible taxicab may pick up non-disabled fares, but must always respond to calls for a disabled pickup if they are the closest wheelchair-accessible taxicab to the call and are dispatched. As a result, drivers sometimes travel multiple unpaid blocks to pick up a disabled fare." *See* Daniel Fitzsimmons, *Fare Access*, NY PRESS (Aug. 26, 2015); *see also* Amended Complaint at ¶ 158. Thus, many drivers who have not already migrated to Uber are opting to drive non-accessible taxicabs, leaving accessible taxicabs "sitting there unleased." *See id.*

In order to avoid the costs and burdens of operating accessible medallions altogether, medallion owners paid a higher price to purchase unrestricted medallions.  *See* Amended Complaint at ¶ 159.  Now, because of the new Accessible Conversion Rules, they are being forced to convert those otherwise more valuable unrestricted medallions into less valuable and more burdensome accessible medallions.  *See id.*  Indeed, the TLC was at all times aware that unrestricted medallions were more valuable, particularly since the TLC was responsible for determining the fair market value of each medallion in order to calculate the transfer tax, and the TLC likewise knew that the Credit Union Plaintiffs' underwriting guidelines assigned a higher loan value to unrestricted medallion collateral as compared with accessible medallion collateral. *See id.* at ¶ 160. By adopting the Accessible Conversion Rules, the TLC has knowingly and

deliberately devalued Credit Union Plaintiffs' unrestricted medallion collateral and impaired their security interests in those medallions.  *See id.*

### D.  The Regulatory Taking of Hail Exclusivity

As with all of the Disparate Medallion Taxicab Rules more generally, the only conceivable justification for requiring medallion taxicabs to comply with the Accessible Conversion Rules, while not imposing comparable accessibility rules on FHVs like those associated with Uber was the medallion owners' statutory right to hail exclusivity—a property right that has now been eviscerated by the ubiquitous acceptance of on-demand E-Hails by every category of FHV operating in New York City.  *See* Amended Complaint at ¶ 161.  By way of background, in late 2012, the TLC announced the creation of a pilot program to study the use of smartphone applications to electronically "hail" taxicabs.  *See id.* at ¶ 162. The program, offered to all taxicabs, allowed the TLC to study the real world impact of E-Hail applications, including patterns of passenger usage and any safety implications.  *See id.*  The announcement of the E-Hail pilot program was initially met with opposition. Specifically, in *Black Car Assistance Corp. v. The City of New York*, 2013 WL 1808082 (N.Y. Sup. Ct. 2013), *aff'd*, 110 A.D.3d 618 (App. Div. 1st Dep't 2013), the FHV industry challenged the E-Hail pilot. *See id.* at ¶ 163.  As part of that case, on February 14, 2013, the TLC represented to the court that "e-hail apps are just that; they're hails." Specifically, Corporation Counsel, acting on behalf of the TLC, stated the following:

> Ms. Goldberg-Cahn:[7] at hotels, at apartments, they have lights that they could flash on to indicate to a cab that somebody wishes to be picked up.  So they're not waving (simulating) for their frantic hail; they're coming—

---

[7] Michelle Goldberg-Cahn was the Assistant Corporation Counsel for the office of Michael A. Cardozo, appearing on behalf of the TLC.

> The Court: That's essentially a hail.  It's equivalent.  I know those signs; I responded to those signs 40 years ago, whenever it was.
>
> Mrs. Goldberg-Cahn: But that's what we're saying this is.  These e-hail apps are just that; they're hails.  It's somebody indicating that they want to be picked up within a – within a prescribed area, without saying where they're going, without saying their race or gender or color, without saying what the fare will be and how much it will be; just, "I want a hail."
> ….
> And there's nothing in the TLC's rules that really define what a "hail" is and says that a hail is limited to sight.  What these e-hails are allowing to do is a sort of look to a little bit more, broader than your sight but not stray too far off the course.

*See* Amended Complaint at ¶ 164.

The TLC subsequently confirmed in its briefing that E-Hails are a product of "newly available technology," that "allow passengers to hail a taxicab electronically," confirming the obvious, common sense fact that electronic "hails" constitute a modern form of the traditional street hail—and thus, belong exclusively to medallion taxicabs.  *See* Amended Complaint at ¶ 165.  The TLC ultimately prevailed and the pilot program was implemented on April 26, 2013. *See id*. at ¶ 166. Although originally scheduled to last for twelve months, the TLC subsequently extended the pilot for another twelve months, setting a pilot end date for April 2015. *See id.* According to the TLC, the pilot program was a success and confirmed that E-Hail applications benefit the transportation market in New York City, while posing no additional risk to passenger safety or taxicab ride accessibility.  *See id*.

On January 29, 2015, the TLC adopted rules regarding the use of smartphone applications to hail rides, which became effective 30 days later (the "E-Hail Rules").  *See* Amended Complaint at ¶ 167.  During the TLC meeting on January 29, 2015, in which the TLC adopted the E-Hail Rules, Mr. Ryan Wanttaja, Assistant General Counsel to the TLC, stated, "[f]or those of you who might be unfamiliar, e-hailing allows a passenger to make a taxi-pickup

request through his or her smart phone. Basically it *extends a hand hail* allowing taxi drivers to see around corners and increases fare opportunities." *See id.*; *see also* Transcript of the New York City Taxi & Limousine Commission, Taxi and Limousine Commission Meeting (Jan. 29, 2015) (emphasis added).

In its Statement of Basis and Purpose for the E-Hail Rules, the TLC explained that the rules "will allow passengers to summon taxicabs and Street Hail Liveries in New York City by E-Hail and to make E-Payments." *See* Amended Complaint at ¶ 168. According to the TLC, its goal in adopting the E-Hail Rules was to "accommodate new technology into the taxi industry while taking into account the needs of E-Hail application developers, drivers, vehicle owners and passengers." *See id.* at ¶ 169. As part of the E-Hail Rules, the TLC for the first time officially defined the term "Hail," and made the definition generally applicable to all TLC rules and regulations. Specifically, the TLC defined the term "Hail" as follows:

> [a] request, either through a verbal (audio) action such as calling out, yelling, or whistling, and/or a visible physical action such as raising one's hand or arm, or through an electronic method such as an E-Hail App, for on-demand Taxicab or Street Hail Livery service at the metered rate of fare as set forth in §58-26 and §82-26 of these Rules by a person who is currently ready to travel. 35 R.C.N.Y. § 51-03 (2015).

*See id.* at ¶ 170. Thus, the TLC clearly recognized that the use of a smartphone application to electronically "hail" a driver "on-demand … by a person who is currently ready to travel," is simply a modern-day version of the traditional hail, precisely as the TLC argued to the Court in *Black Car Assistance Corp. See id.* at ¶ 171.

On April 3, 2015, Plaintiff Melrose wrote to the TLC and Mayor de Blasio, asking that the TLC affirm its commitment to enforcing medallion owners' exclusive right to hails, including with respect to on-demand E-Hails, and asking that, at a minimum, the TLC

immediately suspend any smartphone application provider or base operator that continues to offer on-demand E-Hail service with FHVs, including companies like Uber. *See* Amended Complaint at ¶ 172.  In response, the TLC advised Plaintiff Melrose that as far as the TLC was concerned, the same E-Hail could be used to hail a medallion yellow taxicab or to pre-arrange prompt FHV service, depending on the swipe of a finger on a passenger's smartphone. *See id*. at ¶ 173.[8]   According to the TLC, the traditional meaning of the term "hail" as a regulatory structure for differentiating licensed medallion taxicab services from all other FHVs no longer existed—all FHVs were now permitted to accept on-demand E-Hails.  *See id*.

On May 27, 2015, in an effort to uphold hail exclusivity and prevent a regulatory taking of that exclusive statutory right guaranteed by New York State law, the Credit Union Plaintiffs, as Petitioners, commenced an Article 78 proceeding in the Supreme Court of the State of New York by Order to Show Cause against Defendants the City of New York, the TLC, Meera Joshi in her official capacity as TLC Chair, as well as Bill de Blasio in his official capacity as Mayor of the City of New York (collectively, "City Respondents"), and Eric T. Schneiderman in his official capacity as Attorney General of the State of New York ("State Respondent"). *See* Amended Complaint at ¶ 174.  On September 8, 2015, the Supreme Court dismissed the Verified Petition. *See id*. at ¶ 175.  In doing so, the Supreme Court recognized that "[t]he use of a smartphone application to obtain a ride has blurred the distinction between a street hail and a pre-arrangement and has disturbed the balance of economic interests within the industry."  *See id*. Notwithstanding this, the Court ruled that the TLC had discretion to treat electronic

---

[8] On the Uber application, a passenger can pay a charge to Uber and hail a medallion taxicab through the "UberT" service, which transmits the E-Hail to a medallion taxicab, or, with one swipe of the finger, switch to "UberX," and transmit the same E-Hail to an Uber FHV. Not surprisingly, almost all Uber E-Hails are transmitted to its FHVs.  *See* Amended Complaint at ¶ 173, n.11.

communications as hails or pre-arrangements.  *See id*. On October 7, 2015, Credit Union

Plaintiffs moved the Supreme Court by Order to Show Cause for leave to renew.  *See id*. at ¶

176.   Although the Supreme Court denied the motion, in doing so it expressly held that

"[e]lectronic dispatches via app. allow passengers, *who have not prearranged for transportation*,

to secure immediate livery assistance at any location."  *See id*. In other words, the Supreme

Court correctly found that on-demand E-Hails are not a form of pre-arrangement, which

necessarily means that the TLC has repudiated the regulatory dichotomy separating medallion

taxicabs from all other FHVs, in direct violation of the HAIL Act, thereby effectuating a

regulatory taking of medallion owners' exclusive right to hails. *See id*. [9]

On Friday, January 15, 2016, Defendant City of New York released its "For-Hire Vehicle

Transportation Study" (the "New York City Transportation Study"), in which it admits that:

- In the last three years, the landscape of for-hire service has changed considerably due
  to the rise of app-based electronic dispatch (or-e-dispatch) services, such as Uber and
  Lyft, that allow customers to request vehicles on their smartphones…The rise of e-
  dispatch services have blurred the line between medallion cabs, which can offer
  street-hail service, and non-taxi-for-hire vehicles that offer pre-arranged service.

- With the quick arrival of a car at the tap of a button, the distinctions that yielded
  differential regulatory treatment across black and yellow cars are less relevant, and
  the City must adapt its traditional frameworks to support the new entrants that do not
  squarely fit into traditional categories.

- As a result of the technological advances that have occurred in the for-hire vehicle
  sector, once-distinct regulatory categories are now blurring, and causing more direct
  competition for drivers and passengers. Where there were once yellow and green cabs
  that took on passengers through street hails, and black cars and livery that did not,
  these lines are no longer so clear.  Through the use of apps that let customers "e-hail"
  and summon "e-dispatches," yellow and green cabs, black cars, and livery cars are
  now in direct competition for the same passengers.

---

[9] On February 18, 2016, Credit Union Plaintiffs filed a Notice of Appeal to the Appellate
Division, Second Department, and that appeal is pending.

- This new FHV landscape has had a wide array of ramifications. *The market segmentation that once existed has substantially eroded* . . . Uber's share of the FHV market has risen sharply. Despite the introduction of e-hail apps, yellow cabs have seen their passenger volume decline (emphasis added).

*See id.* at ¶ 178.

The New York City Transportation Study also acknowledges the direct harm inflicted upon the medallion taxicab industry in the aftermath of a collapsed regulatory structure resulting from the continuing disparate regulatory burdens that the taxicab industry alone shoulders, including the mandatory accessibility requirement, while e-hailing companies such as Uber, Lyft, Inc. ("Lyft"), and Gett, Inc. ("Gett") are allowed to rapidly accumulate hail market share without bearing those same burdens. *See id.* at ¶ 179. Defendant City of New York admits:

- Increases in e-dispatch trips are largely substituting for yellow taxi trips in the [Central Business District]. *Because these e-dispatch trips are substitutions and not new trips*, they are not increasing [vehicle miles traveled] (emphasis added).

- While there are important advantages for drivers and customers in the shift toward e-dispatch services, the City has an important stake in maintaining a vibrant and financially healthy taxi industry . . . . *Differential regulations for taxis compared to other categories of for-hire vehicles limit traditional yellow taxis' ability to compete effectively with e-dispatch services*, and encourage a vibrant and competitive market for passengers and drivers alike (emphasis added).

- In New York City, the rise of e-dispatch services has created noticeable shifts in driver and consumer behavior. Many drivers are moving from yellow cabs to drive primarily for e-dispatch companies.

- To companies providing for-hire service, competition for drivers is often as important as competition for passengers. E-dispatch companies have recruited heavily for drivers and have offered financial incentives and earnings guarantees to attract drivers.

- Yellow and green taxi fleets, which are subject to accessible vehicle requirements, *are losing their supply of willing drivers to e-dispatch services, which are subject to the equivalent service rule, but which are not subject to the judicial and statutory mandates affecting yellow and green cabs*…As more e-dispatch vehicles are added to the road, the number of accessible yellow and green taxis becomes a smaller and

smaller percentage of all for-hire vehicles—even without the drop in supply of yellow and green taxi drivers that the City is beginning to experience (emphasis added).

- The blurring between the yellow cab and e-dispatch market has eroded an important source of transit funding, since taxes and fees are applied differently between these two sectors even though passengers now readily move between them.

*See id.* at ¶ 179.

Finally, the New York City Transportation Study acknowledges Defendants' obligation to level the playing field between the medallion taxicab industry and the rest of the for-hire industry, precisely as Plaintiffs allege they are constitutionally required to do.  *See* Amended Complaint at ¶ 180.  Specifically, Defendant City of New York admits:

- While the categories of for-hire vehicles have blurred, the regulatory framework has remained remarkably fixed.

- The City and State can work together in order to create a level playing field that encourages new entrants, while also giving current operators an opportunity to compete by offering quality and responsive for-hire trips.

- In the same way that we seek to provide for evenness in the City's oversight of the industry, the relevant State laws ought to reflect evenness in the mandates facing for-hire vehicles.

- All riders, regardless of accessibility needs, should enjoy the same ability to use for-hire transportation . . . In the absence of a dramatic improvement in service provision in the coming years, the City should pursue a similar path to ensuring accessibility in the non-taxi for-hire vehicle sector.

- Every e-dispatch trip taken in place of a yellow or green taxi diverts revenue from measures to fund an accessible fleet and support New York City's subway and bus system. Without regulatory intervention, the growth of e-dispatch services will have a lasting impact on this important source of support for public transit and accessible vehicles.

*See id.*

Similarly, the New York City Council announced plans on the same day as the release of the New York City Transportation Study to introduce legislation intended to help "level the playing field" in the for-hire industry: "New York City Council to Introduce Legislative Package to Reform Taxi and For-Hire Vehicle Industries; Legislative package helps level the playing field while also fostering innovation and protecting consumers." *See* Amended Complaint at ¶ 181. As Council member Stephen Levin explained, "[s]martphone apps for taxis and black cars have evolved significantly over the past few years, but rules and regulations haven't kept up." *See id*. According to Council Speaker Melissa Mark-Viverito, "[t]axis, liveries, and black cars all face different operating requirements—we're looking to get more parity." *See id.* at ¶ 182. Among other things, the legislation sought to address the fact that, "[l]icenses to drive taxis and FHVs have different requirements, even though these drivers serve many of the same riders," including the requirement that only medallion taxicabs have the requirement "that an applicant pass a written English language exam—a significant barrier to entry to driving a taxi." *See id*. The City Council passed the initial round of legislation on April 21, 2016, however, Defendant TLC has yet to enact the corresponding rules, and neither Defendant TLC nor the City Council has taken any additional steps to address the continuing disparate treatment in numerous other crucial areas, including with respect to fare flexibility and accessibility.

Documents subsequently released by Defendant City of New York also confirm the conclusions reached in the New York City Transportation Study. *See* Amended Complaint at ¶ 183. For example, in a document tiled the "For-hire vehicle transportation industry: Business sector analysis & regulation policy plan," Defendant City of New York admits that, "[l]egacy regulations create distinctions between sectors that are not necessary to serve City policy goals."

*See id*.  Likewise, Defendant City of New York admits that "[e]liminating unnecessary distinctions improves competition."  *See id*.

### E.  <u>Medallion Taxicabs and FHVs are Now Similarly Situated</u>

As alleged in Plaintiffs' Amended Complaint, in the aftermath of a collapsed regulatory structure, the business model for medallion taxicabs and e-hailing companies such as Uber, Lyft and Gett are now exactly the same in every material respect; all of them serve the same customers, create the same value for those customers, transact sales in the same manner, deliver the same services, and use the same strategies to generate revenue in the on-demand transportation service business.  *See* Amended Complaint at ¶ 185.  Generally speaking, a business model "clearly identifies how your business converts its products and services into value."  *See* Amended Complaint at ¶ 186.  According to the Harvard Business Review, "[a] good business model answers Peter Drucker's age-old questions: Who is the customer? And what does the customer value?"  *See id.* at ¶ 186.  Additionally, a business model may include information on "transacting a sale...[and] delivering the service," but most importantly, it answers the key question, "[h]ow do we make money in this business?"  *See id*.

Medallion taxicabs and companies such as Uber, Lyft and Gett now operate on business models that are the same in all material respects.  *See* Amended Complaint at ¶ 187.  First, medallion taxicabs and e-hailing companies such as Uber all seek to make a profit by providing on-demand transportation services to passengers currently ready to travel.  *See id*. Indeed, companies such as Uber and Lyft, neither of which can be booked in advance and can only be hailed on-demand by passengers ready to travel, routinely market themselves against, and compare themselves directly to taxis—only "better, faster, and cheaper, according to Uber."  *See id*.  Illustrating this point, the logo for another one of these companies, Gett, which has recently

doubled the number of FHVs in its New York City fleet to more than 4,000, uses a symbol of a passenger appearing to hail a taxicab against a yellow background in its company logo, as well as in its smartphone application and vehicle signage—a virtual copy of the symbol of a hail that appears on the outside of each New York City medallion taxicab.  *See id.* at ¶ 189.  Gett even advertises its smartphone application as a "Taxi App."  *See id.*

Second, medallion taxicabs and FHVs deliver their services with the same basic inputs— *i.e.* using cars driven by the same drivers. *See* Amended Complaint at ¶ 191.  Defendant City of New York admits the point in the New York City Transportation Study, finding that the "once-distinct regulatory categories are now blurring, and causing more direct competition for drivers." *See id*.  Not surprisingly, it also concludes that, "[i]n New York City, the rise of e-dispatch services has created noticeable shifts in driver and consumer behavior," and "[m]any drivers are moving from yellow cabs to drive primarily for e-dispatch companies," and that "competition for drivers is often as important as competition for passengers."  *See id*.  The New York City Transportation Study notes that e-hailing companies such as Uber have "recruited heavily for drivers and have offered financial incentives and earnings guarantees to attract drivers."  *See id.* at ¶ 192.  Correspondingly, the New York City Transportation Study finds that as a result of competition, medallion taxicabs "are losing their supply of willing drivers to e-dispatch services," a situation made worse according to Defendant City of New York because of the Accessible Conversion Rules.  *See id*.

Third, medallion taxicabs and FHVs transact their sales in exactly the same manner—*i.e.* through smartphones using credit card payments.  On information and belief, passengers are choosing to use credit cards, rather than cash, to pay taxicab fares at an ever increasing rate. *See* Amended Complaint at ¶ 193. Fourth, customers value efficient means of on-demand

transportation, which the business of both e-hailing FHVs and taxicabs are now premised on. *See id*. at ¶ 194. More specifically, customers value the speed with which they can obtain their ride. *See id*. at ¶ 195. Indeed, Gett's Chief Executive Officer, Shahar Waiser, explained that its expanding fleet "has slashed Gett's average response time to 5 minutes—*a crucial 'psychological' threshold for waiting passengers*." *See id*.

Finally, medallion taxicabs and FHVs both provide on-demand transportation services with cars driven by the same drivers *by competing for the same customers*. *See* Amended Complaint at ¶ 196. The New York City Transportation Study confirms that E-Hails are "causing more direct competition for drivers and passengers" and admits that "[i]ncreases in e-dispatch trips are largely substituting for yellow taxi trips in the [Central Business District]." *See id*. at ¶¶ 179, 196. This is also evidenced by a widely reported October 2015 analysis of TLC medallion taxicab and Uber trip data for the three month period from April to June 2015, compared with the three month period from April to June 2014, which revealed that the number of Uber rides in the core of Manhattan, where medallion taxicabs were expressly granted hail exclusivity pursuant to the HAIL Act, increased by 3,818,179 rides, while medallion taxicab pickups in the core of Manhattan during the same three month period declined by 3,830,621— almost the exact same number. *See id*. at ¶ 197.

The above-detailed factual allegations demonstrate that medallion taxicabs and FHVs provide the same service, with the same inputs, and to the same customers. *See* Amended Complaint at ¶ 199. In other words, their business models are identical in all material respects and, therefore, taxicabs and FHVs are now similarly situated for purposes of the Equal Protection Clause. *See id*. Indeed, the only conceivable difference, albeit an immaterial and increasingly eroding one, is the channel through which medallion taxicabs and FHVs distribute their

37

service—*i.e.* medallion taxicabs through E-Hails, as well as traditional hails, and FHVs solely through E-Hails. *See id*. at ¶ 200. Of course, this assumes that E-Hails and street hails are not equivalent, which they clearly are. *See id*. Indeed, as set forth above, Justice Weiss specifically held in the Credit Union Plaintiffs' Article 78 proceedings that E-Hails are *not pre-arranged,* which further underscores the point made by Defendants themselves on the record—i.e., that E-Hails are simply the modern day form of a hail. *See id*.

In any event, even if "hails" and "E-Hails" were considered distinct channels of distribution for the moment; medallion taxicabs and FHVs would still be similarly situated in all material respects. *See* Amended Complaint at ¶ 201. Plainly, traditional hails are decreasing in relevance with every passing day, as more and more medallion taxicab passengers are shifting to e-hailing as their primary means of hailing a medallion taxicab. *See id*. Thus, if they are not already doing so, medallion taxicabs will soon too be using E-Hails as the primary channel through which they provide their service—just as e-hailing companies such as Uber, Lyft and Gett already do. *See id*. To illustrate, in January 2016 medallion taxicabs averaged approximately 397,000 daily trips.[10] *See id.* at ¶ 202. On information and belief, approximately one-third of medallion taxicab hails on average are now being made through E-Hails—*i.e.* approximately 131,000 hails per day are E-Hails and approximately 262,000 per day are made through other forms of traditional hailing. *See id*. Meanwhile, Uber averaged approximately 141,000 daily E-Hails as of October 2015. Likewise, Lyft has grown its own average daily E-Hails to 10,000 in the same period. *See id.* at ¶ 203. On information and belief, green borough taxis are accepting on average approximately 50,000 E-Hail trips per day. *See id.* at ¶ 204.

---

[10] Defendant TLC's data, updated as of March 2016, now indicates that medallion taxicabs averaged 351,000 trips per day in January 2016. *See* Higgins Aff. at ¶ 7. Thus, with even less total trips, E-Hails constitute an even higher percentage of daily medallion taxicab trips, further supporting Plaintiffs' calculations herein.

Therefore, combined with green borough taxis, FHVs are now picking up approximately 200,000 E-Hails on average each day. *See id.* By combining the number of E-Hails accepted on average each day by FHVs, which is approximately 200,000, with the total number of hails (including E-Hails) accepted on average each day by medallion taxicabs, which is approximately 397,000, one can approximate that the hail market totals approximately 597,000 trips per day. *See id.* at ¶ 205. Of this total, medallion taxicabs are only accepting approximately 262,000 traditional hails, or roughly 44%. *See id.*[11]

As medallion taxicab ridership continues to decline, the overall percentage of taxicab hails secured by E-Hail will only increase. *See* Amended Complaint at ¶ 206. In fact, Plaintiffs have alleged that not only have E-Hails taken over the hail market as the predominant channel for providing on-demand transportation services, Plaintiffs also allege that they continue to erode the traditional hail market share, which is no longer able to alone sustain a viable business model, making E-Hails inextricably intertwined with the taxicab business model. *See id.* Moreover, whatever remains of the traditional street hail channel has been further eroded by the de facto operation of illegal street hails. *See id.* at ¶ 207. This is evidenced by the open and notorious proliferation of e-hailing FHVs trolling the streets of Manhattan attempting to pick up traditional street hails. On information and belief, Defendant TLC itself has already admitted its inability to prevent these violations, which essentially means that the remaining street hail

---

[11] Because Defendant TLC does not publish data reflecting E-Hail ridership in medallion taxicabs, Plaintiffs served a Freedom of Information Law ("FOIL") request, seeking disclosure of such E-Hail ridership data. Shockingly, Defendant TLC, after much delay, produced hundreds of thousands (if not millions) of individual data points and raw trip data from which one would have to decipher meaningful E-Hail ridership data. Given their regulatory and oversight function, it is simply amazing that the TLC has either not analyzed this data or has simply thwarted Plaintiffs' ability to demonstrate that E-Hails now make up a majority of the total hail market. *See* Higgins Aff. at ¶¶ 8-9.

channel is now part of the FHV business model every bit as much as it is a part of the medallion taxicab business model.  *See id.*

At a minimum, even if E-Hails could be considered a separate business model when compared to traditional hails, which Plaintiffs do not concede, it cannot be disputed that medallion taxicabs and FHVs are at the very least similarly situated with respect to E-Hails.  *See* Amended Complaint at ¶ 210.  Accordingly, medallion taxicabs should not be subject to any different regulatory burdens than FHVs when picking up E-Hails.  *See id.*  For example, medallion taxicabs should be free to engage in flexible rate structures, just as e-hailing companies such as Uber are permitted, at least for those taxicab passengers who utilize E-Hails to secure medallion taxicabs, in order to ensure that these similarly situated services are not treated disparately.  *See id.*

## F.   The Impact of Disparate Regulatory Treatment and the Regulatory Taking of Hail Exclusivity

As alleged in Plaintiffs' Amended Complaint, even after Defendants took the legal position that medallion taxicabs must compete with all FHV companies in the market for on-demand E-Hails, which has quickly become a standard means for passengers in New York City to hail immediate transport, Defendants have continued to enforce disparate regulatory burdens on medallion taxicabs compared with other FHVs—specifically the Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules. *See* Amended Complaint at ¶ 212.  As a result of Defendants' disparate treatment of these similarly situated businesses, FHV companies like Uber have been able to quickly construct a parallel taxi network operating alongside with, and competing directly against, traditional New York City medallion yellow taxicabs, but without many of the significant regulatory burdens and expenses that medallion taxicabs are subject to, including costly medallion acquisition expenses, burdensome and in many respects antiquated

vehicle and technology requirements, onerous accessibility requirements to equip vehicles for passengers with disabilities, and inflexible metered fare restrictions. *See id.* at ¶ 213. Exploiting the disparate regulatory burdens imposed by New York City, companies such as Uber have captured market share from licensed medallion yellow taxicabs with stunning speed and success. *See id.* at ¶ 214. In just four years, Uber's parallel taxi network has alone reportedly grown to approximately 30,000 drivers, operating more than 22,000 Uber affiliated FHVs—almost double the number of licensed medallion yellow taxicabs in New York City—and accepting millions of now nearly instantaneous E-Hails each month. *See id.*

Not surprisingly, an October 2015 analysis comparing taxicab and Uber trip data for the period from April to June 2014 with the period from April to June 2015 revealed that the number of Uber pickups in the core of Manhattan, where taxicabs have been granted statutory hail exclusivity pursuant to the HAIL Act, increased by 3,818,179 rides, while medallion taxicab pickups in the core of Manhattan during the same period declined by 3,830,621. *See* Amended Complaint at ¶ 219. As reported by Uber itself, "[s]ince reducing prices [in late January 2016], trips starting in [Manhattan] have grown by over 20%." *See id.* at ¶ 220. The growth of its business is similar in all boroughs, with Uber reporting that, "[t]rip growth in Brooklyn has soared by over 26% in the past month," and Staten Island recorded "an increase of 37.2%," while the Bronx "has grown by 37%." *See id.* The data makes the reality of what is happening in the marketplace undeniable: Uber is operating a parallel taxicab network, but without any of the regulatory burdens that medallion taxicab owners must comply with. *See id.* at ¶ 221. The result has been a dramatic shift of business as medallion taxicab hails are unlawfully transferred to companies like Uber. *See id.* The impact on medallion taxicabs has been devastating, and the pace of deterioration continues to accelerate. *See id.* at ¶ 222. The New York State Comptroller's

Office first sounded the alarm in its March 2015 Review of the Financial Plan of the City of New York, stating that "the growing presence of new for-hire vehicle services like Lyft and Uber, which offer electronic hailing and payment through smartphone applications, have changed the market value of current medallions and could affect the value of new medallions at auction." *See id.* New York City's Comptroller reached the same conclusion in March 2015: "Growing competition from ridesharing companies such as Uber and Lyft is believed to be affecting the market value of existing taxi medallions. We believe the ripple effect in the industry poses a risk to the value of new taxi medallions at auction." *See id.* at ¶ 223.

Between June 2013 and March 2015, the total annual net pre-tax income for a medallion taxicab owner/operator reportedly went from $57,193 to $43,260, a 24% drop. *See id.* at ¶ 225; *see also* James F. Hickman, *How Uber Is Actually Killing the Value of a New York City Taxi Medallion*, THESTREET (May 26, 2015). The annual pretax income for a taxicab medallion driver has decreased by 21%, going from $126 a shift to $100 a shift. *See Amended Complaint* at ¶ 225; *see also* James F. Hickman, *Taxi Farebox Declines A Harder Hit to Medallion Owner Bottom Lines*, SEEKING ALPHA (May 13, 2015).  For medallion owners, "every incremental 10% drop in fare box revenue translates into roughly a 25% decline in medallion owner net income." *See id.* Earnings for owner-operators declined by "approximately 24%," between June 2013 and March 2015. *See id.*  The downward trend continued through June 2015, wherein medallion taxicabs averaged approximately 410,000 daily trips, which constitutes an 11% drop from June 2014, while Uber averaged approximately 100,000 daily trips in July 2015, a fourfold increase from July 2014. *See id.* at ¶ 226.  Indeed, the decline "has significantly accelerated in the second half through October [2015], averaging minus 11.1%," and "[t]rips averaged a decline rate of minus 13.4% for the four months ending in October."  *See id; see also* James Hickman, *New York City*

*Taxi Revenue Declines Accelerate in Last Four Months*, THESTREET (Nov. 16, 2015). Based on the five-month moving averages, "trips and meter revenue (farebox including credit card and TLC-estimate cash tips) are down by 24.9% and 18.4% from the post-2012-fare-increase peak, respectively." *Id.* As of January 2016, medallion taxicab ridership has continued to decline, reaching 351,000 trips per day. *See* Higgins Aff. at ¶ 7. Predictably, ridership and farebox revenue continued to decline through February 2016, wherein "yellow taxi trips were down 11.7% versus the prior year, and farebox revenue was down 11%, according to the latest New York Taxi and Limousine Commission data." *See* Higgins Aff. at ¶ 5. Likewise, March and April 2016 data are also down, with March 2016 showing a decrease of 8.5% in ridership and 7.6% in farebox revenue from the prior year, and April 2016 showing a decrease of 8.7% in ridership and 8.1% in farebox revenue from the prior year. *See id.*

The precipitous decline in ridership has also caused the medallion value to plummet by as much as 70%, and the once vibrant market for the purchase and sale of medallions remains all but frozen. *See* Higgins Aff. at ¶ 6. To illustrate, in May of 2014, the highest value of a medallion for an independent transfer was $1,050,000. *Id.* at ¶ 6. A little over a year later, in July 2015, that number dropped to $603,000. *See id.* The value continued to drop so that in March of 2016, the highest values for medallions were $580,000, one for $520,000 and a partnership split for $70,810. *See id.* Finally, in April 2016, a medallion was transferred—in what appears to be an arms-length transaction, as the TLC did not provide any qualifying information—for just $325,000. *See id.* Therefore, in approximately two years, the medallion dropped from a high of $1,050,000 to a low of $325,000, representing a decline of approximately 70%. *See id.* The value of corporate medallions has similarly collapsed. *See id.* The TLC itself has recognized the importance of medallion values, explaining "strong medallion sale prices

have historically been used to judge the overall health and viability of the industry." *See* Amended Complaint at ¶ 33; *see also* Docket Nos. 20, 21 at ¶ 38. If medallion values are indeed the measure of health and viability for the New York City medallion taxicab industry, as the TLC has proclaimed, then New York City faces an industry collapse of historic magnitude. *See id.* at ¶ 33.

The precipitous decline in ridership and the value of the medallion is also harming the tens of thousands of members served by the Credit Union Plaintiffs. *See* Amended Complaint at ¶ 228. Borrowers are falling behind on their monthly loan payments and performing loans are in danger of failing as they mature with balloon payments that medallion owners cannot afford to pay, as evidenced by the increase in loan delinquencies and troubled debt. *See id.* Indeed, Credit Union Plaintiffs have already had to modify thousands of medallion loans, causing Credit Union Plaintiffs' troubled debt restructurings to skyrocket from almost zero in 2014 to well over $400,000,000 in 2016. *See id.* at ¶¶ 28-29, 46-67, 229-31; *see also* Docket No. 25 at ¶ 4-11; Docket No. 24 at ¶¶ 4-11; *and* Docket No. 23 at ¶¶ 7-15.[12]

Further evidencing the devastating harm to the industry is the drastic migration of taxicab drivers to Uber and the corresponding increase in unleased medallion taxicabs. *See* Amended Complaint at ¶ 235. As set forth above, the New York City Council has specifically recognized the disparate regulatory burdens medallion taxicabs face and the harm being suffered as a direct result of the continuing disparate treatment. *See id.* at ¶ 236. Likewise, the New York City Transportation Study found that "[i]ncreases in e-dispatch trips are largely substituting for

---

[12] The crisis with accessible medallions is further evidenced by the current status of the vast majority of the accessible medallions auctioned to the public by the TLC in November 2013. *See Amended Complaint* at ¶ 232. Plaintiff Melrose financed approximately 128 of the roughly 200 accessible medallions sold at the November 2013 auction. *See id.* Today, 108 of the approximately 128 (or 84%) of the medallions sold in the November 2013 auction and financed by Plaintiff Melrose are now classified as either delinquent or troubled debt. *See id.*

yellow taxi trips in the [Central Business District], and "[d]ifferential regulations for taxis compared to other categories of for-hire vehicles limit traditional yellow taxis' ability to compete effectively with e-dispatch services." *See id.* Indeed, the New York City Transportation Study also recognizes that "competition for drivers is often as important as competition for passengers," and that "[y]ellow and green taxi fleets, which are subject to accessible vehicle requirements, *are losing their supply of willing drivers to e-dispatch services*." *See id.* at ¶ 237. The New York City Transportation Study concludes that disparate treatment has resulted in an unprecedented shift in on-demand transportation services and as a result, "yellow cabs have seen their passenger volume decline." *See id.* at ¶ 238.

Many of the Plaintiffs themselves have felt the significant consequences of lost drivers. *See id.* at ¶¶ 212-81. For example, Plaintiff White & Blue Group has been forced to repeatedly slash its daily lease rates to compete with companies such as Uber, which in turn has resulted in reduced leasing payments to medallion owners. *See id.*; *see also* Docket No. 28 at ¶ 41. Plaintiff Ginsberg also saw his medallion leasing income drop by over a third in 2015 because leasing companies have been unable to attract enough drivers to lease all of the available medallion yellow taxicabs, and was eventually dropped by his leasing company altogether because his unrestricted medallion was selected to convert to an accessible medallion, as part of the first lottery conducted by the TLC in June 2015. *See* Amended Complaint at ¶ 240; *see also* Docket No. 29 at ¶¶ 5-10. Likewise, Plaintiff Iztchaky saw his medallion leasing payments decline from $3,100 per month to $2,100, and was ultimately dropped by Westway Brokerage after being selected to convert his unrestricted medallion to an accessible medallion in 2016, as part of the Accessible Conversion Rules. *See id.* at ¶ 241; *see also* Docket No. 30 at ¶¶ 4-11. Similarly, Pearland Brokerage, Inc. ("Pearland") has advised Mr. Kreditor that the decreases in monthly

lease payments on Plaintiffs Safini and KL Motors' medallions are due to a lack of drivers willing to lease taxicabs. *See* Amended Complaint at ¶ 242; *see also* Docket No. 27 at ¶ 14.[13]

The resulting harm to medallion owners is also having a severe impact on the budget for the City of New York. *See Amended Complaint* at ¶ 243. As reported on February 10, 2016, "[l]ooming budget gaps are worse than the mayor presented in his $82 billion budget last month – and part of the reason is taxi industry 'turbulence' created by car services like Uber, City Controller Scott Stringer said Wednesday." *See id.* It has also been reported that, "Stringer predicts a budget gap of $200 million," in 2017, while the "preliminary budget that Mayor de Blasio unveiled at City Hall last month projected no gap for 2017," and that by 2018, "Stringer said there would be a $2.7 billion gap—compared to de Blasio's $2.28 billion—followed by a $3.8 billion gap in both 2019 and 2020," while "[d]e Blasio's budget has a $2.9 billion gap in 2019, and a $2.7 billion gap in 2020." *See Amended Complaint* at ¶ 244. Stringer's numbers are different because he "removed from the budget hundreds of medallion sales projected for 2018 through 2020." *See id.* New York City has "postponed the sales previously, and Stringer said he doesn't think they will happen." *See id.*

Despite continuing their disparate treatment of medallion taxicabs, Defendants cannot possibly offer a plausible rational basis for such a difference in treatment. *See* Amended Complaint at ¶ 246.  Indeed, Defendant Meera Joshi, in her capacity as Chair of the TLC, has publicly acknowledged the intentional disparate burden imposed upon medallion taxicabs because of the Accessible Conversion Rules: "[The TLC is] looking at one segment [of the for-

---

[13] Due to the systemic harm being suffered across the medallion taxicab industry, Plaintiffs TMODA and Mutual Taxi Owners have been forced to expend resources advocating on behalf of member medallion owners concerning the unfair and unequal application of TLC rules in the for-hire industry, including with respect to fare rate restrictions, fees and surcharges, vehicle requirements and wheelchair accessibility requirements. *See* Amended Complaint at ¶ 245.

hire transportation industry] and demanding much, much, more from one small segment and there's lots of segments out there that don't have a similar requirement." *See id.*  In fact, because medallion taxicabs and FHVs accepting on-demand E-Hails are operating identical businesses and servicing identical customers, there is no longer any rational basis for treating the two businesses differently. *See id.* at ¶ 247. Many of the rules and regulations imposed upon medallion taxicabs but not upon FHVs were intended to protect drivers and passengers involved in immediate transport. *See id.* Now that medallion taxicabs and FHVs provide identical services to identical passengers, and in fact directly compete with one another for business, there no longer exists a rational basis for a difference in treatment. *See id.*

For example, there is no rational basis for subjecting taxicabs to metered fare limitations, while permitting similarly situated FHVs to vary their rates as they see fit based on market demand. *See* Amended Complaint at ¶ 248. One justification for this rule used to be that passengers calling ahead to schedule future rides with FHVs could negotiate with the company, or at least know the price in advance, while passengers hailing a taxicab in the street could not. *See id.* Now that FHVs accept on-demand E-Hails through smartphone applications, there is no such opportunity for passengers to negotiate with FHVs or even know the exact fare in advance. *See id.* at ¶ 249. More to the point, the fact that medallion taxicabs also accept on-demand E-Hails makes clear that there is no rational basis for the difference in treatment between medallion taxicabs and FHVs. *See id.*  In fact, the result is that companies such as Uber are permitted to capitalize on unlimited fare flexibility, while medallion taxicabs are restricted to a specific fare at all times, unable to make adjustments for market conditions, which creates a significant advantage for FHV companies like Uber. *See id.* at ¶ 250. This advantage is resulting in an unprecedented shift in drivers and passengers from medallion taxicabs to FHVs. *See id.*  For

example, Uber announced on January 26, 2016, that it was going to dramatically slash its fares in New York City to further accelerate ridership gains, rendering them as much as 35% lower than regulated medallion taxicab fares. *See id.* at ¶ 251. As one published report described it, "Uber is going for the jugular in the escalating Big Apple cab wars—with a substantial drop in prices." *See id.* Underscoring the flexibility FHVs enjoy that is denied to medallion taxicabs, according to other published reports, Uber claims that, "with prices lower than a New York City taxi, Uber is now more affordable and accessible for residents across the five boroughs . . . [the point of the rate cuts is to increase business] . . .we can always reverse them." *See id.* at ¶ 252. Further evidencing this competitive advantage enjoyed only by FHVs, Uber recently released the increased ridership results of its price cuts in January 2016, detailed above, demonstrating a direct correlation between its deliberate price cuts, coupled with surge pricing. *See id.* at ¶ 253. Correspondingly, according to the most recent TLC trip data, medallion taxicab ridership dropped to approximately 351,000 trips, which is the lowest daily average in a month going back to January 2010. *See* Higgins Aff. at ¶ 7.

Likewise, there is no rational basis for limiting medallion taxicab owners and businesses to specific lease caps set by the TLC, while permitting similarly situated FHVs to fluctuate their lease rates as they see fit based on market demand. Nor is there a rational basis for dictating the times and lengths of shifts that medallion taxicab drivers can work, while allowing these same drivers to jump to e-hailing companies where they can drive as little or as much as they choose. *See* Amended Complaint at ¶ 254. This disparate treatment forces medallion owners and their leasing agents to operate at a disadvantage as compared to similarly situated FHVs by restricting them from charging higher rates during times of high driver demand (e.g. on Friday), thereby giving them the flexibility to charge lower rates during times of low driver demand (e.g. on

Monday). *See id.*   In fact, Uber operates the "Uber NYC Marketplace," which is a website through which Uber facilitates FHV leasing to "make it as easy as possible for partners to fill vacancies in their vehicles as well as help prospective partners get started faster," with rental prices adjusted "on a per week basis." *See id.* at ¶ 255. As a result, Uber is able to engage in a market-based approach to leasing, driven by supply and demand, and is permitted to charge either as much or as little for leasing, depending upon driver availability. Medallion taxicabs, however, do not have the freedom to respond to market conditions and competition for drivers based on ordinary principles of supply and demand. *See id.* at ¶ 256.

The TLC has itself recognized the disparity between the treatment of medallion taxicabs and FHVs with respect to the lease cap rules. *See* Amended Complaint at ¶ 257.  Specifically, on October 15, 2015, the TLC approved the Taxicab Leasing Pilot Program (amended on December 3, 2015) in order to permit limited flexibility in the leasing of taxicabs, including with respect to lease caps and shift change times, with the goal of allowing participants to lease out more medallion taxicabs during those times with highest passenger demand, thereby increasing medallion taxicab availability, and to test whether increasing flexibility to determine shift times and lease rates will result in an increase in medallion taxicab availability. *See id.* The Pilot also aims to evaluate whether leasing agents can encourage drivers to lease specific shifts or vehicle types that struggle to attract drivers, including accessible vehicles. *See id.* As the TLC itself admits, the traditional lease caps "make it difficult for lessors to change their operations and offer shifts during the hours Drivers most want to work." *See id.*

There is also no rational basis for requiring taxicabs to pay a Taxi Accessibility Fee, a surcharge of thirty cents per trip to subsidize taxicab accessibility, and a tax of fifty cents per trip to fund MTA operations, while at the same time not requiring similarly situated FHVs to pay any

such fees or taxes. *See* Amended Complaint at ¶ 259. FHVs are not required to collect or pay many of the taxes and fees imposed on medallion taxicabs, thereby unfairly allowing companies like Uber to boast that their fares are cheaper than those charged by medallion taxicabs. *See id.* at ¶ 260. Commissioner Joshi has already admitted the disparity and the need to correct it: "passengers in yellow and green cabs pay 50 cents per trip towards the costs of running the public transportation system . . . [and] 30 cents per trip" towards accessible conversion costs, "while fares generated from for-hire vehicles contribute nothing." *See id.* Moreover, the New York City Transportation Study likewise notes that "[a]s an intensive user of City streets, it is appropriate that for-hire vehicle companies participate in funding these needs, and it is appropriate that e-dispatch companies pay their fair share. The blurring between the yellow cab and e-dispatch market has eroded an important source of transit funding, since taxes and fees are applied differently between these two sectors even though passengers now readily move between them." *See id.* at ¶ 261.

There is also no rational basis for requiring medallion taxicabs to be limited to a few specific vehicles approved by the TLC, while permitting similarly situated FHVs to choose any car they desire. *See id.* at ¶ 262. FHVs are not limited to any particular vehicle model set by the TLC, thereby unfairly allowing companies such as Uber to permit drivers to use newer and higher quality vehicles, including all hybrid vehicles if they so choose, giving drivers and riders a better overall experience. *See id.* at ¶ 263.  Nor is there a rational basis for requiring medallion taxicabs to comply with TLC requirements for features, including paint, finish, lighting, upholstery, seats, windows, air conditioners, and roof lights, while at the same time not requiring similarly situated FHVs to comply with any such requirements. *See id.* at ¶ 264. This disparate treatment allows FHVs like those affiliated with Uber to avoid the significant time and expense

of "hacking up" a vehicle, while retaining the flexibility to respond to evolving passenger preferences. *See id.* Indeed, Commissioner Joshi once again admitted the legacy of disparate treatment that no longer makes any sense: "yellow taxis are the most highly regulated sector – fare, color, vehicle type and age, intaxi payment equipment, shift durations etc. – while historically, modes with less trip volume, black car and livery, operate with much less restrictions." *See id.* at ¶ 265.

There is also no rational basis for requiring medallion taxicabs to comply with TLC specifications for taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" taxicab technology, while at the same time not requiring similarly situated FHVs to comply with any such requirements. *See* Amended Complaint at ¶ 266. Again, because FHVs are now permitted to service the exact same customers as medallion taxicabs, there is no longer a rational basis for the difference in treatment. *See id.* FHVs are also not required to be equipped with taximeters, or any other particular technology systems (35 R.C.N.Y. §§ 59A-31 to 59A-33 (2015)), once again unfairly allowing FHVs to avoid the expense of "hacking up" a vehicle, while retaining the flexibility to respond to evolving passenger preferences. *See id.* at ¶ 267. Nor is there a rational basis for requiring medallion taxicabs to be equipped with partitions, while at the same time not requiring similarly situated FHVs to be equipped with partitions. *See id.* at ¶ 268. While the standardization of safety, comfort and terms of service may constitute a legitimate policy objective; there is no rational basis for the disparate regulatory treatment between medallion taxicabs and e-hailing companies, which is the only inquiry that matters. *See id.* at ¶ 269. There is also no rational basis for requiring medallion taxicab drivers to pass more stringent tests to obtain a license, including passing an English proficiency test, as compared to drivers seeking to obtain a FHV license. *See id.* at ¶ 270. Indeed, the New York City Council

recently stated that "[l]icenses to drive taxis and FHVs have different requirements, even though these drivers serve many of the same riders." *See id.*

Finally, there is no rational basis for requiring medallion taxicabs to comply with the Accessible Conversion Rules, while at the same time not subjecting FHVs to any accessible vehicle requirement whatsoever. *See* Amended Complaint at ¶ 271. While Defendants have suggested that the basis for the accessibility requirement is the government's interest in increasing accessible transportation, that basis is not rationally related to the disparate treatment between taxicabs and FHVs accepting on-demand E-Hails. *See id.* In fact, the effect of the disparate treatment has been to rapidly transfer hail market share to FHVs like Uber, which operate without any accessibility requirement, thereby significantly decreasing the overall number of on-demand vehicles that are being hailed by passengers that are actually accessible. *See id.* at ¶ 272. This will be further magnified as more and more accessible medallions are pulled off the road and Uber continues to increase its hail market share, free of any accessibility requirements. *See id.*

FHVs are not required to be accessible to persons with disabilities, unfairly giving them tremendous advantages over medallion taxicabs. Some of these advantages include the ability to attract drivers and passengers that dislike accessible vehicles, and the freedom to avoid the expense of converting a vehicle to meet accessibility requirements, as well as the added expense of driving and maintaining an accessible vehicle. *See* Amended Complaint at ¶ 273. Commissioner Joshi has again admitted the disparate burden intentionally placed upon medallion taxicabs with respect to the Accessible Conversion Rules: "[The TLC is] looking at one segment [of the for-hire transportation industry] and demanding much, much, more from one small segment and there's lots of segments out there that don't have a similar requirement." *See id.*

Even the United Spinal Association, an advocacy group representing the interests of disabled citizens and a plaintiff in the *Noel* litigation, has demanded that the TLC impose accessibility requirements on companies such as Uber who are engaging in "separate and unequal service" by failing to provide adequate service to wheelchair users. *See id.* at ¶ 274. As noted by the United Spinal Association, "Uber currently has more than 30,000 vehicles operating in New York City, and not a single one is wheelchair accessible" while medallion taxicab owners, a significant number of which already offer accessible service, are the ones being forced to increase their number of accessible vehicles. *See id.*

As for the Accessible Conversion Rules, Defendant City of New York specifically admitted in the New York City Transportation Study that, "[y]ellow and green taxi fleets, which are subject to accessible vehicle requirements, are losing their supply of willing drivers to e-dispatch services, which are subject to the equivalent service rule, but which are not subject to the judicial and statutory mandates affecting yellow and green cabs . . . As more e-dispatch vehicles are added to the road, the number of accessible yellow and green taxis becomes a smaller and smaller percentage of all for-hire vehicles—even without the drop in supply of yellow and green taxi drivers that the City is beginning to experience." *See id.* at ¶ 279. In fact, "[e]very e-dispatch trip taken in place of a yellow or green taxi diverts revenue from measures to fund an accessible fleet and support New York City's subway and bus system. Without regulatory intervention, the growth of e-dispatch services will have a lasting impact on this important source of support for public transit and accessible vehicles." *See id.* Given these admissions, Defendants cannot credibly claim in this action that a rational basis remains for the disparate treatment. *See id.* at ¶ 280. Indeed, the New York City Transportation Study states that "[a]ll riders, regardless of accessibility needs, should enjoy the same ability to use for-hire

53

transportation . . . In the absence of a dramatic improvement in service provision in the coming years, the City should pursue a similar path to ensuring accessibility in the non-taxi for-hire vehicle sector." *See id.* The justifications for disparate regulatory treatment simply no longer exist, to the extent they ever did. *See id.* at ¶ 281. The New York City Transportation Study has confirmed what Plaintiffs have long been arguing—that the disparate burdens are hurting not only Plaintiffs, they are also harming customers, the medallion taxicab industry, and the City of New York. *See id.*

### G.   The Manipulation of Taxicab Medallion Values

Finally, Plaintiffs have also alleged in this action that the TLC deliberately manipulated the price of taxicab medallions by intentionally overstating the monthly average price of taxicab medallions published on the TLC website until at least sometime in late 2014. *See* Amended Complaint at ¶ 290. The TLC's posted fair market value was relied upon by industry participants, including several of the Plaintiffs in this action, in deciding whether to purchase, hold, sell, or loan against New York City taxicab medallions. *See id.* As alleged in Plaintiffs' Amended Complaint, documentary evidence makes indisputable the fact that the TLC purposely omitted from its calculation of monthly average prices any taxicab medallion transfers that were more than 10% below the average price from the prior month—thereby driving higher transfer taxes and ultimately causing higher auction prices for medallions being purchased from New York City. *See id.* at ¶ 291.

The only plausible explanation for Defendants' "conscious" action was to intentionally inflate the reported fair market value of the medallion, which in turn allowed the TLC to auction medallions at higher prices, thereby increasing the prices paid to New York City for medallions and allowing the TLC to collect higher transfer taxes on behalf of New York City on private

medallion sales. *See* Amended Complaint at ¶ 292. For example, on information and belief, the averages posted by the TLC in the spring of 2012, which were used by the TLC to determine fair market value and calculate the 5% transfer tax on the medallions purchased by Plaintiff KL Motors, were false and misleading. *See id.* at ¶ 293. Likewise, the TLC reported average medallion prices in November 2013 of $1,050,000, while the actual average was only $900,000, approximately 14.3% lower than Commission's posted average. *See id.* at ¶ 294. Plaintiff Safini purchased two medallions in November 2013 in reliance on the TLC average for approximately $2 million, and the TLC used that average in calculating the 5% transfer tax on the medallions purchased by Plaintiff Safini. *See id.* Similarly, in September 2014, the TLC reported a monthly average medallion price of $1,045,000, when in fact the only transfer that month apparently closed at $900,000. *See id.* at ¶ 295. The TLC used this posted monthly average medallion price to determine the fair market value of the medallion, and to calculate the 5% transfer tax paid on medallions purchased the following month. *See id.*

The TLC trapped medallion purchasers and financiers into using the TLC's posted average by basing its medallion transfer tax on that misrepresented and overstated average. *See id.* at ¶ 296. As outlined above, New York City receives a 5% transfer tax on secondary market sales of taxicab medallions, based on the consideration paid for the medallions. *See id; see also* N.Y.C. Admin. Code § 11-1402(a) (2015). As set forth in the 2008 "Audit Report on the Taxi and Limousine Commission's Controls over Taxi Medallions" prepared by the City of New York, Office of the Comptroller, "[t]he tax is paid by the transferee (new medallion owner) and collected by TLC upon the approval of the transfer. *See id.* at ¶ 297. Currently, TLC requires transferees to obtain a tax waiver letter from DOF for all transfers that are $10,000 below fair market value. TLC calculates fair market value by determining the average sales price of the

previous month's transfers." *See id.* On information and belief, as a matter of practice, the TLC required medallion purchasers to secure a waiver from the New York City Department of Finance if the price of a taxicab medallion transfer was more than 5% below the fair market value of the medallion, as determined by the TLC based on its previous month's posted "average." *See id.* at ¶ 298.

By October 2013, Plaintiff Melrose had become concerned about the accuracy of the monthly average prices because many of the transactions that it was funding were closing at prices well below the monthly averages posted by the TLC.  *See id.* at ¶ 299. Accordingly, Plaintiff Melrose reached out to the TLC in order to raise questions about how the posted medallion averages were being calculated.  *See id.* Specifically, Plaintiff Melrose wrote in an e-mail on October 2, 2013 to Allan Fromberg, Deputy Commissioner for Public Affairs of the TLC, that "[a]ccording to the 4 individual medallion transfers recorded last month, the highest price was $1,000,000 while the other 3 transfers were for between 925k and 950k … the average couldn't possibly be $1,050,000 as stated by your spreadsheet." *See id.* at ¶ 300. Two days later, Mr. Fromberg responded, "the TLC long ago made a *conscious decision* to set aside any transactions below "fair market value" which I believe we define as within 10% of the high" (emphasis added).  *See id.*  Despite admitting this to Melrose, Defendants took no action to advise the market of this policy or otherwise discontinue the practice until it was eventually reported in the press in late 2014.  *See id.* at ¶ 301.

Meanwhile, between 2012 and 2014, the rest of the Credit Union Plaintiffs, as well as Plaintiffs KL Motors and Safini, continued to detrimentally rely on the TLC's intentional misrepresentations and omissions concerning the fair market value of the taxicab medallion in underwriting medallion sales and purchasing and holding individual medallions. *See id.* For

example, Plaintiff Safini relied on the TLC's determination of fair market value based on the posted average monthly medallion prices in connection with the purchase of its medallions in November 2013.  *See id.* at ¶ 302. Likewise, Plaintiff KL Motors relied on the TLC's determination of fair market value based on the posted average monthly medallion values prices in connection with the purchase of its medallions in March 2012.  *See id.* As part of the purchase process and acting on behalf of Plaintiffs KL Motors and Safini, Mr. Lvovsky and Mr. Kreditor became aware of the TLC's webpage, which posted the monthly average sales price of the medallion and had long constituted the industry-accepted fair market value determination.  *See id.* at ¶ 303. Mr. Lvovsky and Mr. Kreditor relied upon the TLC's posted monthly average in making their decision to purchase their medallions.  *See id.* at ¶ 304. Had Mr. Lvovsky and Mr. Kreditor known that the TLC's posted monthly averages significantly overstated and misrepresented the actual fair market value of the medallion, neither of them would have purchased the medallions. *See id.*

Incredibly, the TLC now claims that medallion prices were an "'artificial bubble' created by a few outsized transactions;" a stunning contention given that it now appears from the evidence that any artificial bubble in taxicab medallion prices was actually created and orchestrated by the TLC itself. *See id.* at ¶ 305. The TLC has also inexplicably claimed that the TLC "doesn't get into the business of valuing."  *See id.* at ¶ 306. This cannot be true, however, because the TLC is specifically charged with setting the minimum upset price at auctions in accordance with TLC rules, which state that "[t]he Chairperson will set a minimum upset price for Medallions to be sold."  *See id; see also* 35 R.C.N.Y. § 65-05(b)(1) (2015). Moreover, the TLC is responsible for determining the fair market value of the medallion for purposes of the transfer taxes paid by medallion purchasers, rendering patently false and misleading any

assertion that the TLC is not involved in setting values and prices for medallions. *See* Amended Complaint at ¶ 307.

### III.    <u>LEGAL STANDARD</u>

To withstand a motion to dismiss, a complaint need only "contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).   Indeed, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp.*, 550 U.S. at 555.   In other words, the factual allegations must merely "be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *See id*. (citations omitted). Accordingly, "courts must accept all factual allegations in the complaint as true and draw all reasonable inferences in plaintiff's favor." *Transp. Workers Union of Am., Local 100, AFL-CIO v. New York City Transit Auth.,* 342 F. Supp. 2d 160, 164 (S.D.N.Y. 2004). More to the point, "it is not necessary for the district court to determine which party shall ultimately prevail… but whether the claimant is entitled to offer evidence to support the claim." *Aurecchione v. Schoolman Transp. System, Inc.*, 426 F.3d 635, 638-39 (2d Cir. 2005) (citation omitted) (internal quotations omitted).

Accordingly, under "the Federal Rules' simplified standard for pleading, '[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Transp. Workers Union of Am., Local 100, AFL-CIO* 342 F. Supp. at 163-64 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)) (with emphasis). Thus, a "well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp.*, 550 U.S. at 556

(quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).  As set forth below, Plaintiffs' Amended Complaint readily meets and exceeds the standard governing this motion practice with respect to each of the claims alleged.

## IV.   ARGUMENT

### A.   Plaintiffs Have Standing

As an initial matter, Defendants challenge each Plaintiff's standing to assert any of the claims set forth in the Amended Complaint. *See* Opening Memorandum at 5-12. In doing so, Defendants ignore the pleading standard, overlook Plaintiffs' detailed allegations of injury and dispense with common sense.  For example, Defendants contend that the Credit Union Plaintiffs have not adequately pleaded the required injury-in-fact, and have not otherwise alleged that they are "within the zones of interest of the challenged regulations." *See* Opening Memorandum at 6. Next, Defendants argue that Plaintiffs TMODA and League of Mutual Taxi Owners have not established organizational standing because they have made only "conclusory assertions that they have 'expended resources' advocating on behalf of their members…." *See* Opening Memorandum at 9.  Finally, Defendants argue that Plaintiffs Ginsberg and Itzchaky make "unsubstantiated" claims about their alleged injury, and they are "simply speculating as to their current and future injury," and the Corporate Plaintiffs fail to establish causation because "the regulations they attack have been in effect for decades."  *See* Opening Memorandum at 10-11. As discussed below, none of these arguments has any merit.

Article III standing "is the threshold question in every federal case, determining the power of the court to entertain the suit." *McDermott v. New York Metro LLC*, 664 F. Supp. 2d 294, 297 (S.D.N.Y. 2009). To establish standing at the pleading stage, a plaintiff need only plausibly allege "(1) an 'injury-in-fact,' (2) a sufficient 'causal connection between the injury

and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'" *Ross v. AXA Equitable Life Ins. Co.,* 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).  In determining whether a party has standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v Seldin*, 442 U.S. at 490, 501 (1975)).  In addition, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 889 (1990)); *see also Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc*., 448 F.3d 138, 145 (2d Cir. 2006) ("There is no heightened pleading requirement for allegations of standing" (internal citations omitted)); *Carter v. HealthPort Techs., LLC*, No. 15-1072, 2016 WL 2640989, at *5 (2d Cir. May 10, 2016) (plaintiff need only allege "even a small financial loss" in order to allege an injury-in-fact); *Hidalgo v. Johnson & Johnson Consumer Cos., Inc.,* No. 15-CV-5199 (SAS), 2015 WL 8375196, at *2 (S.D.N.Y. Dec. 8, 2015) (plaintiff need only "allege facts that affirmatively and plausibly suggest that it has standing to sue" to survive a 12(b)(1) motion to dismiss).  Thus, "at the pleading stage, standing allegations need not be crafted with precise detail, nor must the plaintiff prove his allegations of injury." *Baur v. Veneman*, 352 F.3d 625, 631 (2d Cir. 2003).  Plaintiffs have met and exceeded that standard.

> i.      *The Credit Union Plaintiffs Have Standing*

As detailed in Plaintiffs' Amended Complaint, the Credit Union Plaintiffs have alleged an injury-in-fact resulting from the impairment of their security interest in the medallions, an

increasing number of loan delinquencies, troubled debt restructurings, foreclosures, and inevitable balance sheet losses. *See* Amended Complaint at ¶¶ 228-32. Plaintiffs have set forth the causal connection between their injury and Defendants' actions by alleging, among other things, that disparate treatment and the regulatory taking of medallion owners' statutory right to hail exclusivity has caused the value of the medallion to collapse. *See* Amended Complaint at ¶¶ 228, 351.[14] Credit Union Plaintiffs have also adequately alleged that they are within the zone of interest of the challenged regulations.

Despite this, Defendants argue that the Credit Union Plaintiffs are not "for-hire transportation providers in the City of New York" or directly "regulated by TLC," and therefore they do not fall within the regulation's "zone of interest." *See* Opening Memorandum at 6-7. This argument, however, misses the point.   The test is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Bennett v. Spear*, 520 U.S. 154, 163 (1997).  "That interest, at times, may reflect 'aesthetic, conservational, and recreational' as well as economic values." *Ass'n of Data Processing Service Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970).  In addition, "[t]he test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987).

Here, the Credit Union Plaintiffs have alleged an economic interest in the regulations. The Credit Union Plaintiffs are three federally insured, non-profit corporations that provide

---

[14] Defendants attempt to blame the loan delinquencies on the Credit Union Plaintiffs' "own questionable lending practices," however, the Credit Union Plaintiffs relied on the TLC's stated monthly average medallion transfers, which were posted on the TLC website, in making their lending decisions. *See* Amended Complaint at ¶¶ 54, 60, 66; *see also* Opening Memorandum at 7.  Plaintiffs continued to rely on the TLC's posted figures until they learned that the TLC was deliberately overstating those averages.  *See* Amended Complaint at ¶ 54.

much of the financing for taxicab medallion purchases both at auctions held by New York City

and in secondary market sales. The alleged injury-in-fact results from the dramatic declining

value of those medallions, which serve as collateral for more than two billion dollars in loans

that the Credit Union Plaintiffs made to medallion owners, leading to massive loan delinquencies

and defaults. Indeed, as of June 30, 2015, the Credit Union Plaintiffs collectively had more than

31,000 members and held security interests in approximately 5,189 taxicab medallions—almost

half of all issued medallions, which serve as collateral for approximately 4,611 medallion loans

totaling approximately $2.4 billion. *See* Amended Complaint at ¶¶ 51, 57, 63. Every one of the

Credit Union Plaintiffs' security interests is being impaired each day by Defendants'

unconstitutional actions.   Therefore, the Credit Union Plaintiffs have met the standing

requirement by alleging economic interests that fall within the zone of interest of TLC

regulations, and by meeting all of the other requirements to plausibly assert standing. *See, e.g.,*

*Carter,* 2016 WL 2640989, at \*5; *see also Hidalgo,* 2015 WL 8375196, at \*2.

> ii.      *TMODA and Mutual Taxi Owners Have Standing*

To establish standing on behalf of Plaintiffs TMODA and Mutual Taxi Owners, the

Amended Complaint clearly alleges an injury-in-fact— the expenditure of resources advocating

on behalf of member medallion owners as well as a causal connection between the injury and

Defendants' actions— that the expenditure was necessitated by the systematic harm being

suffered across the medallion taxicab industry as a result of Defendant's unfair and unequal

application of TLC rules in the for-hire industry. *See* Amended Complaint at ¶ 245. Further, it is

abundantly clear that a favorable decision in this matter will prevent the additional expenditure

of resources, as the injury imposed by the accessibility regulations will have been addressed. *See*

Amended Complaint at ¶¶  45, 73, 77. Thus, the Plaintiffs in question have pled sufficient facts

to survive Defendants' Motion to Dismiss.  Notwithstanding this, Defendants argue that Plaintiffs TMODA and Mutual Taxi Owners have not adequately alleged organizational standing under § 1983. A cursory review of applicable law makes plain, however, that while "an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983… nothing prevents an organization from bringing a § 1983 suit on its own behalf so long as it can independently satisfy the requirements of Article III standing." *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011).  Directly contrary to Defendants' argument, in *Nnebe v. Daus*, the Second Circuit held that the New York Taxi Workers Alliance (NYTWA), a taxi driver advocacy organization, had standing since the organization's expenditure of resources constituted an interest in the controversy separate from that of its members.  *Id*. at 158.  The Second Circuit went further to make unambiguous that "only a perceptible impairment of an organization's activities is necessary for there to be an injury in fact."  *Id.* at 157 (citations omitted; internal quotations omitted).  In fact, "the Supreme Court has stated that so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference.]' " *Id.* (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Here, Defendants contend that Plaintiffs have made only conclusory statements that they have "expended resources." *See* Opening Memorandum at 9. However, similar to NYTWA in *Nnebe*, TMODA and Mutual Taxi Owners have alleged an economic injury sufficient to independently establish standing. *See* Nnebe, 644 F.3d at 158.  Plaintiffs allege that TMODA has expended resources advocating on behalf of member medallion owners concerning the unfair and unequal application of TLC rules in the for-hire industry.  *See* Amended Complaint at ¶ 72; *see*

*also* Gill Affidavit at ¶ 4.  The same is true of Mutual Taxi Owners.  *See* Amended Complaint at ¶ 76; *see also* Kay Affidavit at ¶ 13.  There can be no dispute that Defendants' actions and inactions detailed above and in the Amended Complaint, necessitated the expenditures by TMODA and Mutual Taxi Owners thereby causing them injury-in-fact.  That is all that these Plaintiffs were required to allege at the pleading stage in order to establish standing. *See, e.g., Carter,* 2016 WL 2640989, at *5; *see also Hidalgo,* 2015 WL 8375196, at *2.

### iii.        The Remaining Plaintiffs Have Standing

Finally, the remaining Plaintiffs have likewise properly alleged the elements of standing. Specifically, the remaining Plaintiffs alleged injury caused by Defendants' actions and inaction in connection with enforcement of the TLC rules. Against this, Defendants argue first that Plaintiffs Ginsberg and Itzchaky fail to allege an injury-in-fact and any alleged injuries are mere speculation. *See* Opening Memorandum at 10. Far from it, Plaintiffs have alleged that as a result of Defendants' actions, which caused their previously unrestricted medallions to be converted to accessible medallions, Mr. Ginsberg's and Mr. Itzchaky's medallions are now completely worthless as they cannot be leased out.  *See* Docket No. 29 at ¶¶ 5-10; *see also* Docket No. 30 at ¶¶ 6-10; Amended Complaint at ¶¶ 111-18.[15]

As with Mr. Itzchaky and Mr. Ginsberg, the Corporate Plaintiffs have also alleged injuries-in-fact in the form of drops in their monthly leasing income caused by Defendants' actions, specifically the Accessibility Conversion Rules, as well as the burden of costs for

---

[15] Defendants also argue that Plaintiffs Ginsberg and Itzchaky's claims that their medallions are worthless remain unsubstantiated because they have not attempted to sell or move their medallions to other leasing agents.  *See* Opening Memorandum at 10.  For one thing, they have plausibly alleged the fact and that is all that is required.  In any event, Plaintiff Itzchaky specifically attested to his efforts to lease to other brokers. *See* Itzchaky Affidavit at ¶ 9. Plaintiff Ginsberg was likewise informed by his leasing agent that "companies such as Uber have taken many of [Taxi Fleet Management's] drivers and have begun to take rideshare away from [the] industry…." *See* Amended Complaint at ¶ 240.

converting accessible vehicles, more than meeting the pleading standard. *See* Amended Complaint at ¶ 39; *see also Lujan* 504 U.S. at 561. Notwithstanding this, Defendants next argue that the Corporate Plaintiffs have failed to show that the challenged regulations have made accessible vehicles less desirable and that the Corporate Plaintiffs fail to establish causation because "the regulations they attack have been in effect for decades" and were in place when accessible medallions were auctioned for record prices in 2014. *See* Opening Memorandum at 11-12. These arguments, however, ignore the well-pled allegations of the Amended Complaint concerning driver claims that accessible vehicles are simply not worth leasing given the significant amount of additional regulatory burdens imposed on them and the alternative leasing options available (*See* Amended Complaint at ¶ 41), and Plaintiff White & Blue Group Corp. allegations of a leasing income drop as much as 50% in a given month over the past year, coinciding with accessibility conversion dates. (*See* Amended Complaint at ¶ 39). In addition, contrary to Defendants' argument that causation is lacking given the timing of the regulations, the TLC actually approved the Accessibility Conversion Rules in April 2014, and they did not even take effect until January 2016, once again a direct correlation with the injuries alleged. The Corporate Plaintiffs as well as Mr. Ginsberg and Mr. Itzchaky have plainly met their burden for establishing standing at the pleading stage as they have alleged injuries in fact caused by Defendants, which a favorable ruling could redress. *See, e.g., Carter,* 2016 WL 2640989, at *5; *see also Hidalgo,* 2015 WL 8375196, at *2.

### B. Plaintiffs' Claims Are Not Barred by Res Judicata

Defendants next argue that each and every one of Plaintiffs' claims is precluded by the doctrine of res judicata as a result of the Credit Union Plaintiffs' Article 78 proceeding in Supreme Court, Queens County, which was dismissed on September 8, 2015. *See* Opening

Memorandum at 16-17.   Among other things, Defendants claim that Credit Union Plaintiffs "could have asserted their federal claims, as well as their newly asserted state law fraud claim, in the state court proceeding."   *See id*.   Furthermore, Defendants claim that the Credit Union Plaintiffs did in fact assert "an Equal Protection claim similar to the one raised herein, based on the same <u>Illinois Transp.</u> Decision," in Plaintiffs' *Motion for Reconsideration*. *See id*. Defendants additionally claim that although some plaintiffs "were not named parties in the state case," this "does not impede the application of *res judicata* against all of the plaintiffs in this federal case," because "plaintiffs are represented by . . . the same attorney who represented the Credit Union Plaintiffs in the state court proceeding."   *See id*. at 17-18.   None of these contentions have any merit.

Generally, res judicata is an affirmative defense to be pleaded in a defendant's answer. *See* Fed. R. Civ. P. 8(c)(1). Only when all relevant facts are shown by the court's own records, of which the court takes judicial notice, the defense may be upheld on a Rule 12(b)(6) motion without even requiring an answer. *See, e.g., W.E. Hedger Transp. Corp. v. Ira S. Bushey &* Sons, 186 F.2d 236 (2d Cir. 1951); *Day v. Moscow,* 955 F.2d 807, 811 (2d Cir. 1992). To prevail on the defense of res judicata, the moving party must therefore conclusively show that: (1) the previous action involved an adjudication on the merits; (2) the previous action involved the plaintiffs or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994); *Chase Manhattan Bank, N.A. v. Celotex Corp*., 56 F.3d 343, 345–46 (2d Cir. 1995).   The party asserting *res judicata* bears the burden of proving these elements. *Monahan v. N.Y. City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir. 2000). When considering the question of privity, courts look to whether "the party against whom claim preclusion is sought has, in essence,

already received his or her day in court, and the application of *res judicata* would not alter this conclusion." *Pharr v. Evergreen Garden, Inc.,* 123 Fed.Appx. 420, 424 (2d Cir. 2005). Importantly, "[a]s a general proposition, *res judicata* requires an identicality, or privity, of the plaintiffs and defendants in the initial and subsequent actions for preclusion to apply." *See id.* New York courts further "recognize privity based on representation only if the interests of the person alleged to be in privity were 'represented [in the prior proceeding] by another vested with the authority of representation.'" *See Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt In'tl B.V. v. Phillippe S.E. Schreiber,* 327 F.3d 173, 185 (2d Cir. 2003) (citations omitted). Additionally, when considering the third element of res judicata, "[i]t must first be determined that the second suit involves the same 'claim'-or 'nucleus of operative fact'-as the first suit.'" *Interoceanica Corp. v. Sound Pilots, Inc.,* 107 F.3d 86, 90 (2d Cir. 1997).

To start, there has been no previous adjudication on the merits for the claims at issue in this action, and the claims were not and could not be raised in the prior action. Indeed, Defendants acknowledge that the Credit Union Plaintiffs' Article 78 proceeding was asserted in the nature of mandamus to compel, mandamus to review, declaratory judgment, and writ of prohibition, which is fundamentally different than this action. *See* Opening Memorandum at 14-15. In fact, the Credit Union Plaintiffs specifically limited the claims in their Verified Petition to the single issue of whether E-Hails fall within medallion owners' exclusive statutory right to hails, and specifically excluded constitutional claims and compensatory damages, alleging instead that they intended to commence a claim for damages in a federal action.[16]   Not

---

[16] Article 78 plaintiffs may only recover such damages incidental to an order compelling a government to fulfill a mandatory duty. *See Gross v. Perales*, 72 N.Y.2d 231, 236 (1988); *see also* N.Y. CPLR Sec. 7806. Therefore, an Article 78 proceeding is not a means for plaintiffs to

surprisingly then, Defendants themselves argued to Justice Weiss in opposition to the *Motion for Reconsideration* that an Equal Protection Clause claim was "a claim not pled in [the Article 78] proceeding," and that the "Article 78 petition does not assert an Equal Protection claim under the United States or New York Constitutions." *See* Docket No. 38 at 30.  The Credit Union Plaintiffs fully agreed: "City Respondents are correct about one thing, and only one thing. Petitioners have not raised and do not seek relief in these Article 78 proceedings for any constitutional violations."  *See* Docket No. 38 at 30.   In turn, Justice Weiss made no mention of any constitutional claim in his ruling on the motion for leave to renew; to the contrary, he concluded that *Illinois Transp. Trade Ass'n* "does not constitute new evidence or, in anyway, change or undermine the law upon which this Court's decision was based." *See* Docket No. 38 at 30.  The foregoing should dispel any question that the Article 78 proceeding involved the same claims brought in this action. Given that the Credit Union Plaintiffs specifically excluded constitutional claims from their Article 78 proceeding, and given that Defendants specifically argued that no such claims were before Justice Weiss, and given that Justice Weiss did not rule on any such claim, *res judicata* is clearly inapplicable – in fact Defendants should be estopped from even arguing it given their prior position in that proceeding.

In any event, even if it could be argued that *res judicata* applied to some part of this action, which it does not, at most any such application would be relevant solely to the Credit Union Plaintiffs as privity cannot be found with the other Plaintiffs, who clearly have not "already received his or her day in court." *Pharr v. Evergreen Garden, Inc.,* 123 Fed.Appx. 420,

---

seek non-incidental compensatory damages.  *Metro. Taxicab Bd. of Trade v. N.Y.C. Taxi & Limousine Com'n*, 958 N.Y.S. 2d 569 (Sup. Ct. N.Y. Cty. 2013), *aff'd*, 115 A.D.3d 521 (1st Dep't 2014), *leave to appeal summarily denied by* 24 N.Y.3d 911 (2014).  Thus, this action is inherently different from the Article 78 proceeding brought by the Credit Union Plaintiffs against Defendants, and as such is not a proper basis for asserting *res judicata*.

424 (2d Cir.2005).   Defendants' claims that Plaintiffs TMODA, Mutual Taxi Owners, KL

Motors, Safini, White & Blue Group, FIMA, Ginsberg, and Itzchaky should be subject to the

application of *res judicata* is easily dispensed with as the Credit Union Plaintiffs did not have

any authority in the Article 78 proceedings to represent the interests of the rest of the Plaintiffs in

this action, therefore, the fact that the same attorney represents the Plaintiffs here and represented

the Credit Union Plaintiffs in the Article 78 proceeding has no bearing on whether *res judicata*

applies. *See Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het

Kapitaal Van Saybolt In'tl B.V. v. Phillippe S.E. Schreiber,* 327 F.3d 173, 184-185 (2d Cir. 2003)

(citations omitted).   Plaintiffs have not received their day in court and deserve that opportunity to

be heard in this matter, and since the claims have not and could not be adjudicated previously,

Defendants' *res judicata* argument must fail.

### C.   Plaintiffs' Claims Are Not Barred by the Doctrine of Laches

Defendants also argue that the doctrine of laches bars Plaintiffs' claims because they are

"guilty of such an unreasonable delay," and many of the rules that are the subject of this

litigation have been in effect for years.   *See* Opening Memorandum at 19.   First, Defendants

argue that "the use of electronic apps in the FHV sector has been authorized by TLC since

2011," and during the past 5 years "hundreds of companies and individuals have structured their

business models around the 2011 approval of electronic app usage in the FHV sector, and

thousands of individuals have now come to rely on electronic apps to prearrange their

transportation on a daily basis."   *See id*. at 19.   Second, Defendants claim that "with regard to the

Accessibility Rules, as previously detailed, they were enacted in 2014."   *See id*. at 20.   Finally,

Defendants contend that the remaining regulatory burdens placed on medallion taxicabs "have

been in place for decades."   *See id*. None of these arguments is correct.

As an initial matter, the doctrine of laches is an equitable defense that presumptively "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of New York*, 103 F.3d 257, 259 (2d Cir. 1997) (internal quotation marks and citations omitted). The defense of laches is an affirmative defense, which is generally not appropriately raised in a motion to dismiss. *See, e.g., Karlen v. New York Univ.,* 464 F. Supp. 704, 708 (S.D.N.Y. 1979). Indeed, a court may only consider the defense of laches on a motion to dismiss "in certain circumstances, when the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar." *Lennon v. Seaman,* 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999). Therefore, a party asserting the defense of laches in a motion to dismiss must, on the face of the complaint, establish that: (1) the plaintiff knew of the defendant's misconduct; (2) the plaintiff inexcusably delayed in taking action; and (3) the defendant was prejudiced by the delay. *See e.g., Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.,* 17 F.3d 38, 44 (2d Cir. 1994).

First, and perhaps most importantly, all of the claims set forth in the Amended Complaint are squarely within applicable statute of limitations periods.[17]  Second, there was no delay in

---

[17] "The statute of limitations on an Equal Protection claim brought in New York under 42 U.S.C. § 1983 is three years" and begins to run when Plaintiff knew or should have known of the disparate treatment (in this case 2015 with the passage of E-Hail Rules). *See Fahs Const. Group, Inc. v. Gray*, 725 F.3d 289, 292 (2d Cir. 2013) (citations omitted).  Moreover, "[w]here a plaintiff challenges a 'continuous practice and policy of discrimination ... the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it.'"  *See id* (quoting *Cornwell v. Robinson*, 23 F.3d 694, 703 (2d Cir. 1994).  A similar analysis applies to Plaintiffs' takings claim, which is also entitled to a three-year statute of limitations period.  *See Sherman v. Town of Chester*, 752 F.3d 554, 566 (2d Cir. 2014). As for Plaintiffs' Due Process claims, again a three-year statute of limitations period applies and accrues from when Accessible Conversion Rules took effect in 2016, or even under Defendants' analysis when enacted in 2014.  *See Ashley v. Eastchester Police Dept.*, 2012 WL 234399, *2 (S.D.N.Y. Jan. 6,

Plaintiffs taking action here, especially since Defendants only formally promulgated rules governing E-Hails in January and April 2015. Indeed, it was not until the adoption of the E-Hail Rules that Defendants were finally forced to reverse their prior determination and take the position that E-Hails were somehow not simply a modern day form of the traditional "hail" and were therefore authorized for all FHVs in New York City. Likewise, it has only been in the past year that passenger and driver acceptance has reached the critical mass required to achieve nearly instantaneous E-Hails – which is precisely the reason why there is now collapsing ridership numbers. More to the point, Uber alone has increased its average daily E-Hails to 141,000 as of October 2015, representing a 40% increase from just the prior three months. *See* Amended Complaint at ¶ 203.

Likewise, with respect to the Accessible Conversion Rules, while it is true that the Accessible Conversion Rules were adopted over a year ago, they did not go into effect until January 1, 2016, and the TLC has still not finalized the details concerning TLC's supposed reimbursement to medallion owners from the Taxicab Improvement Fund for the costs associated with converting and operating an accessible vehicle. *See* Amended Complaint at 146. Indeed, had Plaintiffs moved earlier, Defendants would have argued that the motion was premature because they were still developing their plans for implementing the Accessible Conversion Rules. In any event, the lottery held by the TLC to select medallion owners for conversion only occurred in June 2015. As a result, medallion owners, including the Medallion Owner Plaintiffs who were selected to convert their medallions are just now being faced with the hardships involved with converting their vehicles and moved as swiftly as could reasonably be expected to challenge Defendants' wrongful actions. Plaintiffs clearly did not delay in bringing their claims

---

2012). Lastly, actions based on fraud in New York are afforded a six-year statute of limitations period. *See* C.P.L.R. § 213 (2016).

and there could be no prejudice whatsoever to Defendants since there was no delay. Accordingly, Plaintiffs' claims are timely and warranted, and the defense of laches is not clear on the face of the complaint, making it improper at this stage of the proceedings, and based on the foregoing, otherwise inapplicable to these claims. *See e.g. Lennon* 63 F. Supp. 2d at 439.

### D.      Plaintiffs' Equal Protection Claim Is Well Pled

Plaintiffs allege in their Amended Complaint that Defendants have violated the Equal Protection Clause by applying the TLC's Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules, to participants in the New York City medallion taxicab industry, while not "applying those same rules and regulations to similarly situated FHV companies." *See* Amended Complaint at ¶ 311. "[T]he market and collateral value of the medallions and their marketability are being and will continue to be impaired by the unequal application of the TLC's Disparate Medallion Taxicab Rules and Accessible Conversion Rules." *See id.* at ¶ 315. Plaintiffs further allege that, "[d]ue to Defendants' evisceration of hail exclusivity, medallion taxicabs and FHVs now operate under the same business models and are now similarly situated for purposes of the Equal Protection Clause." *See id.* at ¶ 312. Finally, Plaintiffs allege that "Defendants have not offered any rational justification for the unequal application of the TLC's Disparate Medallion Taxicab Rules, including the Accessible Conversion Rules," *see id.* at ¶ 313, and thus "Defendants' actions are irrational and wholly arbitrary, and without any rational basis or legitimate government purpose." *See* Amended Complaint at ¶ 314. These allegations are all that is required at the pleading stage.

###### i.      *Plaintiffs Properly Allege that Medallion Taxicabs and FHVs Accepting On-demand E-Hails Are Similarly Situated*

For purposes of an Equal Protection claim, the government is required "to treat all similarly situated people alike." *African Trade & Info. Ctr., Inc. v. Abromaitis*, 294 F.3d 355,

362 (2d Cir. 2002); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 (1985).

To be similarly situated, individuals must be similarly situated not in every particular manner,

but "in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.

1997).   To succeed on its claim, the plaintiff must establish that: "(i) no rational person could

regard the circumstances of the plaintiff to differ from those of a comparator to a degree that

would justify the deferential treatment on the basis of a legitimate government policy; and (ii)

the similarity in circumstances and difference in treatment are sufficient to exclude the

possibility that the defendant acted on the basis of a mistake."  *Clubside, Inc. v. Valentin*, 468

F.3d 144, 159 (2d Cir. 2006).   In weighing the question of similarity, "a court should 'not

demand exact correlation, but should instead seek relevant similarity.'"   *Loesel v. City of

Frankenmuth*, 692 F.3d 452, 462 (6th Cir. 2012) (quoting *Bench Billboard v. City of Cincinnati*,

675 F.3d 974, 987 (6th Cir. 2012)).

Accordingly, to withstand a motion to dismiss, a plaintiff need only "allege differential

treatment from similarly situated individuals" that was "wholly arbitrary and irrational" to "state

a viable equal protection claim." *Aikens v. Royce*, 2015 WL 7758892, at *10 (S.D.N.Y. Dec. 1,

2015) (quoting *Vaher v. Town of Orangetown, N.Y.,* 916 F. Supp. 2d 404, 433 (S.D.N.Y. 2013)).

To be certain, "a plaintiff is not required to proffer evidence of similarly situated individuals at

the motion to dismiss stage."  *Vaher*, N.Y., 916 F. Supp. 2d at 434-35.  Rather, the court must

merely "determine whether, based on a plaintiff's allegations in the complaint, it is plausible that

a jury could ultimately determine that the comparators are similarly situated.'"  *Id*. (quoting

*Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011)).

Additionally, "the plaintiff is entitled to all reasonable inferences from the facts alleged…." *Doe*

*v. Hagenbeck*, 98 F. Supp. 3d 672, 683-84 (S.D.N.Y. 2015) (quoting *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir.2004)).

In other words, all that Plaintiffs in this action must allege to satisfy this element is that they are similarly situated to another group of individuals, and that they are being treated differently than that group, and that differential treatment is wholly arbitrary and irrational. Plaintiffs have done so by alleging in their Amended Complaint that as a result of Defendants' evisceration of hail exclusivity, "the business model for medallion taxicabs and e-hailing companies such as Uber, Lyft, and Gett are now exactly the same in all material respects," and are therefore similarly situated. *See* Amended Complaint at ¶ 185.  Both medallion taxicabs and e-hailing companies "seek to make a profit by providing on-demand transportation services to passengers currently ready to travel."  *See* Amended Complaint at ¶ 187.  Both medallion taxicabs and e-hailing companies provide their services with "cars driven by the same drivers," *see* Amended Complaint at ¶ 191, and charge customers in the same manner – "through smartphones using credit card payments." *See* Amended Complaint at ¶ 193. Furthermore, because medallion taxicabs and FHVs provide the same on-demand transportation service, they are "competing for the same customers."  *See* Amended Complaint at ¶ 196. This fact is even admitted by Defendant City of New York in the New York City Transportation Study, which states that FHVs and medallion taxicabs "are now in direct competition for the same passengers." *See* Amended Complaint at ¶ 196. Finally, notwithstanding the fact that medallion taxicabs and FHVs are similarly situated, Defendants have intentionally enacted Disparate Medallion Taxicab Rules that treat medallion taxicabs differently than FHVs. *See* Amended Complaint at ¶ 311. Therefore, Plaintiffs have "allege[d] differential treatment from similarly

situated individuals," *Aikens*, 2015 WL 7758892, at *10 (quoting *Vaher,* 916 F. Supp. 2d at 433),

and satisfied the first element of an Equal Protection claim.

Despite the detailed allegations set forth in Plaintiffs' Amended Complaint, Defendants

argue in their Opening Memorandum that medallion taxis and FHVs are not similarly situated

because "[t]he services provided by medallion owners and FHV operators are markedly

different." *See* Opening Memorandum at 23. In particular, Defendants point out that taxis are

subject to "metered fares, passenger surcharges, insurance requirements, credit card machine

requirements, and vehicle color and appearance requirements" that do not apply to FHVs. *See*

Opening Memorandum at 25. According to Defendants, these differences, combined with the

fact that "taxis, and taxis only, may accept street hails," s*ee* Opening Memorandum at 25,

establish enough of a dissimilarity between taxi owners and FHV operators to justify dismissal of

Plaintiffs' Equal Protection claim at the pleading stage.  In other words, Defendants are arguing

that medallion taxicabs and FHV companies like Uber are not even plausibly similarly situated

for purposes of Equal Protection.

Defendants are mistaken.  All of the differences between Plaintiffs and FHV operators

discussed in Defendants' Opening Memorandum, many of which implicate factual inquiries

beyond the scope of pleading challenge, are in any case inconsequential, not material. The

service provided by both medallion owners and FHV operators is transportation, and to be

similarly situated, individuals must be similarly situated not in every particular manner, but "in

all material respects." *Shumway*, 118 F.3d at 64. Due to Defendants' evisceration of hail

exclusivity, "medallion taxicabs and FHVs now operate under the same business models."  *See*

Amended Complaint at ¶ 312. Because Plaintiffs have alleged that medallion taxicabs and e-

hailing companies "serve the same customers, create the same value for those customers, transact

sales in the same manner, deliver the same services, and use the same strategies to generate revenue in the on-demand transportation service business," *see* Amended Complaint at ¶ 185, Plaintiffs have alleged more than enough factual matter to plausibly allege that medallion owners and FHV operators are similar in all material respects and are similarly situated for purposes of the Equal Protection Clause.

Moreover, even the minor differences relied on by Defendants are more similar than they appear. As stated in Defendants' Opening Memorandum, FHV services provide each customer with "a binding fare quote" prior to serving the customer. *See* Opening Memorandum at 26. Similarly, as Defendants continue, "[w]hat is known in a medallion taxi…is the rate of fare." *Id*. at 27. While Defendants hoped to suggest a material difference between taxi medallion operators and FHV operators, it clearly implies that customers, whether using an FHV service or a taxi service, have a general idea of how much each service will cost them prior to using the services. Thus, Defendants are inadvertently emphasizing a similarity between the two services. Another similarity between the two services is that customers know the level of service with which they will be provided prior to entering a vehicle. Uber customers have "access to information about [their drivers]," which provides them with an idea of what service they can expect from their drivers. *Id*. at 26.  Likewise, by the Defendants' own admission, "[t]axi medallion passengers are also familiar with the level of service to expect." *Id*. at 27.

Defendants' Opening Memorandum is essentially an attempt to contradict Plaintiffs' well-pled allegations with factual contentions of their own. These differences bring to light many factual disputes, including the debate over whether E-Hails are in all material respects, simply a modern day hail as Defendants used to believe. The motion to dismiss stage, however, is not intended to resolve any factual disputes. When the Amended Complaint is read with "all

reasonable inferences from the facts alleged…." *Hagenbeck*, 98 F. Supp. 3d at 683-84, drawn in

Plaintiffs favor, it is clear that Plaintiffs have alleged sufficient facts so that "it is plausible that a

jury could ultimately determine that the comparators are similarly situated." *Vaher*, N.Y., 916 F.

Supp. 2d at 434-35.  That is enough for now.

> ii.     *Plaintiffs Properly Allege that there is No Rational Basis for*
> *Defendants' Disparate Treatment of Medallion Taxicabs and FHVs*
> *Accepting On-demand E-Hails*

For purposes of an Equal Protection claim, a court will only "uphold the legislation if it

bears a rational relationship to a legitimate government interest."  *Windsor v. United States*, 699

F.3d 169, 180 (2d Cir. 2012) (quoting *Thomas v. Sullivan,* 922 F.2d 132, 136 (2d Cir.1990)).

Two prongs must be satisfied to meet the rational basis standard: "(1) the challenged action must

have a legitimate purpose and (2) it must have been reasonable for the lawmakers to believe that

use of the challenged classification would promote that purpose."  *N.Y.C. Managerial Employees*

*Ass'n v. Dinkins*, 807 F. Supp. 958, 965 (S.D.N.Y. 1992).  While rational basis review is meant

to be respectful to the legislature, it is not meant to be toothless. *Schweiker v. Wilson*, 450 U.S.

221, 234 (1981).  To survive a motion to dismiss, Plaintiffs need only "allege that the

governmental action was 'irrational and wholly arbitrary' or motivated by animus toward

plaintiffs." *Seabrook v. City of New York*, 509 F. Supp. 2d 393, 402 (S.D.N.Y. 2007).

Here, Plaintiffs have alleged that Defendants' actions were irrational and wholly

arbitrary. First, Plaintiffs alleged in their Amended Complaint that "there is no rational basis for

subjecting taxicabs to metered fare limitations, while permitting similarly situated FHVs to vary

their rates as they see fit based on market demand."  *See* Amended Complaint at ¶ 248.

Similarly, Plaintiffs alleged that "there is no rational basis for limiting medallion taxicab owners

and businesses to specific lease caps set by the TLC, while permitting similarly situated FHVs to

fluctuate their lease rates as they see fit based on market demand," and "there is no rational basis for dictating the times and lengths of shifts that medallion taxicab drivers can work, while allowing these same drivers to jump to e-hailing companies where they can drive as little or as much as they choose."  *See id.* at ¶ 254.  Further, Plaintiffs alleged that there is "no rational basis for requiring taxicabs to pay a Taxi Accessibility Fee, a surcharge of thirty cents per trip to subsidize taxicab accessibility, and a tax of fifty cents per trip to fund MTA operations, while at the same time not requiring similarly situated FHVs to pay any such fees or taxes."  *See id.* at ¶ 259.  Additionally, there is "no rational basis for requiring medallion taxicabs to be limited to a few specific vehicles approved by the TLC, while permitting similarly situated FHVs to choose any car they desire," and "no rational basis for requiring medallion taxicabs to comply with TLC requirements for features, including paint, finish, lighting, upholstery, seats, windows, air conditioners, and roof lights, while at the same time not requiring similarly situated FHVs to comply with any such requirements."  *See id.* at ¶¶ 262, 264.  Nor is there a rational basis for requiring medallion taxicabs, and not FHVs, to comply with TLC specifications for taximeters, partitions, in-vehicle camera systems, credential holders, and "T-PEP" technology.  *See id.* at ¶¶ 266-69.  Likewise, "there is also no rational basis for requiring medallion taxicab drivers to pass more stringent tests to obtain a license, including passing an English proficiency test, as compared to drivers seeking to obtain a FHV license."  *See id.* at ¶ 270.  Finally, Plaintiffs alleged "there is no rational basis for requiring medallion taxicabs to comply with the Accessible Conversion Rules and reach 50% accessibility by 2020, while at the same time not subjecting FHVs to any accessibility requirement whatsoever."  *See id.* at ¶ 271.

Notwithstanding these allegations, which are presumed to be true for pleading purposes, Defendants contend that the Disparate Medallion Taxicab Rules and Accessible Conversion

Rules are presumptively valid and otherwise pass rational basis review.  *See* Opening Memorandum at 28-44.  According to Defendants, the continuing disparate regulatory treatment of medallion taxicabs reflected in the Disparate Medallion Taxicab Rules remains rational because only taxicabs pick up "random" and "spontaneous" street hails.  *See id.* at 29-30.  As a result, Defendants argue that "[i]t is rational to require medallion taxis to only charge the established metered fare because passengers should know in advance what the rate of fare will be, regardless of which vehicle a passenger hails."  *See* Opening Memorandum at 32.  Additionally, Defendants argue that requiring only medallion taxicabs to purchase accessible vehicles is rationally related to its interest in increasing the availability of accessible vehicles that can be street hailed.  *See* Opening Memorandum at 36-37.

Fundamentally, Defendants' claimed continuing rational basis implicates factual questions that cannot be resolved on a motion to dismiss.   At the very least, Plaintiffs have plausibly alleged that the challenged regulations lack a rational basis—indeed, Plaintiffs' allegations go beyond mere assertion and actually point to Defendants' own admissions that the continuing disparate treatment is unnecessary, counterproductive, hurts competition and needs to be changed.  That is more than enough to plausibly allege the absence of a rational basis—it practically proves it on the merits as well.  In any event, the court's determination of the motion to dismiss filed in *Illinois Transportation Trade Association v. City of Chicago* illuminates the inquiry well.  While the City of Chicago argued that vehicles affiliated with companies like Uber are not similarly situated to taxicabs because they cannot be hailed on the street, the rides are pre-arranged, there is a pre-existing contractual relationship with the customer, the customer knows who the driver is, and the fares are not established by the City of Chicago, the court found that "none of the supposed differences are rationally related to the differences in treatment under

the [law]." *Illinois Transp. Trade Ass'n v. City of Chicago*, Case No. 14-cv-827 (N.D. Ill. Sep. 22, 2015); s*ee also* Docket Nos. 20-21 at ¶ 31.  Similarly, in *Boston Taxi Owners Ass'n v. City of Boston*, 84 F.Supp.3d 72 (D. Mass. 2015), the court recently found that "Plaintiffs have also raised a plausible claim that the City's disparate treatment of taxicab operators and TNCs is not rationally related to a legitimate government objective," because neither of the City's two policy goals is "rationally related to any distinction between taxi operators and TNCs."  *See* Docket No. 55, <u>Exhibit A</u> at 17.  More specifically, the City of Boston argued that "declining to apply Rule 403 to TNCs enhances the City's interest in increasing the availability and accessibility of cost-effective transportation."  *See id*.  The court rejected this argument because while "[i]t is likely true that permitting TNCs to operate unfettered by the requirements of Rule 403 furthers that goal," the disparate treatment of taxis and TNCs "in its application of the rule has, however, no 'fair and substantial relation' to the furtherance of that objective."  *See id*.  In other words, "the distinctions between taxicab operators and TNCs cited by the City, such as differences in the kind of vehicle and payment methods used, are unrelated to the City's policy objective."  *See id*. Therefore, the disparate treatment "could...be considered arbitrary or irrational."  *See id*.

> iii.    *Plaintiffs Properly Allege that the Similarity in Circumstances and Differences In Treatment Between Plaintiffs and FHVs Excludes Any Possibility that Defendants Acted on the Basis of a Mistake*

Finally, to prevail on the merits of their Equal Protection claim, Plaintiffs must ultimately establish that the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that Defendants acted on the basis of a mistake.  This prong is satisfied when the similarity in the circumstances of the plaintiff and the comparator, and the difference in the treatment of the two, is sufficient to eliminate the possibility that the defendants acted on the basis of a mistake.  *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2006). As set forth above, the

similarities between Plaintiffs and FHVs are indisputable, and the starkness of the disparate treatment is so great that there is simply no possibility that the differences in treatment resulted from a mistake.  Indeed, the disparities are codified in the Disparate Medallion Taxicab Rules and Accessible Conversion Rules, and Defendants continue to actively enforce them knowing the disparate burdens they impose.  *See* Amended Complaint at ¶¶ 310-17.

### E.   Plaintiffs' Takings Claim Is Well Pled

As set forth in the Amended Complaint, Plaintiffs seek just compensation in this action arising from Defendants' regulatory taking of Plaintiffs' property in violation of the Fifth Amendment of the United States Constitution and article one of the New York State Constitution.  Specifically, Plaintiffs seek "just compensation for Defendants' illegal taking of Plaintiffs' property interests in the taxicab medallion, and in the statutory right to hail exclusivity that accompanies it." *See* Amended Complaint at ¶ 3. Plaintiffs allege that Defendants have effected a regulatory taking of their protected property interests by deliberately adopting rules and regulations that permit FHVs to deploy smartphone technology in order to intrude upon medallion owners' exclusive statutory right to hails, thereby collapsing the eighty year old regulatory distinction between hails and pre-arranged transportation and allowing all FHVs to solicit and accept E-Hails.

Notwithstanding Plaintiffs' well-plead claims, Defendants argue that Plaintiffs' claims must be dismissed for two supposed defects, both of which misstate or misrepresent the nature of Plaintiffs' takings claims. First, Defendants contend that Plaintiffs cannot bring their claims before this Court based upon Defendants' assertion that "any alleged takings claims are not ripe . . . [b]ecause plaintiffs fail to allege that they have sought just compensation in state court." *See* Opening Memorandum at 46. As discussed below, however, Plaintiffs' claims are in fact ripe

because the Credit Union Plaintiffs and numerous other medallion industry litigants have already exhausted any means reasonably available to them to seek just compensation against Defendants in state court. Indeed, those means—an Article 78 proceeding in New York State Supreme Court—are not even reasonable, certain and adequate means for parties in Plaintiffs' situation to seek just compensation, and, thus, at least for parties in Plaintiffs' situation, not seeking just compensation through these means would not be a bar to Plaintiffs' claims before this Court. Even still, the Credit Union Plaintiffs did in fact file an Article 78 proceeding in order to uphold the meaning of statutory hail exclusivity. *See* Amended Complaint at ¶ 174.  That petition, along with two other petitions filed by other non-parties deemed related, one of which expressly alleged a takings claim, was dismissed, and with it, any prospect in state court for "just compensation" for a regulatory taking. Given this, even if Plaintiffs could otherwise reasonably, adequately, and certainly recover just compensation via an Article 78 proceeding—which they cannot—any further Article 78 litigation would be futile since Defendants would surely raise *res judicata* or argue issue estoppel.

Alternatively, Defendants contend that, even though the Amended Complaint provides detailed factual allegations to substantiate Plaintiffs' takings claims, Plaintiffs still fail to state a claim for an unconstitutional taking. According to Defendants, Plaintiffs "do not adequately plead a taking. . . . [because] Plaintiffs do not have a protected property interest in the market value of their medallions." Opening Memorandum at 48. Plaintiffs do, however, allege protected property interests in their medallions themselves and Plaintiffs' (and all current and future medallion owners') statutory right to hail exclusivity. Amended Complaint at ¶¶ 320-21. Thus, this assertion misconstrues what Plaintiffs have alleged in the first place and is easily rejected because Plaintiffs do allege plausible, protected property interests.

Defendants also contend that Plaintiffs' "takings claims fail as a matter of law . . . [because] plaintiffs must establish that [the challenged regulations] will so devalue their taxicab medallions so as to render the taxicab medallion industry unprofitable as a whole." Opening Memorandum at 49. This is specious misstatement of the standards incumbent on Plaintiffs to state a takings claim. Indeed, Plaintiffs have stated a non-categorical regulatory takings claim, and provided allegations that satisfy each of the factors set forth in *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978), plausibly alleging a well-plead takings claim. First, Defendants seem to claim that Plaintiffs fail to meet the first factor of this *ad hoc* test, because "a takings claim may not rest on a mere diminution in the value of property." Opening Memorandum at 49. Plaintiffs have, however, alleged *catastrophic* economic losses beyond mere diminution in value, Amended Complaint at ¶ 28, including as much as a 70% loss in medallion value, *see id.* at ¶¶ 32, 324, 327; *see also* Higgins Aff. ¶ 6, Ex. 4, an unprofitable market for hails, *see, e.g.*, Amended Complaint at ¶ 34, and skyrocketing delinquencies, bankruptcies, and troubled debt restructurings in businesses based on medallion ownership, *id.* at ¶¶ 28-30.

As to the second factor, Defendants claim that Plaintiffs fail to state a claim because "an owner's reasonable-investment-backed expectations in a highly regulated industry, such as the New York City medallion taxi industry, are limited . . . [and] entirely irrelevant." Opening Memorandum at 49. As alleged, however, Plaintiffs' expectations rely on reasonable investment-backed expectations in Defendants' enforcement of *mandatory provisions of New York <u>State</u> law*, including hail exclusivity, *see id.* at ¶¶ 320-21—expectations defied by Defendants' regulatory decisions, including adopting regulations that do not recognize a meaningful distinction between hail-based and prearranged transportation, which permit trespass upon Plaintiffs' exclusive property rights, *id.* at ¶¶ 19, 20.

As to the third factor, Defendants claim that Plaintiffs fail to state a claim because their action does not have an impermissible character and "is a lawful use of the government's authority and within the scope of that authority." Opening Memorandum at 50. Plaintiffs allege, however, that Defendants' conduct is beyond the scope of Defendants' authority, because it violates New York State law and effects a regulatory taking of Plaintiffs' already purchased property interests in hail exclusivity. *See* Amended Complaint at ¶¶ 320-21. Moreover, Plaintiffs allege that Defendants' regulatory conduct against Plaintiffs' protected property is plausibly characterized as willful and wanton,[18] and also dominated by private regulatory burdens unjustified by public benefit, if any even exists. Accordingly, Defendants' supposed pleading defects are baseless, and they must fail.

### i.        Plaintiffs' Takings Claim Is Ripe for Judicial Review

As a preliminary matter, Defendants argue that Plaintiffs' state and federal takings claims must be dismissed pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure because "any alleged takings claims are not ripe . . . [b]ecause plaintiffs fail to allege that they have sought just compensation in state court." Opening Memorandum at 46. Defendants are mistaken. Plaintiffs have exhausted the only state means available to them for just compensation damages against Defendants. Indeed, "in an effort to uphold the meaning of hail exclusivity," the Credit

---

[18] Defendants have themselves acknowledged on multiple occasions that there is no material distinction between traditional hails and e-hails. For instance, Defendants' counsel in this matter has already conceded that "e-hail apps are just that; they're hails." Amended Complaint at ¶ 164. Additionally, Defendant City of New York has conceded in its January 2016 Transportation Study that "e-dispatch services have blurred the line between medallion cabs, which can offer street-hail service, and non-taxi-for-hire vehicles that offer pre-arranged service." *Id.* at ¶ 178. Yet—despite the significant private burdens suffered by medallion holders by Defendants' regulatory actions and omissions—Defendants have consistently refused to do anything to enforce New York State law by enforcing Plaintiffs' protected property interest in an exclusive market for hails, even with respect to whatever FHV conduct Defendants themselves admit blurs its way into the province of street hails. *See id.* at ¶ 180.

Union Plaintiffs and numerous other non-parties to this action filed multiple Article 78 actions against Defendants, *id.* at ¶ 174—a remedy that does not even reliably provide the sort of just compensation which Plaintiffs are even seeking. When Plaintiffs were denied this relief, Plaintiffs properly filed suit in this Court. *See id.* at ¶ 175. In short, Plaintiffs have made the best use of state procedure that they could. Further litigation would not gain Plaintiffs anything; it would likely be futile, and also precluded by other claims lodged against Defendants by medallion owners and industry stakeholders in separate Article 78 proceedings deemed "related" to the proceeding brought by the Credit Union Plaintiffs.

For a claim to be ripe, "the plaintiff must 'show that (1) the state regulatory entity has rendered a 'final decision' on the matter,[19] and (2) the plaintiff has sought just compensation by means of an available state procedure.'" *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d Cir. 2014) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002)). The "sought compensation" prong concerns whether a plaintiff has sought just compensation through state procedure, which plaintiffs do not have to do if the state does not offer a "reasonable, certain and adequate provision for obtaining compensation." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 379-80 (2d Cir. 1995) (quoting *Williamson Cty. Regional*

---

[19] Defendants do not appear to contend that the regulatory entity in question has not made a final regulatory decision, though they do characterize Plaintiffs' takings claims as an "as applied" challenge, Opening Memorandum at 45, possibly to suggest—albeit unclearly—that Plaintiffs' Amended Complaint fails the first prong of this analysis, *see* Opening Memorandum at 44-46 (claiming that plaintiffs' takings claims are "premature"). To make this argument, Defendants would have to contend that the TLC regulations do not amount to a sufficiently final regulatory decision. This would be absurd, however, because plaintiffs' Amended Complaint clearly alleges that the Disparate Medallion Taxicab Rules and Accessible Conversion Rules are final TLC regulations, to which all medallion holders are now subject, and that Defendants' regulatory decision to permit FHVs to enter the market for hails is based on final regulations as well. *See* Amended Complaint at ¶¶ 15-44. Plaintiffs' Amended Complaint clearly alleges that the TLC regulations constitute a final decision that all medallion holders, not just plaintiffs, are faced with—and will continue to be, unless the TLC actually amends the regulatory scheme— allegations that readily satisfy the first prong of analysis. *See* Amended Complaint at ¶¶ 124-84.

*Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 194 (1985)). In New York

State, plaintiffs seeking relief or compensation from any municipal government decision must

bring an action pursuant to Article 78 of the New York State Civil Practice Law and Rules. *See*

N.Y. CPLR § 7801 (1962). An Article 78 proceeding, however, is not a means for Plaintiffs to

seek non-incidental "just compensation" damages, and New York State does not by statute

provide any other reasonable, certain, and adequate means for seeking such damages against

*municipalities* like the City of New York.[20] *Metro. Taxicab Bd. of Trade v. N.Y.C. Taxi &*

*Limousine Comm'n*, 958 N.Y.S.2d 569 (Sup. Ct. N.Y. Cty. 2013), *aff'd*, 115 A.D.3d 521 (1st

Dep't 2014), *leave to appeal summarily denied by* 24 N.Y.3d 911 (2014).

In any case, even if a reliable just compensation procedure were available—which, in

Plaintiffs' case, it is not—Plaintiffs need only to have "pled facts showing that compensation

[was sought] from the state for the alleged taking before [plaintiffs] filed their complaint [in

federal court]." *TZ Manor, LLC v. Daines*, 815 F. Supp. 2d 726, 735 (S.D.N.Y. 2011). To this

---

[20] In limited circumstances, such as where, unlike in this case, a Plaintiff sues the state, or a government's eminent domain condemnation activities are undertaken pursuant to New York State's Eminent Domain Procedure Law, courts have held that New York State has a reliable just compensation procedure. *E.g.*, *R-Goshen LLC v. Vill. of Goshen*, 289 F. Supp. 2d 441, 450 (S.D.N.Y. 2003). However, since Article 78 Plaintiffs may not recover damages that are not incidental to an order compelling a government to fulfill a mandatory duty, this turns on whether Plaintiffs who prevail in an Article 78 proceeding can subsequently lodge a separate claim for money damages. *See Gross v. Perales*, 72 N.Y.2d 231, 236 (1988); *see also* N.Y. CPLR § 7806. For instance, an Article 78 plaintiff who prevails against New York State, *but not a political subdivision of the state like New York City*, may as a matter of right commence an action in the New York State Court of Claims to recover money damages. *Gross*, 72 N.Y.2d at 234 (1988) ("[W]here a party seeks only money damages against the State, the proper forum for such an action is the Court of Claims. . . ."). Moreover, just compensation "money [damages are] only incidental if a grant of the relief that is the primary aim of the Article 78 proceeding would make it a *statutory duty* of the respondent [municipality] to pay the petitioner the sum sought." *Metro. Taxicab Bd. of Trade*, 958 N.Y.S.2d at 941. Therefore, the right to pursue just compensation money damages against a municipality does *not* reliably extend to Article 78 plaintiffs who prevail against a political subdivision of the state like New York City in the circumstances of a case where, as here, just compensation proceedings are only conducted through the auspices of an Article 78 proceeding. *See id.* at 944.

end, complaints survive a defendant's motion to dismiss unless the "Plaintiffs' complaint [is] devoid of *any* allegation that plaintiffs sought and were denied just compensation for the alleged taking under New York State's available procedures." *Mejia v. City of New York*, No. 01 Civ. 3381 (GBD), 2004 WL 2884407, at *6 (S.D.N.Y. Dec. 10, 2004). Thus, courts have held that plaintiffs simply have to plead that a state just compensation proceeding led the plaintiff to file a takings claim in federal court—even where "the decision was not 'on the merits' in the strictest sense." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 519 (6th Cir. 2004).

Here, New York State does not provide a reasonable, certain and adequate means to secure just compensation. Plaintiffs could only sue Defendants through an Article 78 action, and the only damages recoverable in an Article 78 action are those damages that are incidental to a wrongful government act, such as Defendants' decision not to enforce the mandatory provisions of New York State law.  Since Defendants would not have a statutory duty to pay Plaintiffs' just compensation money damages, Plaintiffs' damages are not incidental in character,[21] and Plaintiffs cannot recover just compensation through an Article 78 proceeding. Moreover, Plaintiffs who sue municipalities, rather than the state, do not reliably have the opportunity to pursue damages beyond those that are incidental to the wrongful government act. Therefore, beyond certain limited circumstances inapplicable in Plaintiffs' case, New York State does not provide an adequate statutory means by which parties like Plaintiffs can reliably seek relief, and Plaintiffs are not barred from seeking just compensation damages for unconstitutional takings before this Court.

---

[21] Even if just compensation would be classified as "incidental" damages, given Defendants' wrongful regulatory decisions—which it would not be—the mere fact that Plaintiffs cannot without a judicial determination of what is and is not "incidental" secure just compensation would be enough to say that an Article 78 proceeding does not provide a reasonable, certain and adequate means to recover just compensation damages for an alleged taking because of a municipality's actions contrary to state law.

Even assuming an Article 78 action qualified as a reasonable, certain, and adequate means to secure just compensation in Plaintiffs' case, Plaintiffs have, for all practical purposes, exhausted the recourse available under Article 78 to the fullest extent possible. As Plaintiffs allege, the Credit Union Plaintiffs filed an Article 78 action in New York State Supreme Court "in an effort to uphold the meaning of hail exclusivity." *See* Amended Complaint at ¶ 174. That proceeding was dismissed, along with two other "related" Article 78 proceedings brought by other medallion industry participants, one of which, *Glyka Trans, LLC et al. v. City of New York et al.*, Index No. 5963/2015 (N.Y. Sup. Ct. Queens Cty.), specifically alleged a regulatory takings claim on behalf of medallion owners.  In each of these related actions, the Defendants— who include the three Defendants here, The City of New York, The New York City Taxi & Limousine Commission, and Meera Joshi—moved to dismiss the proceedings. Subsequently, Justice Weiss did so, in three opinions issued on the same day, September 8, 2015. *Compare* Memorandum Decision 1-9, *Melrose Credit Union v. City of New York*, No. 6443/15 (N.Y. Sup. Ct. Queens Cty. Sept. 8, 2015) *with* Memorandum Decision 1-8, *Glyca Trans LLC v. City of New York*, No. 8962/15 (N.Y. Sup. Ct. Queens Cty. Sept. 8, 2015) (hereinafter the "*Glyca* decision"), *and* Memorandum Decision 1-9, *XYZ Two Way Radio Serv. v. City of New York*, No. 100578/2015 (N.Y. Sup. Ct. Queens Cty. Sept. 8, 2015).[22]

Given the foregoing, Plaintiffs have sufficiently and plausibly alleged that they sought just compensation through the only state procedures available. Plaintiffs have alleged that the

---

[22] Notably, Justice Weiss used language abstract enough to encompass takings claims brought by any party having interest in taxi medallions, and certainly all of the Plaintiffs in the related actions. After performing the *Penn Central* analysis as to Plaintiffs' federal takings claim, the court summarily rejected petitioners' state takings claim by noting, "[t]here was no appropriation of private property for public use without just compensation[], and on similar grounds applicable to the federal claim, the petitioners do not have a cause of action under the state constitution for a regulatory taking." *Glyca* Decision at 13 (citations omitted).

Credit Union Plaintiffs and numerous other industry participants sought to uphold the meaning of hail exclusivity in an Article 78 proceeding and they were denied this relief. Nothing more could be asked of Plaintiffs at this point. Therefore, even if Article 78 is a reliable means for Plaintiffs to pursue just compensation—which it is not—Credit Union Plaintiffs and Medallion Owner Plaintiffs alike should be considered to have sought "just compensation" for the purposes of alleging a ripe takings claim.[23]

ii.      *Plaintiffs' Takings Claim Is Well Pled*

Plaintiffs have plausibly alleged regulatory takings claims arising out of Defendants' interference with Plaintiffs' property rights. Regardless of the "form the alleged taking assumes, to succeed in establishing a constitutional violation claimants must demonstrate: (1) that they have a property interest protected by the Fifth Amendment, (2) that they were deprived of that interest by the government for public use, and (3) that they were not afforded just compensation." *Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 195 (S.D.N.Y. 2005). Plaintiffs have met this basic standard. Moreover, with respect to stating a claim for an *ad hoc* taking pursuant to *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978), courts balance the following three factors: (1) the economic impact of some government regulatory action on the property owner alleging the taking; (2) the effect of the government action on the owner's reasonable investment backed expectations; and (3) the character of the government action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104 (1978).[24]

---

[23] To the extent that this Court determines that it is necessary for Plaintiffs to return to New York State Supreme Court for further litigation of this matter, Plaintiffs respectfully request a stay of decision on Defendants' motion to dismiss Plaintiffs' takings claims pending the resolution of further Article 78 proceedings in state court.

[24] While an *ad hoc* claim will ultimately be unsuccessful if Plaintiffs cannot establish all factors of the *Penn Central* test, *see Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 204 (S.D.N.Y.

First, Plaintiffs have pled allegations to satisfy each of the basic requirements to state a takings claim. *See, e.g.*, Amended Complaint at ¶¶ 320, 326 (alleging that "taxicab medallions, and the accompanying right to hail exclusivity . . . are property within the meaning of the Takings Clause . . . Defendants have taken private property rights belonging to [Plaintiffs] and transferred them to [FHV companies such as Uber, for public use] . . . without paying any compensation to [Plaintiffs], let alone the just compensation required by the takings clause"). Notwithstanding this, however, Defendants claim that Plaintiffs "do not adequately plead a taking. . . . [because] Plaintiffs do not have a protected property interest in the market value of their medallions." Opening Memorandum at 48. As discussed below, this contention is meritless, because Plaintiffs have plausibly alleged protected property interests in the medallions themselves, as well as the accompanying statutory right to hail exclusivity upon which the medallions' value is actually based. Amended Complaint at ¶ 320.

Second, Plaintiffs have pled allegations that plausibly state a claim as to each of the factors of the *ad hoc* test set forth in *Penn Central*. *See, e.g.*, Amended Complaint at ¶¶ 28, 180, 320-22 (alleging, as to the first factor, catastrophic loss of medallion value; as to the second factor, reasonable investment-backed expectations in enforcement of rights provided under state law currently in force; and, as to the third factor, willful refusal to enforce state law). Defendants seem to claim that Plaintiffs fail to meet the first factor of this *ad hoc* test, because "a takings

---

2005), courts have recognized that it is not necessary at the motion to dismiss phase to conduct the *Penn Central* inquiry into the particular factors, *e.g.*, *Grabhorn, Inc. v. Metro. Serv. Dist.*, 624 F. Supp. 2d 1280, 1289 (D. Ore. 2009) (refusing to dismiss a plaintiff's regulatory takings claim); *see also Aureus Asset Managers, Ltd. v. United States*, 121 Fed. Cl. 206, 213 (2015) (characterizing a plaintiff's reference to the Penn Central factors as "premature at this stage of the case," and denying a motion to dismiss); *Swartz v. Beach*, 229 F. Supp. 2d 1239, 1262 (D. Wyo. 2002) (refusing to dismiss plaintiffs' *ad hoc* takings claim where "[p]laintiff[s have] sufficiently alleged that the State Defendants inaction fails to advance a legitimate government interest"). To the extent that Plaintiffs are required to show that they have plausibly pleaded allegations to support each factor, however, Plaintiffs are able to make this showing, if only to rebut Defendants' supposed infirmities and pleading defects.

claim may not rest on a mere diminution in the value of property." Opening Memorandum at 49. As discussed below, however, Plaintiffs have alleged *catastrophic* economic losses beyond mere diminution in value, and losses by medallion owners that amount to a *de facto* collapse of the entire market for medallions. As to the second factor, Defendants argue that Plaintiffs fail to state a claim because "an owner's reasonable investment-backed expectations in a highly regulated industry, such as the New York City medallion taxi industry, are limited . . . [and] entirely irrelevant." Opening Memorandum at 49. Plaintiffs, however, allege reasonable expectations in exclusive rights guaranteed under state law, including the HAIL act, expectations that are certainly reasonable, even if Defendants might lawfully regulate Plaintiffs' medallions without violating state law. Indeed, Defendants themselves actively marketed and sold taxicab medallions on the basis of continued enforcement of this valuable exclusive right and boasted of the "guaranteed employment" that it creates.  *See* Amended Complaint at ¶¶ 12, 14.  As to the third factor, Defendants assert that Plaintiffs fail to state a claim because their action does not have an impermissible character and "is a lawful use of the government's authority and within the scope of that authority." Opening Memorandum at 50. As discussed below, Defendants misperceive their own character; as Plaintiffs allege, Defendants' conduct is actually beyond the scope of Defendants' authority because it violates New York State law, and, notwithstanding this, Defendants' conduct is of an impermissible nature because it willfully interferes with Plaintiffs' property rights. Accordingly, Defendants' supposed pleading defects are baseless, and they must fail.

1.  Plaintiffs Properly Allege Protected Property Interests

Plaintiffs have plausibly alleged protected property interests in their medallions and the attendant right to hail exclusivity. "To state a claim under either the Due Process Clause or the

Takings Clause, Plaintiffs [a]re required to allege facts showing that state action deprived them of a protected property interest." *Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992). In takings claims, "the existence of a property interest is determined by reference to 'existing rules or understandings that stem from an independent source such as state law.'" *Phillips v. Wash. Legal Found.*, 524 U.S. 156, 164 (1998) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). Thus, protected property rights are stated when Plaintiffs allege rights "protected by the Taking Clause of the Fifth Amendment . . . *to the extent that [plaintiffs have] an interest . . . cognizable . . . under [state] law* [e.g., the exclusive right to hails under New York State's HAIL act]." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984) (emphasis added).[25] Courts emphasize that Plaintiffs need only to "allege[] *sufficient facts* to show a property interest in the [property] they sought to protect," *Aureus Asset Mgmt., Ltd. v. United States*, 121 Fed. Cl. 206, 212 (2015) (emphasis added), or, otherwise stated, "to establish a [] taking, a claimant must

---

[25] *See also, e.g.*, *Armstrong v. United States*, 364 U.S. 40, 44, 46, 80 (1960) (holding that materialman's lien provided for under Maine law is protected by Taking Clause); *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 596–602 (1935) (holding that real estate lien is protected); *Lynch v. United States*, 292 U.S. 571, 579 (1934) (holding that valid contracts are property within meaning of the Taking Clause); *Story*, 978 F.2d 60, 61 (2d Cir. 1992) (noting that plaintiffs only "failed to allege a property interest that could support their due process and takings claims" because plaintiffs had alleged a property interest in the enforcement of a law that had been repealed).

As to the substance of property rights, "[t]he hallmark of a protected property interest is the right to exclude others," *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 673 (1999), which is "one of the most essential sticks in the bundle of rights that are commonly characterized as property," *Kaiser Aetna v. United States*, 444 U.S. 164, 176 (1979). Where state government has recognized a property interest, "the [state] legislature . . . [h]aving enacted a [law] that create[s] [] a right, [] retains the power to enact new legislation altering or eliminating the right . . . when the statute that once authorized the benefit in question is repealed, any property right in that benefit is extinguished." *Story v. Green*, 978 F.2d 60, 62, 64 (2d Cir. 1992). In other words, legislative or administrative bodies that in the first place do not have the authority to create a certain property right (e.g., the TLC) do not have the power to extinguish that right, and the right remains a protected property interest until the body that creates it or another with authority to extinguish it (e.g., the New York State Legislature) acts. *See id.*

identify a cognizable property interest," *Estate of Hage v. United States*, 687 F.3d 1281, 1291 (Fed. Cir. 2012).[26] Moreover, "a property interest, within the meaning of the Fourteenth Amendment [applying the Fifth Amendment], includes not only what is owned but also . . . what is sought . . . [subject to] 'a legitimate claim of entitlement.'" *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 915 (2d Cir. 1989) (quoting *Roth*, 408 U.S. at 577); *see also Mejia v. City of New York*, No. 01 Civ. 3381 (GBD), 2004 WL 2884407, at *5 (S.D.N.Y. Dec. 10, 2004) (holding that Plaintiffs "properly claim[] the deprivation of a protected property interest" when they allege in their complaint rights that they are generally entitled to).

Plaintiffs in this action have plausibly alleged the existence of protected property interests. In relevant part, Plaintiffs' Amended Complaint states that Plaintiffs are due "just compensation for Defendants' illegal taking of Plaintiffs' property interests in the taxicab medallion, and in the statutory right to hail exclusivity that accompanies it." Amended Complaint at ¶ 3. Further, it alleges that "Credit Union Plaintiffs' and Medallion Owner Plaintiffs' are owners of property . . . medallions, and the accompanying statutory right to hail exclusivity expressly granted to present and future medallion owners pursuant to New York State law, [] property within the meaning of the Takings Clause . . . that may not be taken by Defendants without payment of just compensation." *Id.* ¶¶ 320-21.[27]

---

[26] Decisions of the United States Court of Federal Claims operate under the Rules of the United States Court of Federal Claims (the "RCFC") rather than the Federal Rules of Civil Procedure. These courts analyze motions to dismiss for failure to state a claim pursuant to RCFC 12(b)(6), which is subject to the *Twombly-Iqbal* plausibility standard applied to FRCP 12(b)(6) motions. *See, e.g.*, *Colonial Chevrolet Co., Inc. v. United States*, 123 Fed. Cl. 134 (stating that "[w]hen deciding a motion to dismiss a complaint pursuant to RCFC 12(b)(6), the court must accept the material facts alleged in the complaint to be true, draw all reasonable inferences in favor of the plaintiffs, and decide whether it is plausible that plaintiffs have a valid claim for relief").

[27] Accordingly, Plaintiffs allege property rights expressly granted by state law, "[]affirmed by the New York State Legislature, most recently in the HAIL act, which expressly provides that '*it*

Notwithstanding these well-pled allegations, Defendants argue that Plaintiffs fail to plead a taking because they do not have a protected property interest in the market value of their medallions. Opening Memorandum at 48. Specifically, Defendants insist that the decisions in *Boston Taxi Owners' Ass'n v. City of Boston*, No. 15-10100-NMG, 2016 WL 1274531, at *1 (D. Mass. Mar. 31, 2016), *Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 575 F.3d 502 (8th Cir. 2008), *Ill. Transp. Trade Ass'n v. City of Chi.*, 134 F. Supp. 3d 1108 (N.D. Ill. 2015), and *Gebresalassie v. Dist. of Columbia*, No. 15-762 (CKK), 2016 WL 1089219, at *1 (D.D.C. Mar. 18, 2016) support the proposition that Plaintiffs do not have a protected property interest in the value of medallions, or in the property right to exclude non-medallion holders from the market for hails under New York State law. *See id.* at 48-49.

Plaintiffs' detailed recitation of the governing law in New York State—and the conflict and intrusion caused by the recent changes to long-standing, lawful TLC regulations—provides the foundation for Plaintiffs' allegations that there are protected property interests in medallions themselves as well as in the statutory right to exclusivity in the market for hails—property interests that have been unlawfully taken without just compensation.[28] Amended Complaint at ¶

---

*shall remain the exclusive right of existing and future taxicabs* licensed by the TLC as a taxicab to pick up passengers via street hail . . . No driver of any for-hire vehicle shall accept a passenger within the city of New York by means other than pre-arrangement.'" Amended Complaint at ¶ 6. Moreover, "[t]he taxicab medallion, and with it, the exclusive right to accept hails, has long been recognized as private property—a transferrable commodity . . . [a perception for which t]he TLC has repeatedly reinforced the investment expectations of medallion owners in the property rights being acquired by purchasing a New York City taxicab medallion. . . . Defendants have thus marketed and sold medallion owners a protectable, vested property interest in the New York City taxicab medallion, along with the statutory right to hail exclusivity that accompanies it, on which medallion purchasers [such as Plaintiffs] have reasonably relied in marking the decision to purchase a medallion and operate their private businesses." *Id.* at ¶¶ 12, 14.

[28] To the extent that Defendants are claiming that Plaintiffs have no protected property interest in the *market value* of medallions, Plaintiffs have never alleged—and their Amended Complaint does not state—that there is a protected property interest in the market value of medallions.

320; *see also id.* at ¶¶ 5-47. Accordingly, Plaintiffs have provided ample allegations to plausibly state, despite Defendants' contentions, a protected property interest in hail exclusivity—the property right guaranteed to medallion holders as a matter of entitlement under New York State law. As Plaintiffs allege, New York City, unlike the city governments in Defendants' cited cases, is subject to a state legislature's express recognition of a property right for medallion holders— through the HAIL act—exclusive of interlopers who would accept hails without taxi medallions. Defendants' cited decisions are all inapposite because they concern only the property rights extant, if any, in a *particular* state-and-local regulatory scheme, *not* in New York. These decisions—arising out of the city-state taxi-regulatory schemes in Boston, (Massachusetts),[29] Minneapolis (Minnesota),[30] Chicago (Illinois)[31] and the District of Columbia[32]—are

---

Rather, Plaintiffs have simply alleged that "New York City taxicab medallions, and the accompanying statutory right to hail exclusivity expressly granted to present and future medallion owners pursuant to New York State law, are property within the meaning of the Takings Clause." Amended Complaint at ¶ 320. Accordingly, Defendants have misstated the property interests that Plaintiffs allege having in the first place.

[29] With respect to Boston's taxi business, "[b]y statue, the Massachusetts 'Legislature empowered the [Police] Commissioner [of the City of Boston] to regulate the taxi business in Boston and to fix rates of fare.'" *Boston Cab Dispatch, Inc. v. Uber Techs., Inc.*, No. 13-10769-NMG, 2014 WL 1338144, at *3 (D. Mass. Feb. 28, 2014) (quoting *Town Taxi Inc. v. Police Comm'r of Boston*, 377 Mass. 576 (1979)). Moreover, Mass. Gen. L. ch. 392 "authorizes the [Police Commissioner of the City of Boston] to regulate the taxi business in Boston in part by issuing hackney licenses, or medallions, authorizing the holder to operate a cab within the city." *Boston Neighborhood Taxi Assoc. v. Department of Pub. Utils.*, 410 Mass. 686 (Mass. 1991). In other words, the only action by the state of Massachusetts has been to provide a broad grant of authority to the City of Boston. One inference to make—and one made in the March 31, 2016 order in *Boston Taxi*—is that in Boston, unlike in New York City, there is no market exclusivity, because the City is in complete control of what constitutes the market. In New York City, by contrast, the state has granted *market exclusivity as a property right*, and the City, by failing to enforce medallion exclusivity, effects a taking.

[30] In *Minneapolis Taxi*, the City of Minneapolis amended its taxicab ordinance to open a previously restricted and lucrative market; a coalition of license holders alleged a taking on grounds that "removing the cap on the number of licenses destroyed the market value of the taxicab licenses." *See Minneapolis Taxi*, 572 F.3d at 504-07. Although the Eighth Circuit

categorically distinct from Plaintiffs' medallion interests under the New York State regulatory scheme because each particular city in these cases was granted wide discretion to define the extent of property rights, if any, that medallion holders have in the market for hails, whereas New York State has expressly articulated the dimensions of New York City medallion holders' property rights through the HAIL Act. Plaintiffs have alleged that the TLC's regulatory decisions—which, by Defendants' Counsel's own concessions, have permitted FHVs to compete for a sort of hails indistinct from street hails—amount to a taking of this property. Thus, Plaintiffs plausibly allege an entitlement to property rights under New York State law, for which Defendants have now deprived Plaintiffs.

---

ultimately held that the plaintiffs' interest in the licenses was only a collateral interest (i.e., not a *protected* property interest), it only arrived at this conclusion because the plaintiffs there, unlike plaintiffs here, "[were] unable to point to any Minnesota [state] law establishing the property interest the Coalition [medallion holders and organizational plaintiff] argues has been taken," with the result that "*any property interest that the taxicab-license holders' may possess does not extend to the market value of the taxicab licenses* derived through the closed nature of the City's taxicab market. Without such a property interest, their takings claim necessarily fails." *Id.* at 508 (emphasis added). Differently, New York State law expressly grants the property interest that Plaintiffs allege was taken by Defendants—i.e., medallion owners' statutory right to hail exclusivity.

[31] In *Illinois Transp.*, the court noted that there was no statute or case law in the State of Illinois, unlike in New York, that expressly provided for a property right in a closed market for taxi medallions, or in exclusivity for medallion holders. *Ill. Transp. Ass'n*, 134 F. Supp. 3d at 1112 (noting that "[w]hile Illinois courts have recognized certain property interests in the transferability and assignability of the taxi medallions, there is no case law establishing a blanket property interest in their ownership or market value" and that no statute provided an explicit right).

[32] Likewise, in *Gebresalassie*, the court determined that plaintiffs had "provided no basis" that the District of Columbia exceeded its authority under the D.C. Home Rule Act, or, otherwise stated, that enabling law limited that government's ability to regulate the taxi industry. *Gebresalassie*, 2016 WL 1089219, at *13.

2.  Plaintiffs Properly Allege a Non-Categorical Regulatory Taking for Which Just Compensation is Due

Plaintiffs have stated a non-categorical takings claim for which just compensation is due. In order to state a takings claim in cases where governmental action does not categorically take protected property through physical actions or deprive property owners of "all economically beneficial uses" of an entire parcel, *Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1019 (1992), Plaintiffs must allege a non-categorical regulatory takings claim. *See Tahoe–Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002). Under the non-categorical formulation, takings for which fair compensation is due occur when regulatory restrictions on the use of property go "too far." *Penn. Coal v. Mahon*, 260 U.S. 393, 415 (1922). The contemporary articulation of this *ad hoc* takings analysis balances the following three factors: (1) the economic impact of some government regulatory action on the property owner alleging the taking; (2) the effect of the government action on the owner's reasonable investment backed expectations; and (3) the character of the government action. *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). The outcome of these factors depends "largely upon the particular circumstances [in the] case."[33] *Palazzolo v. Rhode Island*, 533 U.S. 606, 633 (2001) (quoting *Penn Cent. Trans. Co.*, 438 U.S. at 124 (1978)).

_____

[33] Courts generally couch the analysis differently depending on the context of the loss that they are investigating in analyzing whether a taking should be said to have occurred, e.g., (1) whether the government has appropriated assets for its own use; (2) whether the economic impact is out of proportion with the experience had before; and (3) whether the circumstances reasonably made persons believe that they would not take a loss. *See Concrete Pipe & Prods. of Cal., Inc.*, 508 U.S. 602, 604 (1993).

While an *ad hoc* claim will ultimately be unsuccessful if Plaintiffs cannot establish all factors of this test, *see Ganci v. N.Y.C. Transit Auth.*, 420 F. Supp. 2d 190, 204 (S.D.N.Y. 2005), courts have recognized that it is not necessary at the motion to dismiss phase to conduct the *Penn Central* inquiry into the particular factors, *e.g.*, *Grabhorn, Inc. v. Metro. Serv. Dist.*, 624 F. Supp. 2d 1280, 1289 (D. Ore. 2009) (refusing to dismiss a plaintiff's regulatory takings claim); *see also*

Plaintiffs have alleged a non-categorical regulatory takings claim. Plaintiffs have plausibly stated allegations that show, as *Mahon* requires, that Defendants' regulations go "too far." Amended Complaint at ¶ 3 (alleging that Plaintiffs are due "just compensation for Defendants' illegal taking of Plaintiffs' property interests in the taxicab medallion, and in the statutory right to hail exclusivity that accompanies it."); *see also, e.g.*, Amended Complaint at ¶¶ 28, 180, 320-22 (alleging, as to the first factor, catastrophic loss of medallion value; as to the second factor, reasonable investment-backed expectations in enforcement of rights provided under state law currently in force; and as to the third factor, willful refusal to enforce state law). This is plausible—and true—because Defendants' regulatory encroachment on hail exclusivity has rendered Plaintiffs' property interest in their medallions compromised to a point beyond diminution of value; indeed, their property interests in statutory hail exclusivity have been altogether destroyed.

### a. Plaintiffs' Properly Allege Deprivation of Economic Use

Plaintiffs have plausibly alleged a takings claim that is supported by the first *Penn Central* factor. As to this factor, the key question for the Second Circuit is not whether the remaining use will be profitable for Plaintiffs, but whether Plaintiffs would be able to sell the

---

*Aureus Asset Managers, Ltd. v. United States*, 121 Fed. Cl. 206, 213 (2015) (characterizing a plaintiff's reference to the Penn Central factors as "premature at this stage of the case," and denying a motion to dismiss); *Swartz v. Beach*, 229 F. Supp. 2d 1239, 1262 (D. Wyo. 2002) (refusing to dismiss plaintiffs' *ad hoc* takings claim where "[p]laintiff[s have] sufficiently alleged that the State Defendants inaction fails to advance a legitimate government interest").

Moreover, in denying a motion to dismiss a plaintiffs' takings claims, courts have cautioned that "*Penn Central* can not be read [] narrowly . . . it makes no sense to limit Penn Central [] when there are myriad ways in which government action can seriously impact individual owners' use of their property." *Mekuria v. Wash. Metro. Area Transit Auth.*, 975 F. Supp. 1, 6 (D.D.C. 1997) (*sic*). Accordingly, courts caution against "assum[ing] the conclusion" at this juncture that Plaintiffs' Amended Complaint pleads only "non-compensable impairment" rather than "compensable takings." *Id.*

property at issue to someone else for its intended use. *Sadowsky v. City of New York*, 732 F.2d 312, 318 (2d Cir. 1984) (citing *Pompa Constr. Corp. v. City of Saratoga Springs*, 706 F.2d 418, 424 (2d Cir. 1983)). In other words, even if diminution in value is not sufficient to state a claim as to this factor, there is a point of economic loss where courts will infer that Plaintiffs' Amended Complaint plausibly states an economic impact serious enough to resolve this factor in Plaintiffs' favor. *See Rent Stabilization Ass'n of N.Y.C., Inc. v. Dinkins*, 805 F. Supp. 159, 163 (S.D.N.Y. 1992) (noting that "the Second Circuit does not consider the denial of a 'reasonable return' as *necessarily* preventing an owner's economically viable use of his [property]" (emphasis added)). Moreover, courts recognize that the threshold requirement for stating a claim as to this factor is "that plaintiffs show 'serious financial loss' from the regulatory imposition in order to merit compensation . . . and [] a significant effect on [Plaintiffs'] business." *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 449-50 (2005) (quoting *Cienga Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003)).

Here, Plaintiffs' Amended Complaint indicates that Plaintiffs' property interests in medallions and hail exclusivity have been so greatly compromised that the Plaintiffs' interest in this property has suffered an economic impact serious enough to merit resolving this factor in the Plaintiffs' favor. As alleged, the "resulting harm to medallion owners and the businesses that they operate has been catastrophic." *Id.* ¶ 28. "As a direct and proximate result of [Defendants'] misconduct and constitutional violations . . .  including the[] deliberative evisceration of the medallion owners' statutory right to hail exclusivity, [] the value of the medallion has plummeted by *more than 40%*, and the once vibrant market for the purchase and sale of New York City taxicab medallions is now frozen." *Id.* ¶¶ 327, 32. The Credit Union Plaintiffs have suffered skyrocketing delinquencies and troubled debt restructurings, and the New York State Department

99

of Financial Services has taken possession of and conserved one Plaintiff, Montauk Credit Union. *See id.* ¶¶ 29-30. The Individual Medallion Owner Plaintiffs "have now lost all of their leasing income, rendering their medallions worthless," and these Plaintiffs face stiff competition and diminishing returns in using their medallions themselves because FHVs can compete in the market for hails. *See, e.g.*, *id.* ¶¶ 34, 45. . In other words, Plaintiffs' interests in the medallions have reached a point of loss that goes beyond mere diminution in value. The Medallion Owner Plaintiffs cannot sell their medallions or otherwise market their medallions to others for intended use. Similarly, the Credit Union Plaintiffs have experienced significant defaults on medallion loans, because medallion owners themselves cannot make productive use of their medallions. The value of the collateral itself—the medallions—has been dramatically impaired;[34] thus, Plaintiffs have plausibly alleged that, as *Sadowsky* and *Rent Stabilization Association of N.Y.C.* require, the value and marketability of Plaintiffs' property is compromised in a manner beyond mere diminution in value.   Incredibly, in a manner that underscores their callousness, "Defendants have permitted and continue to permit FHVs . . . to usurp and trespass upon the exclusive property rights of [Plaintiffs] . . . without paying any compensation to [Plaintiffs], let alone the just compensation required by the Takings Clause." *Id.* ¶ 323.

Fundamentally, Plaintiffs have alleged that their property interests in hail exclusivity have been destroyed—the market for hails has been thrust wide-open to all FHVs, with entirely

---

[34] Defendants cite *Alexandre v. TLC*, No. 07 Civ. 8175(RMB), 2007 WL 2826952, at *1 (S.D.N.Y. Sept. 28, 2007), and *Sanitation & Recycling Indus. Inc. v. City of New York*, 928 F. Supp. 407 (S.D.N.Y. 1996) to support their claim that Plaintiffs are impermissibly *speculating* that the TLC's regulatory decision to permit non-medallion holder FHVs to trespass on hail exclusivity has caused their lost profits and diminished returns. Rather, Plaintiffs have plausibly stated that the TLC's actions—and only the TLC's actions—are the direct and proximate cause of unlawful FHV intrusion in medallion holders' protected property interest in hail exclusivity. Amended Complaint at ¶ 320.   Moreover, Plaintiffs plausibly allege—satisfying the pleading standard—that the TLC's actions are to blame for the devaluations—an obvious market response to unlimited competition for hails where no such competition existed before.

foreseeable results. The value of the medallion has plummeted, the market for medallion transactions is frozen, and taxicab ridership has declined dramatically. That is significantly more than could ever be required under the first factor at the pleading stage. Notwithstanding these well-pled allegations, Defendants argue that "plaintiffs must establish that the challenged regulations deny petitioners *all* economically viable uses of their property. . . . [and] that the regulations will so devalue their taxicab medallions so as to render the taxicab medallion industry *unprofitable as a whole*." *See* Opening Memorandum at 49 (emphasis added). Defendants are wrong. Plaintiffs need not allege that each and every medallion in the taxi medallion market has no economically viable use. Rather, Plaintiffs have plausibly alleged that the economic loss to their protected property interests—both the medallions themselves, as well as the accompanying right to hail exclusivity—have suffered losses beyond mere diminution in value; indeed, Plaintiffs' property interests in hail exclusivity have been destroyed.

### b. Plaintiffs Properly Allege Reasonable Investment-Backed Expectations

Plaintiffs' Amended Complaint also plausibly alleges Plaintiffs' reasonable investment-backed expectations in their medallions and hail exclusivity. The Second Circuit has held that Plaintiffs state a claim as to this factor if they allege that they reasonably rely on "some form" of stability in investment expectations, even for highly regulated property concerns. *See Sherman v. Town of Chester*, 752 F.3d 554, 565 (2d Cir. 2014) (holding that plaintiff stated a claim as to this factor where he alleged an ability to "recoup[] [his] investment [in property] after a reasonable time [by getting] the Town's approval [for a zoning permit] on at least some form of development"); *see also Colonial Chevrolet Co., Inc. v. United States*, 123 Fed. Cl. 134, 139 n.5 (2015) (finding that plaintiffs could survive a motion to dismiss by showing that they had reasonable expectation in their property maintaining such value that their franchise agreements

would not be cancelled). Moreover, courts recognize that Plaintiffs state reasonable investment-backed expectations where they "operat[e] in a highly regulated industry and [do] not challenge the government's ability to regulate procedures with the industry . . . [but rather challenge] the destruction of [a plaintiff's] business [where a plaintiff] claims it had the expectation that it would not be eliminated from the industry by [regulation] and [acted] on reliance." *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 449 (2005). Notably, this factor is "a matter often informed by the law in force in the State in which the property is located." *Ark. Game & Fish Comm'n v. United States*, 133 S. Ct. 511, 522 (2012). Thus, Plaintiffs reasonably rely on a certain state of law or regulation when "the effects of [some] restriction [are reasonable because] the implied limitation has been there [in law and tradition] all along." *1256 Hertel Ave. Assocs., LLC v. Calloway*, 761 F.3d 252, 267 (2d Cir. 2014).

Plaintiffs have alleged reasonable investment-backed expectations in "[t]he taxicab medallion, and with it, the exclusive right to accept hails, [which have] long been recognized as private property—a transferrable commodity . . . [a perception for which t]he TLC has repeatedly reinforced the investment expectations of medallion owners in the property rights being acquired by purchasing a New York City taxicab medallion . . . [because] Defendants have thus marketed and sold medallion owners a protectable, vested property interest in the New York City taxicab medallion, along with the statutory right to hail exclusivity that accompanies it, on which medallion purchasers [such as Plaintiffs] have reasonably relied in making the decision to purchase a medallion and operate their private businesses." *Id.* ¶¶ 12, 14. As the Amended Complaint alleges, Defendants' destruction of hail exclusivity has interfered with the Plaintiffs' "reasonable, investment-backed expectations[, including] relying on Defendants to enforce their

own laws and regulations, including with respect to hail exclusivity, and to not take regulatory action that impairs the value of their property." *Id.* ¶ 322.

Despite these well-pled allegations as to the nature and extent of Plaintiffs' reasonable investment-backed expectations in their property interests, Defendants contend that "the investment-backed expectations of individuals and entities that purchased medallions are *entirely irrelevant* . . . [because] it is axiomatic that an owner's reasonable investment-backed expectations in a highly regulated industry, such as the New York City medallion taxi industry, are limited . . . ."[35] *See* Opening Memorandum at 49. Here, however, both the Credit Union Plaintiffs and the Medallion Holder Plaintiffs have reasonable investment-backed expectations in hail exclusivity, the property right that Defendants have extinguished by adopting regulations that permit FHVs to intrude in the market for hails.  Following the Supreme Court's decision in *Ark. Game & Fish Comm'n* and the Second Circuit's decision in *Colloway*, the allegations in Plaintiffs' Amended Complaint plausibly allege that Plaintiffs' investment-backed expectations—expectations that Defendants would, quite simply, do their job in enforcing New York State law, guaranteeing the both traditional and legally secured right of medallion holders to exclusivity in the market for hails—are plainly reasonable. Even though medallion rights have long been a highly regulated form of property, this degree of regulation does not nullify Plaintiffs' rights under New York State law, which, as historical background law as well as mandatory provisions of contemporary state law, Plaintiffs reasonably relied upon Defendants to enforce. Thus, as the Amended Complaint indicates, Plaintiffs have reasonable investment-

---

[35] Defendants cite no authority for this proposition, but point out earlier in their recitation of case law that "[t]he Second Circuit has repeatedly found that no taking exists when a plaintiff voluntarily participates in a highly regulated program or activity." Opening Memorandum at 47. They also note that "plaintiffs purchased their medallions with full knowledge that TLC heavily regulates all aspects of the taxi vehicle." *Id.* at 48.

backed expectations in the enforcement of mandatory provisions of New York State law, as well as Defendants refraining from taking actions that would, contrary to such mandates, impair the value of Plaintiffs' property interests. Accordingly, Plaintiffs have adequately alleged plausible reasonable investment-backed expectations in their property interests, and also clearly alleged how Defendants interfered with those reasonable expectations.

*c. Plaintiffs Properly Allege Defendants' Wrongful Conduct*

Finally, the allegations in Plaintiffs' Amended Complaint plausibly support resolution of this third factor in Plaintiffs' favor, because the Amended Complaint reveals the intentionally wrongful nature of Defendants' regulatory actions. In the context of a motion to dismiss, plaintiffs state a claim as to this factor where they allege "conduct [that is] unfair, unreasonable, and in bad faith. . . . Though the precise contours of the 'character' factor may be blurry." *Sherman v. Town of Chester*, 752 F.3d 554, 565-66 (2d Cir. 2014). Therefore, in this context, courts resolve this factor in Plaintiffs' favor where courts could plausibly "hold[] that the nature of the government's action is the type that may require compensation . . . given the "plaintiff's characterization of the [regulation] . . . such that plaintiff should have the opportunity to present evidence. *Huntleigh USA Corp. v. United States*, 63 Fed. Cl. 440, 448-49 (2005). Moreover, a regulatory taking will be more readily found where Plaintiffs plead "interference [beyond] . . . adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124.

Here, Plaintiffs' Amended Complaint alleges that Defendants have deliberately permitted, by failing to adopt "a meaningful marketplace dichotomy separating vehicles that are permitted to accept hails from those permitted only to accept passengers through pre-arrangement [i.e., FHVs] . . . on demand E-Hails [that have] eviscerated hail exclusivity and

destroyed the carefully designed marketplace dichotomy, eliminating any meaningful distinctions between [medallion taxis and FHVs]." *Id.* ¶¶ 19, 20. Defendants have done this despite Plaintiffs' vested present and future protected property interests in hail exclusivity, upon which basis Plaintiffs have formed reasonable investment-backed expectations. *See id.* ¶¶ 180, 322. Indeed, Plaintiffs have alleged that Defendants went so far as to fraudulently misrepresent the value of taxicab medallions while New York City happily collected hundreds of millions of dollars in revenue from their sale. *See* Amended Complaint at ¶ 374.

Notwithstanding these well-pled allegations, Defendants contend that Plaintiffs' claims fail because "plaintiffs cannot credibly claim that the requirements applicable to taxis are not rational or with TLC's authority. . . . [because character turns on] whether the action is a lawful use of the government's authority and within the scope of that authority."[36] Opening Memorandum at 50. To the contrary, Plaintiffs allege that Defendants are willfully acting *beyond* the scope of their authority in enacting regulations that impinge upon hail exclusivity. Moreover, Plaintiffs have plausibly stated allegations that support the inference that Defendants' conduct in intruding on Plaintiffs' property interests, including hail exclusivity, amounts to government conduct that is unfair, unreasonable, and in bad faith.  Indeed, Defendants continue to persist in their wrongful conduct even after the Transportation Study made plain the devastation to the

---

[36] Defendants cite no authority for this assertion of law, though they ultimately reiterates their position that "plaintiffs simply have no property interest in the value of their medallions, nor does the use of e-dispatch constitute a street hail . . . [and, additionally,] plaintiffs do not have a protected property interest in the enforcement of TLC regulations and rules against others [because] [m]edallion owners' street hail exclusivity 'existed by virtue of the City's regulatory structure rather than the medallion owners' property rights.'" Opening Memorandum at 51 (citing *Boston Taxi Owners' Ass'n*, 2016 WL 1274531, at *5). Of course, the statutory grant of hail exclusivity to present and future medallion owners embodied in New York State law makes Defendants' contention patently frivolous.

medallion industry being caused by Defendants' actions. Therefore, Plaintiffs have plausibly alleged and characterized the Defendants' conduct to be government action that merits resolving this factor in favor of a taking.

Assessing these factors in sum, both Credit Union Plaintiffs and Medallion Owner Plaintiffs have plausibly alleged an *ad hoc* non-categorical regulatory taking against Defendants. Defendants have trespassed on Plaintiffs' protected property interests—interests that are guaranteed to Plaintiffs under New York State law, including the HAIL act. This trespass has had the effect of, among other things, allowing FHVs like Uber, Lyft, and Gett to compete with medallion holders—who are already saddled with the disparate impact regulations and the accessibility regulations—in the market for hails, the very market for which medallion owners have been granted hail exclusivity. And Defendants—despite Plaintiffs' reasonable investment-backed expectations that these parties would enforce the mandatory provisions of New York State law—have willfully failed to meet their legal obligations.

### F. Plaintiffs Due Process Claim is Well Pled

Plaintiffs also allege in their Amended Complaint that, "[b]y promulgating and implementing regulations pursuant to which Defendants have required Medallion Owner Plaintiffs to convert their unrestricted medallions to accessible medallions, and devalued Credit Union Plaintiffs' unrestricted medallion collateral, Defendants have deprived, and will continue to deprive, Medallion Owner Plaintiffs and Credit Union Plaintiffs of rights guaranteed by the Fourteenth Amendment to the United States Constitution in violation of 42 U.S.C. § 1983." *See* Amended Complaint at ¶ 346. These allegations are all that is required to state a Due Process claim for the purposes of 12(b)(6).

The right to procedural due process stems from the Fourteenth Amendment, which provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend. XIV, § 1.  The requirements of procedural due process apply "only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property."  *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569 (1972).  In identifying property interests subject to due process protections, the Court's past opinions make clear that these interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."  *Id.* at 577.

For a due process claim to survive a 12(b)(6) motion to dismiss, Plaintiffs must preliminarily set forth facts alleging: (1) "a deprivation of a liberty or property interest protected by the Constitution or federal statutes;" and (2) that this deprivation occurred "without due process of law." *Jordan v. Goord*, 00 CV 1294, 2001 WL 1286977, at *1 (S.D.N.Y. Oct. 22, 2001) (citing *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995)). An essential principle of due process is that "a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). The requisites for the hearing can vary "depending upon the importance of the interests involved and the nature of the subsequent proceedings," but an opportunity to be heard remains the Due Process Clause's "root requirement." *Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971). For a hearing to satisfy the requirements of Due Process, it must be held at a "meaningful time and [conducted] in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (citation and internal quotation marks omitted).

Plaintiffs have met these requirements by alleging in the Amended Complaint that Defendants' actions forced "Medallion Owner Plaintiffs to convert their unrestricted medallions to accessible medallions without notice or the opportunity to be heard" in violation of Plaintiffs' Due Process rights. *See* Amended Complaint at ¶¶ 343, 350. It has been established that "a deprivation of life, liberty, or property [must] 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, 470 U.S. at 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). Because the Medallion Owner Plaintiffs and Credit Union Plaintiffs were not afforded an opportunity to be heard before being deprived of their security interests in the medallion taxicabs, Plaintiffs have sufficiently alleged facts to support a due process claim.

Notwithstanding this, Defendants mischaracterize Plaintiffs' Amended Complaint as asserting a protected property interest in the market value of the medallions, and claim that such a property interest is not protected under the Due Process Clause. *See* Opening Memorandum at 52.  In support of this argument, Defendants cite to *Boston Taxi Owners Ass'n v. City of Boston*, 84 F. Supp. 3d 72 (D. Mass. 2015) and *Illinois Transp. Trade Ass'n v. City of Chicago*, 134 F. Supp. 3d 1108 (N.D. Ill. 2015).  *See* Opening Memorandum at 52. While Defendants are correct in stating that both cases hold that the market value of a taxi medallion does not qualify as a protected property interest, Plaintiffs are not claiming to have a protected property interest in the market value of the medallions. Rather, the Credit Union Plaintiffs and the Medallion Owner Plaintiffs allege that the *conversion of their unrestricted medallions to accessible medallions* without notice or the opportunity to be heard violated the Due Process Clause.  *See* Amended Complaint at ¶ 343.  Thus, Medallion Owner Plaintiffs have alleged a protected property interest

in their unrestricted medallions and the Credit Union Plaintiffs have alleged a protected property interest in their unrestricted medallion collateral.

Defendants also argue that Plaintiffs cannot establish that they were deprived of their property "because the alternating accessibility requirement is simply one of the many requirements medallion owners have to comply with to operate taxis." *See* Opening Memorandum at 52.   This argument is unfounded and incorrect.   A regulation is not constitutional simply because it is part of a series of regulations, just as the deprivation of a protected property interest is not acceptable simply because an industry is highly regulated. While it is true that taxis are an "important part of the public life of [New York] City," and must be "pervasively regulated," *Statharos v. NYC Taxi and Limousine Comm'n*, 198 F.3d 317, 324 (2d Cir. 1999), these regulations cannot violate fundamental constitutional rights.

In addition to asserting a protected property interest, Plaintiffs have also established that they were deprived of said property interest without due process of law.   According to this Court, "[u]pon determining that a party has been deprived of a cognizable property interest, a court must assess what process plaintiffs were due before they could be deprived of that interest." *Ford Motor Credit Co. v. NYC Police Dep't*, 394 F. Supp. 2d 600, 609 (S.D.N.Y. 2005) (internal quotations omitted).   In gauging the constitutional adequacy of procedures, the Court must weigh the following factors:

> "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

*Nat'l Org. For Women v. Pataki*, 261 F.3d 156, 167-68 (2d Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)) (quotation marks omitted).   This Court has previously held

that the *Mathews v. Eldridge* factors counsel in favor of requiring the City to provide creditors actual notice of the deprivation of any vehicle in which creditors hold a security interest.  *Ford Motor Credit*, 394 F. Supp. 2d at 615.  The Credit Union Plaintiffs allege that they were not given "notice or the opportunity to be heard," *see* Amended Complaint at ¶¶ 344, 351, when they were deprived of their property interest.  Likewise, Medallion Owner Plaintiffs also allege they were not given "notice or the opportunity to be heard."  *See* Amended Complaint at ¶¶ 343, 350.

While Defendants agree that Plaintiffs should have been afforded notice and an opportunity to be heard, they argue that Plaintiffs were nevertheless afforded an opportunity to be heard through the notice and comment period that took place prior to TLC's adoption of the accessibility rule.  *See* Opening Memorandum at 52-53.  While it is true that a party's due process rights are not violated when "it may participate fully in an administrative agency proceeding," *Liberty Cable Co. v. City of New York*, 60 F.3d 961, 964 (2d Cir. 1995), rulemaking procedures and hearings can be declared inadequate when they are not held "at a *meaningful* time and [conducted] in a *meaningful* manner." *Goldberg*, 397 U.S. at 267 (citation and internal quotation marks omitted) (emphasis added).

The public hearing conducted by the TLC was inadequate and did not constitute a "*meaningful* opportunity to be heard."  *Singh v. Joshi*, 15-CV-5496, 2016 WL 304761, at *8 (E.D.N.Y. Jan. 26, 2016) (emphasis added).  The TLC only instigated the formal rulemaking process as a result of the *Noel* settlement;[37] a settlement in which the public was not allowed to

---

[37] *Noel v. New York City Taxi and Limousine Commission*, 687 F.3d 63 (2d Cir. 2012), involved a lawsuit challenging pervasive and ongoing discrimination by the New York City TLC against people with mobility disabilities who needed and wanted to use medallion taxis. This case was eventually settled, and "[t]he settlement was entirely a product of negotiations between the *Noel* plaintiffs and TLC; no medallion owners or taxi trade groups were invited to participate." *Singh*, 2016 WL 304761 at *2.

participate.  As a direct result of that settlement, the TLC was required to enact specific rules that would make New York City medallion taxis reach 50% accessibility by 2020.  There was no discretion on the part of the TLC as to whether to enact this requirement, and as a result, the TLC entered the public hearing knowing exactly what rules it would need to enact in order to satisfy the *Noel* settlement deal.  As a result, it had no intention or at least no real ability to consider the numerous objections from the many medallion owners who attended the hearing. Consequently, the Plaintiffs were denied a *meaningful* opportunity to be heard.  Thus, Plaintiffs have alleged that they were deprived of a protected property interest and that they were not given notice or an opportunity to be heard prior to the deprivation.  Therefore, Plaintiffs have alleged enough facts to support their Due Process claim and survive a motion to dismiss.

### G.      Plaintiffs' Common Law Fraud Claim is Well Pled

"Under New York law, '[t]o state a cause of action for fraud, a plaintiff must allege a representation of material fact, the falsity of the representation, knowledge by the party making the representation that it was false when made, justifiable reliance by the plaintiff and resulting injury."  *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 291 (2d Cir. 2006) (quoting *Kaufman v. Cohen,* 307 A.D.3d 113, 119 (1st Dep't 2003)).[38]  Furthermore, in order to survive a motion to dismiss, a plaintiff's New York common law fraud claims are subject to Rule 9(b) of the Federal

---

[38] This court should exercise supplemental jurisdiction based upon 28 U.S.C. §1367(a) because six out of the seven claims are federal causes of action. Therefore, this Court holds original jurisdiction over such claims and as a result may exercise supplemental jurisdiction over any state law claims arising out of the "same case or controversy."  *See* 28 U.S.C. §1367(a); *see also* 28 U.S.C. 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.")  Here, all claims (state and federal), arise out of the same case and controversy because they arise out of "a common nucleus of operative fact."  *See People ex rel. Abrams v. Terry*, 45 F.3d 17, 23 n.7 (2d Cir.1995) (quoting *United Mine Workers v. Gibbs,* 383 U.S. 715, 725 (1966)). Given the limited exceptions, supplemental jurisdiction has been seen as the "favored and normal course of action," which is construed generously.  *Promisel v. First Am. Artificial Flowers, Inc.,* 943 F.2d 251, 254 (2d Cir. 1991).

Rules of Procedure.  In order for a plaintiff to survive a motion to dismiss under Rule 9(b), the plaintiff must: (1) specify the fraudulent statements; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain what made the statements fraudulent.  *Lerner,* 459 F.3d at 290 (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1176 (2d Cir. 1993)).  On the other hand, "a plaintiff need not plead dates, times and places with absolute precision, so long as the complaint gives fair and reasonable notice to defendants of the claim and the grounds upon which it is based."  *Madison Maidens, Inc. v. American Mfrs. Mut. Ins. Co.,* 2006 WL 785270 *1 (S.D.N.Y. 2007) (quoting *International Motor Sports Group, Inc. v. Gordon,* 1999 WL 619633 *3 (S.D.N.Y. 1999)).  Additionally, "[t]he requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir.1994), *superseded by statute on other grounds, as stated in In re Paracelsus Corp. Sec. Litig.*, 61 F.Supp. 2d 591, 595 (S.D. Tex. 1998) (*Shields* standard for an inference of fraudulent intent was superseded as to private securities litigation).

Here, Plaintiffs allege that "Defendant TLC posted the monthly "average" sale price for taxicab medallion transfers each calendar month until sometime in late 2014," on their website. *See* Amended Complaint at ¶ 332. In doing so, Defendants intentionally "made material misrepresentations and omissions of fact regarding the monthly average price of medallion transfers by intentionally and secretly excluding all medallion transfers that were priced more than 10% below the highest sale price from the prior month's transactions, when calculating the monthly average price of medallion transfers." *See* Amended Complaint at ¶¶ 334-35. During this time, Plaintiffs underwrote the purchase of and purchased medallions for value in the market

created by and regulated by Defendants. *See* Amended Complaint at ¶¶ 330-31. Plaintiffs, along with the rest of the medallion taxicab industry, reasonably relied on the accuracy of the Defendant TLC's posted monthly average, which was used to determine the fair market value of the taxicab medallion in private transactions, because the TLC itself used its own posted monthly "averages" in order to determine the fair market value of a medallion for purposes of calculating the 5% transfer tax collected from the proceeds of every transaction on behalf of New York City. *See* Amended Complaint at ¶ 333. Defendant TLC's intentional misrepresentation of the average monthly price posted on its website artificially inflated the value of the taxicab medallions, thereby artificially increasing the auction prices paid to the City of New York for new taxicab medallions and artificially increasing the amount of transfer tax owed to the City of New York by medallion purchasers in private transactions. *See* Amended Complaint at ¶ 336. Plaintiffs suffered an economic loss believed to be in excess of $75,000 as a direct result of their justifiable reliance upon Defendants' misrepresentations and omissions concerning the monthly average medallion transfer prices posted to Defendant TLC's website. *See* Amended Complaint at ¶¶ 337-41.

That is more than enough to state a claim.  Plaintiffs have stated with certainty the facts constituting the circumstances of the fraud.  *See* F.R.C.P. 9(b).  Plaintiffs have pled the fraudulent statements (the material representations of the "average" sale price of the taxicab medallions), the speaker (Defendant TLC), the time and place (monthly between the years of 2012 and 2014 on Defendant TLC's official website), and what made them fraudulent (Defendant TLC secretly excluding all medallion transfers that were priced more than 10% below the highest sale price from the prior month's transactions, when calculating the monthly average price of medallion transfers), all in the Amended Complaint.  *See* Amended Complaint

at ¶¶ 328-41; *see also Lerner,* 459 F.3d at 291.   Furthermore, Defendants did not even explicitly argue a lack of specificity in regards to Rule 9(b) in their *Motion to Dismiss*, impliedly admitting that the Amended Complaint was sufficient in detail to survive such a review.   Tellingly, they have also offered no explanation for their conduct.

Notwithstanding this, Defendants argue in conclusory fashion that this claim "must be dismissed based on the fact that the plaintiffs failed to comport with basic pleading requirements."  *See* Opening Memorandum at 56.   Defendants argue that "[i]n accordance with Admin. Code § 7-201(a), pleadings in actions seeking monetary damages against the City must contain specific allegations that such claims were presented to the Comptroller's Office and that more than thirty days has elapsed with no adjustment by the Comptroller."  *See id.*   Additionally, Defendants argue that "plaintiffs do not plead that they have presented their claims to the Comptroller's Office," and, therefore, "plaintiffs fail to meet the minimal pleading requirements."  *See id.* at 57. To the contrary, Plaintiffs were under no obligation by Admin. Law § 7-201 to inform the Comptroller's office of their claim, which only applies to non-tort actions for monetary damages, which is clearly not the case with this claim.  *See City of New York v. 611 West 152nd St., Inc.,* 273 A.D.2d 125, 127 (1st Dep't 2000); *Ferrara v. City of New York,* 65 N.Y.S.2d 327 (N.Y. City Ct. Bronx County 1946) (§ 7-201(a) superseded by N.Y. Gen. Mun. Law § 50-e, applicable to tort actions against City of New York); Steven Isaacs and Mathew Paulose Jr., *The Notice of Claim Provision in Breach of Contract Actions Against the City of New York,* 6 N.Y. City L. Rev. 1, 2 (Summer 2013).  Plaintiffs' third cause of action is indeed a state law fraud claim, which is a common law tort, and should not be subjected to the strict requirements of Admin. Law § 7-201.

Additionally, even if Admin. Law § 7-201 applied, the purpose of such is to afford the Defendant City of New York an opportunity to investigate and seek to settle claims before the expense of litigation, which the City had the absolute opportunity to do in this case.   *See Davidson v. Bronx Mun. Hosp.,* 484 N.Y.S.2d 533, 535 (1984).   Notice of claim requirements have been excused where the defendants "have received clear notice 'of the nature of the claims, and time when, the place where, and the manner in which the claims arose.'" *Brooklyn School for Special Children v. Crew,* 1997 WL 539775 *16 (S.D.N.Y. 1997) (quoting *Deposit Cent. School Dist. v. Public Employment Relations Bureau,* 214 A.D.2d 288, 291-92 (3d Dep't 1995)). Prior to this litigation being commenced, before any litigation costs were incurred, the City was put on notice of the fraud which was committed, the details behind such, and the possibility of a federal lawsuit being commenced, by way of the allegations set forth in the Credit Union Plaintiffs' Article 78 proceeding in May of 2015. Those allegations specifically identified what fraudulent statements were made, where they were made, when they were made, and what made them false. In other words, prior to any litigation cost being incurred here, the City had over nine months with all the information necessary to investigate and seek to settle any such claims before litigation. The City had notice of enough information on the basis of the claim prior to litigation in order to satisfy the rationale behind Admin. Law § 7-201.   Indeed, both before and after the Amended Complaint was filed, Defendants sent multiple pre-motion letters to this Court and Plaintiffs, in which the argument of dismissal based upon Admin. Law § 7-201 is wholly absent. Defendants have not complied with the spirit of Admin. Code § 7-201 and have not suffered any prejudice, and so should not be rewarded for it. *See Deposit Cent. School Dist.*, 214 A.D.2d at 291-92 (union's filing of unfair labor practice charge substantially complied with notice of claim requirement); *Brooklyn School for Special Children v. Crew,* 1997 WL 539775 *16 (S.D.N.Y.

115

1997); *Hygrade Insulators, Inc. v. Board of Educ.,* 207 A.D.2d 430, 431 (2d Dep't 1994)

(submission of invoice for repair work substantially complied with notice of claim requirement);

*Pope v. Hempstead Union Free School Dist. Bd. Of Educ.*, 194 A.D.2d 654, 655 (2d Dep't 1993)

(demand letter from superintendent's counsel substantially complied with notice of claim

requirement).[39]

## V.  **CONCLUSION**

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny

Defendants' *Motion to Dismiss the Amended Complaint* in its entirety and grant any further and

additional relief as the Court deems just and proper.


Dated: June 6, 2016
　　　New York, New York


　　　　　　　　　　　　　　　　　　　Respectfully Submitted,


　　　　　　　　　　　　　　　　　　　By: /s/ Todd A. Higgins, Esq.
　　　　　　　　　　　　　　　　　　　Todd A. Higgins, Esq. (TH7920)
　　　　　　　　　　　　　　　　　　　Crosby & Higgins, LLP
　　　　　　　　　　　　　　　　　　　477 Madison Avenue, 6th Floor
　　　　　　　　　　　　　　　　　　　New York, NY 10022
　　　　　　　　　　　　　　　　　　　(646) 452-2300


　　　　　　　　　　　　　　　　　　　*Attorneys for Plaintiffs*

---

[39] Even if Admin. Law § 7-201 applies to Plaintiffs' state law claim and this Court finds that no notice was given—which Plaintiffs do not concede—this Court may still grant leave to Plaintiffs to file the proper notice of claim if necessary. *See Russell Pipe & Foundry Co. v. City of New York*, 1997 WL 80601 *14-15 (S.D.N.Y. 1997).

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 6, 2016, I served the foregoing *Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Amended Complaint* on counsel for Defendants listed below by filing using the ECF System which will send notification to counsel for Defendants listed below.

<u>Defendants' Counsel</u>

Michelle Goldberg-Cahn
New York City Law Department
Office of the Corporation Counsel
100 Church Street
New York, NY 10007

  /s/ Todd A. Higgins, Esq.
Todd A. Higgins, Esq. (TH7920)
Crosby & Higgins, LLP
477 Madison Avenue, 6th Floor
New York, NY 10022
(646) 452-2300
*Attorneys for Plaintiffs*