UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MELROSE CREDIT UNION, PROGRESSIVE
CREDIT UNION, LOMTO FEDERAL CREDIT
UNION, TAXI MEDALLION OWNER DRIVER
ASSOCIATION, INC., LEAGUE OF MUTUAL
TAXI OWNERS, INC., KL MOTORS, INC.,
SAFINI TRANSPORT, INC., WHITE & BLUE
GROUP CORP., FIMA SERVICE CO., INC.,
CARL GINSBERG, and JOSEPH ITZCHAKY,

                        Plaintiffs,

           –v–

THE CITY OF NEW YORK; THE NEW YORK
CITY TAXI & LIMOUSINE COMMISSION; and
MEERA JOSHI, in her Official Capacity as the
Chair of the New York City Taxi & Limousine
Commission,

                      Defendants.

15-cv-09042 (AJN)

OPINION & ORDER

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAR 3 0 2017

ALISON J. NATHAN, District Judge:

      Plaintiffs, a group of individuals, companies, credit unions, and trade associations

affiliated with New York City's medallion taxicab industry, bring this action against the City of

New York (the "City"), the New York City Taxi & Limousine Commission (the "TLC"), and

TLC Chair Meera Joshi (collectively, "Defendants"), alleging that certain TLC regulations

contravene the Equal Protection, Due Process, and Takings Clauses of the United States

Constitution and analogous provisions of the New York State Constitution. Plaintiffs also assert

a claim sounding in common law fraud. Before the Court is Defendants' motion to dismiss

pursuant to Federal Rules of Procedure 12(b)(1) and 12(b)(6). For the reasons set forth below,

the motion is GRANTED with respect to Plaintiffs' federal claims, and the Court declines to

exercise supplemental jurisdiction over the remaining state law claims.

1

## I.   BACKGROUND[1]

### A.   The Parties

Plaintiffs can be sorted into three groups.  One group is composed of Melrose Credit Union, Progressive Credit Union, and LOMTO Federal Credit Union (the "Credit Union Plaintiffs").  Each of these entities is a federally insured, not-for-profit New York corporation that provides financing for taxicab medallions in New York City.  *See* Amended Complaint, Dkt. No. 47 ("Compl."), ¶¶ 50, 56, 62.  Together, the Credit Union Plaintiffs hold security interests in thousands of taxicab medallions.  *Id.* ¶¶ 51, 57, 63.

A second group consists of KL Motors, Inc., Safini Transport, Inc., FIMA Service Co., Inc., Carl Ginsberg, Joseph Itzchaky, and White & Blue Group Corp. (collectively, the "Medallion Plaintiffs").  These individuals and entities own TLC-issued taxicab medallions, which they often in turn lease to others.  *Id.* ¶¶ 34, 38, 80-84, 105.

A third group consists of the Taxi Medallion Owner Driver Association, Inc. and the League of Mutual Taxi Owners, Inc.  These entities are not-for-profit New York corporations that represent the interests of hundreds of taxicab medallion owners in New York City, and engage in advocacy concerning taxicab regulation.  *Id.* ¶¶ 70-76.

Defendants, as noted, are the City; the TLC, which is the "charter-mandated agency, responsible for licensing and regulating [the City's] taxicabs and liveries, and implementing transportation initiatives in a manner consistent with law," *id.* ¶ 122; and Meera Joshi, "the Chair and Chief Executive Officer of the TLC," *id.* ¶ 123.

---

[1] Unless otherwise noted, the facts set forth herein are taken from Plaintiffs' Amended Complaint, as well as exhibits attached thereto, and assumed to be true for purposes of this motion.

### B.    Medallion Taxis and For-Hire Vehicles

According to the Amended Complaint, the City's for-hire ground transportation industry consists primarily of two segments that are subject to different regulations and accorded different privileges. *Id.* ¶ 5.  One consists of the "traditional New York City medallion yellow taxicabs." *Id.* ¶ 23.  This group is defined by its ownership of a medallion, which is a license issued by the TLC that permits its owner to, *inter alia*, "operate a taxicab on the streets of New York," "use the license as security for loans (which may include, but are not necessarily limited to purchase money loans), and lease the license to other operators for a fee." *Id.* ¶ 12.

The second industry segment pertinent here is composed of for-hire vehicles without TLC-issued medallions that are permitted to transport passengers in the City so long as they do "not solicit or pick up [p]assengers other than by prearrangement" ("FHVs").  *Id.* ¶ 134 (quoting 35 R.C.N.Y. § 55-19(a) (2015)).  This group includes well-known companies such as Uber, Lyft, and Gett.  Compl. ¶¶ 23-24, 179.

Plaintiffs allege that medallion owners who operate taxis must comply with a number of regulations imposed by the TLC regarding, among other things: fare rates, 35 Rules of the City of N.Y. ("R.C.N.Y.") § 58-26 (2017); surcharges, *id.* §§ 58-16(g), 58-03(x), 58-26(a)(3); and vehicle attributes, such as model, paint, finish, lighting, upholstery, seats, windows, air conditioner, roof lights, taximeters, partitions, camera systems, placement of credentials, and payment systems, *id.* §§ 67-04 to 67-15.  *See* Compl. ¶ 15.  Moreover, Plaintiffs allege, if a medallion owner leases out its taxicab, it must do so within the strictures of TLC-mandated "lease caps" and "shift change time limitations," which together regulate the amount of time and money for which a medallion can be leased.  *Id.* ¶ 257; *see also* 35 R.C.N.Y. § 58-21. Collectively, these regulations are hereafter referred to as the "Medallion Specific Rules."

According to Plaintiffs, in exchange for operating under these allegedly "burdensome" regulations, medallion taxicabs are accorded, by statute, the "exclusive right to accept [street hails.]" Compl. ¶ 5. As defined by TLC regulation, a "hail" is

> [a] request, either through a verbal (audio) action such as calling out, yelling, or whistling, and/or a visible physical action such as raising one's hand or arm, or through an electronic method such as an E-Hail App, for on-demand Taxicab or Street Hail Livery service at the metered rate of fare as set forth in § 58-26 and § 82-26 of these Rules by a person who is currently ready to travel.

35 R.C.N.Y. § 51-03 (2017).   The exclusivity of this right is currently protected by, *inter alia*, the New York City Administrative Code, which provides in pertinent part that "[n]o motor vehicle other than a duly licensed taxicab shall be permitted to accept hails from passengers in the street." N.Y.C. Admin. Code tit. 19 § 504(a)(1) (2017); *see also id.* § 502(l) ("'Taxi,' 'taxicab,' or 'cab' means motor vehicle carrying passengers for hire in the city, designed to carry a maximum of five passengers, duly licensed as a taxi cab by the commission and permitted to accept hails from passengers in the street.").

By contrast, Plaintiffs allege, FHVs may not accept street hails, but, correspondingly, are free from many of the regulatory burdens imposed on medallion owners, such as the Medallion Specific Taxicab Rules.  FHVs are not, for example, subject to mandated fare rates, but instead file a rate schedule with the TLC.  Compl. ¶¶ 136-37.  Similarly, FHVs are not limited to particular vehicle models dictated by the TLC.  *Id.* ¶¶ 141-42.

### C.   Promulgation of "E-Hail Rules" and the Alleged "Evisceration" of Hail Exclusivity

Plaintiffs allege that, notwithstanding the framework set forth above, there has been a "collapse of the regulatory structure governing for-hire transportation in New York City, brought about by the government-sanctioned proliferation of smartphone technology being used by

4

companies like Uber to bypass taxicab medallions and allow passengers to electronically hail a parallel network of unlicensed vehicles." *Id.* ¶ 1.  Plaintiffs aver that the key event in this purported "collapse" was the TLC's promulgation of the "E-Hail Rules" on January 29, 2015. *Id.* ¶ 167; New York City Taxi And Limousine Commission, E-Hail Rules (2015), *available at* http://www.nyc.gov/html/tlc/downloads/pdf/newly_passed_rules _ehail.pdf.  In relevant part, these rules permit passengers, in sum and substance, to arrange immediate ground transportation service through an electronic request sent via smartphone-based application, of the sort maintained by Uber and its competitors.  Compl. ¶¶ 23-24 167-72, 179.[2]

   According to Plaintiffs, the result of allowing FHVs to engage in e-hailing is that "[m]edallion taxicabs and companies such as Uber, Lyft and Gett clearly now operate on business models that are the same [as medallion taxicabs in] all material respects." Compl. ¶ 187.  Specifically, Plaintiffs allege that medallion taxicabs and FHVs using e-hail (1) serve the same "on demand travel" costumers, *id.* ¶ 185; (2) "create the same value for those customers," *id.*, as demonstrated by the fact that "passenger wait times" for e-hailing "have all but disappeared," *id.* ¶ 218; (3) "transact sales in the same manner" – *i.e.*, often through smartphones using credit card payments, *id.* ¶¶ 185, 193, 218; and (4) compete for the same drivers to operate their vehicles, *id.* ¶¶ 237, 279.  Plaintiffs further allege that these developments have decreased the average medallion's market value, *id.* ¶¶ 222-23, leasing value, *see, e.g.*, *id.* ¶ 241, and meter revenue, *id.* ¶¶ 224-26.

   To buttress these allegations, Plaintiffs marshal statements purportedly made by

---

[2] Plaintiffs describe Uber's platform, for example, as follows: "passengers wishing to use Uber simply download the smartphone application, create an account, and input credit card information.  Once logged into the application, passengers are provided with a map showing the location of available cars and the approximate travel time of the closest car to the passenger's location. When a passenger electronically hails an Uber FHV, the application sends the request directly to the closest available driver who must then accept or decline the request. If the Uber driver declines the request, it is then automatically forwarded to the next closest driver." Compl. ¶ 125.

Defendants that suggest, according to Plaintiffs, that they too believe that there is no material difference between a traditional street hail and an e-hail. For example, Plaintiffs allege that the City stated in a study that the "once-distinct regulatory categories are now blurring, and causing more direct competition for [medallion drivers]." *Id.* ¶ 191. Similarly, Plaintiffs allege that the Assistant General Counsel to the TLC stated in connection with the adoption of the E-Hail Rules that "[f]or those of you who might be unfamiliar, e-hailing allows a passenger to make a taxi-pickup request through his or her smart phone. Basically it extends a hand hail allowing taxi drivers to see around corners and increases fare opportunities." *Id.* ¶ 167; *see also id.* ¶ 164 (alleging that the TLC stated in an unrelated court proceeding that "e-hail apps are just that; they're hails. It's somebody indicating that they want to be picked up . . . within a prescribed area, without saying where they're going, without saying their race or gender or color, without saying what the fare will be and how much it will be."); *id.* ¶ 236 (alleging that the TLC stated that "[d]ifferential regulations for taxis compared to other categories of for-hire vehicles limit traditional yellow taxis' ability to compete effectively with e-dispatch services.").

### D.     The "Accessible Conversion Rules"

In addition to the Medallion Specific Taxicab Rules and the E-Hail rules, Plaintiffs' claims also implicate certain recently promulgated TLC regulations concerning the handicap accessibility of medallion taxicabs. Specifically, Plaintiffs allege that in 2015 the TLC adopted 35 R.C.N.Y. § 58-50 (2015) (the "Accessible Conversion Rules"), which provides that, by 2020, 50% of all medallion taxicabs in the City shall be made accessible to passengers with disabilities, in part pursuant to an ongoing multi-tiered lottery selection process conducted by the TLC. Compl. ¶¶ 16, 145.[3]   According to Plaintiffs, the Accessible Conversion Rules "effectively

---

[3] The details of the lottery system are not directly relevant to Plaintiffs' claims, as Plaintiffs do not challenge the legality of the lottery itself, but rather – as discussed further below – the process whereby the

convert the unrestricted medallion – *i.e.*, a medallion that was never required to be placed on accessible vehicle – into a restricted medallion – *i.e.*, a medallion that is required to be placed on accessible vehicle," on at least an "alternating basis." *Id.* ¶ 147-48. These "accessible medallions," it is alleged, are "far less valuable than unrestricted medallions" for several reasons, including the increased operating costs associated with handicap-accessible vehicles, certain call response obligations assumed by those driving such vehicles, and, correspondingly, the "extreme[] difficul[ty]" of leasing such vehicles. *Id.* ¶¶ 148, 157-58. Indeed, individual Plaintiffs Ginsberg and Itzchaky were, according to the Amended Complaint, "both selected by the TLC to convert their previously unrestricted medallions into accessible medallions as part of the first such lottery held pursuant to the Accessible Conversion Rules," *id.* ¶ 34, and "as a result of the forced conversion, both of them have been dropped by their leasing agents." *Id.*

Plaintiffs also allege that the TLC implemented the Accessible Conversion Rules pursuant to a rulemaking that was initiated in connection with the settlement of a class action civil rights lawsuit brought against it under a the Americans with Disabilities Act and the New York City Human Rights Law: *Noel v. N.Y.C. Taxi & Limousine Comm'n*, 837 F. Supp. 2d 268 (S.D.N.Y. 2011), *vacated*, 687 F.3d 63 (2d Cir. 2012). Compl. ¶ 145; *see also id.* ¶ 145 n.8 ("[TLC] entered into a settlement agreement, which stated that the TLC would begin rulemaking within 30 days of the execution of the settlement that would require medallion owners to progressively utilize accessible vehicles."). Other than the assertion that the Accessible

---

Accessible Conversion Rules were passed. For a decision addressing the legality of the lottery, see *Singh v. Joshi*, 152 F. Supp. 3d 112, 127 (E.D.N.Y. 2016) ("Instead, TLC's decisions to set a goal of 50% accessibility, to include both corporate and individual medallion owners in that mandate, and to require all individual owners to share the burden on a rotating basis, all reflect the balancing of interests that defines modern policymaking. The nature of independent medallion ownership (i.e., ownership of a single vehicle) required a mechanism for choosing which owners would bear that burden first. The use of a lottery, in which every owner was treated exactly like every other owner, entirely comports with equal protection.").

Conversion Rules effectively "arose out of the *Noel* settlement," Compl. ¶ 145, the complaint

contains no allegations concerning either the rulemaking process by which the TLC promulgated

those Rules and or the specific terms of that settlement.

## II.   PROCEDURAL POSTURE

Plaintiffs filed this suit on November 17, 2015. Dkt. No. 1. On December 29, 2015,

Plaintiffs moved for a preliminary injunction, arguing principally that the Medallion Specific

Rules and the Accessible Conversion Rules violate the Equal Protection Clause. Dkt. Nos. 19,

31. The Court denied that motion on the record during a hearing held on January 26, 2016. *See*

Dkt. No. 43 (memorializing denial). Plaintiffs moved for reconsideration, Dkt. No. 48, and the

Court denied that application, as well. Dkt. No. 57.

On March 7, 2016, Plaintiffs filed an Amended Complaint asserting three federal causes

of action pursuant to 42 U.S.C. §§ 1983 and 1988 and seeking both injunctive and declaratory

relief as well as compensatory, exemplary, and punitive damages. Comp. ¶¶ 310-27, 342-48,

368-77. First, Plaintiffs assert that the TLC rules and regulations discussed above, including the

Medallion Specific Rules, contravene the Equal Protection Clause by imposing disparate burdens

on participants in the medallion taxicab industry relative to purportedly similarly situated FHV

companies, such as Uber and its competitors. Compl. ¶¶ 310-17. Second, Plaintiffs aver that the

current TLC regulatory structure effects a taking without just compensation of their statutory

right to hail exclusivity in violation of the Takings Clause of the Fifth Amendment. Compl.

¶¶ 318-19. And third, Plaintiffs allege that the TLC's adoption of the Accessible Conversion

Rules runs afoul of the Fourteenth Amendment's Due Process Clause in purportedly "forcing"

medallion owners to "convert" unrestricted medallions into accessible medallions without notice

or a sufficient opportunity to be heard. Compl. ¶¶ 342-48. Plaintiffs also assert corresponding

claims under the New York State Constitution and a claim for common law fraud. Compl.
¶¶ 328-41, 349-64.

On May 2, 2016, Defendants moved to dismiss the Amended Complaint in its entirety
pursuant to Federal Rule of Procedure 12(b)(1) and 12(b)(6). Dkt. No. 58. Defendants advance
multiple contentions in support of their motion, but principally argue (1) that Plaintiffs lack
standing to maintain this action because they do allege concrete and particularized injury-in-fact
sufficiently traceable to the Defendants' alleged conduct, Defendants' Memorandum of Law in
Support of Defendants' Motion to Dismiss the Amended Complaint, Dkt. No. 61 ("Defs.'
Mem.") at 5-12; (2) that Plaintiffs' claims are precluded under the doctrine of *res judicata*, *id.* at
12-18; (3) that the claims are barred by the doctrine of laches, *id.* at 19-21; (4) that Plaintiffs'
federal takings claim is unripe, *id.* at 44-46; and (5) that each federal cause of action fails to state
a claim on which relief can be granted, *id.* at 21-44, 46-55. Defendants further urge the Court to
decline to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Id.* at 55.

On November 22, 2016, this case was reassigned from the Honorable Analisa Torres to
the undersigned.

## III.   STANDARD OF REVIEW

Defendants, as noted, seek dismissal under both Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6). Pursuant to Rule 12(b)(1), a court must dismiss a claim if, among other
things, it determines that the plaintiff lacks standing to prosecute it. *Bldg. & Constr. Trades
Council v. Downtown Dev., Inc.*, 448 F.3d 138, 144 (2d Cir. 2006). When a Rule 12(b)(1)
challenge is brought on the basis of the pleadings, a court is required to accept as true "all
material allegations of the complaint, and must construe the complaint in favor of the
complaining party." *Id.* However, the burden remains with the party asserting jurisdiction to

allege facts demonstrating standing. *See, e.g., Johnson v. Bryson*, 851 F. Supp. 2d 688, 699 (S.D.N.Y. 2012). The Court may, if necessary, rely on evidence outside the pleadings in deciding a Rule 12(b)(1) motion. *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.à.r.l*, 790 F.3d 411, 417 (2d Cir. 2015).

To survive a motion to dismiss brought under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* If a complaint "pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

In resolving a motion under Rule 12(b)(6), a court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N. Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (citation omitted). The court is not, however, "bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The court's analysis is generally confined to the four corners of the pleadings, but it may also "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference . . . and documents possessed by or known to the plaintiff and upon which [he] relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

## IV.    DISCUSSION

Plaintiffs, as noted, assert three federal claims. The Court first addresses the threshold question, raised by Defendants, of whether the Plaintiffs have standing to prosecute such claims. Concluding that at least one Plaintiff does have standing, the Court then proceeds to consider Defendants' claim-specific arguments in support of dismissal.

As set forth further below, the Court determines that the equal protection and due process counts must be dismissed for failure to state a claim, and that the takings claim is unripe. In light of these conclusions, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

### A.    Federal Claims

#### 1.    Defendants' Standing Challenge is Unavailing

As an initial matter, Defendants contend that Plaintiffs lack standing to prosecute their claims. Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Ross v. Bank of Am., N.A. (USA)*, 524 F.3d 217, 222 (2d Cir. 2008) (internal quotation marks and citations omitted). That is because standing is "[a]n important component of the Article III jurisdictional limit of federal courts to deciding 'cases' or 'controversies.'" *All. for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 85 (2d Cir. 2006). In order to meet the Article III standing requirement, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action' and the injury must be likely redressable by a favorable decision." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Notably, the Second Circuit has recognized that "[e]ven a small financial loss is an injury for purposes of Article III standing." *Nat. Res. Def. Council v. FDA*,

11

710 F.3d 71, 85 (2d Cir. 2013).  It has also described the requisite "causal connection" as "a standard lower than that of proximate causation" and made clear that "[a] defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III standing." *Carter v. HealthPort Tech.*, 822 F.3d 47, 55 (2d Cir. 2016) (citing *Rothstein v. UBS AG*, 708 F.3d 82, 91-92 (2d Cir. 2013)).

The Supreme Court has held in the context of multi-plaintiff constitutional challenges to legislative and regulatory actions that sufficient injury on the part of one plaintiff "is sufficient to confer standing under . . . Article III." *Bowsher v. Synar*, 478 U.S. 714, 721 (1986); *see also Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (noting with approval that the Court of Appeals "did not determine whether the other plaintiffs have standing because the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement"); *Comer v. Cisneros*, 37 F.3d 775, 778 (2d Cir. 1994) ("For federal courts to have jurisdiction over [myriad of constitutional and statutory claims against federal, state, and local officials], only one named plaintiff need have standing with respect to each claim."); *cf. Massachusetts v. EPA,* 549 U.S. 497, 518 (2007) ("Only one of the petitioners needs to have standing to permit us to consider their petition for review.").  Accordingly, if the Court determines that at least one Plaintiff has plausibly alleged standing with respect to each claim, it may exercise jurisdiction over this action and address Defendants' merits-based arguments in support of dismissal.

Individual Plaintiff Itzchaky, one of the Medallion Plaintiffs, has adequately alleged such standing.  Plaintiffs aver, among other things, that Itzchaky's monthly medallion leasing income fell by approximately a third – from more than $3,000 to $2,100 – directly following the passage of the E-Hail Rules, "as leasing companies have been unable to attract enough drivers to lease all

of the available medallion yellow taxicabs." Compl. ¶ 117. They also allege that the "conversion" mandated by the Accessible Conversion Rules of Itzchaky's medallion into an "accessible medallion" – with its attendant heightened operational costs and regulatory burdens – resulted in the "los[s] [of] all of his medallion income," rendered his medallion "worthless," and prompted his leasing agent to "drop[]," him, *id.* ¶ 118. All told, Plaintiffs allege, Itzchaky has suffered financial harm in an amount of at least $75,000. *Id.* ¶¶ 119-20.

Defendants characterize such allegations as unsubstantiated and speculative. Defs.' Mem. 10-11. On a motion to dismiss, however "general factual allegations of injury resulting from the defendant's conduct may suffice,'" because the Court must "'*presume that general allegations embrace those specific facts that are necessary to support the claim.*'" *Carter*, 822 F.3d at 56 (quoting *Lujan*, 504 U.S. at 561) (emphasis in original) (internal alteration omitted). At this stage of the litigation, moreover, "[a]ny monetary loss suffered by the plaintiff," including "even a small financial loss" suffices to establish the injury-in-fact element, and the causation standard – which is "not . . . onerous" – may be satisfied even by allegations of an indirect connection between the challenged actions and the plaintiff's injury. *Id.* at 55, 59. The Court is satisfied that Plaintiffs' allegations with respect to Itzchaky clear these hurdles, and it concludes that Itzchaky, at least, has plausibly alleged standing to prosecute the federal claims at issue. *See Singh v. Joshi*, 152 F. Supp. 3d 112, 122 (E.D.N.Y. 2016) (concluding, in similar action, that medallion owners have standing to challenge TLC regulations). Accordingly, the Court turns to Defendants' arguments on the merits.

### 2.   Plaintiffs Fail to State an Equal Protection Claim

Plaintiffs' federal equal protection claim is premised, as noted, on the purported disparate regulatory burdens imposed on medallion taxicabs relative to otherwise similarly situated FHVs

that use electronic hailing applications.  Plaintiffs' Memorandum of Law in Opposition to

Defendants' Motion to Dismiss the Amended Complaint, Dkt. No. 65 ("Pls.' Opp'n"), at 74.

According to Plaintiffs, even though FHVs are technically not permitted to pick up street hails,

several of these companies "serve the same customers, create the same value for those

customers, transact sales in the same manner, deliver the same services, and use the same

strategies to generate revenue" as traditional medallion taxicabs, but the latter are uniquely

subject to, among other things, the purportedly stringent Medallion Specific Rules.  Compl. ¶¶

185, 310-17.

Where, as here, a plaintiff asserts an equal protection claim without alleging

discrimination based on membership in a protected class, the plaintiff must plausibly allege, and

later prove, that it  has "been intentionally treated differently from others similarly situated and

that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*,

528 U.S. 562, 564 (2000).  The Second Circuit has recognized that in order to succeed in such a

claim, a "plaintiff must establish that (i) no rational person could regard the circumstances of the

plaintiff to differ from those of a comparator to a degree that would justify the differential

treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances

and difference in treatment are sufficient to exclude the possibility that the defendants acted on

the basis of a mistake." *Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir.

2010) (internal quotation marks omitted).

When rational basis scrutiny applies – as Plaintiffs concede it does here – effective

"classifications" in statutes "bear[] a strong presumption of validity," and "those attacking the

rationality of the legislative classification have the burden to negative every conceivable basis

which might support it." *FCC v. Beach Comm'ns*, 508 U.S. 307, 314-15 (1993) (internal

quotation marks and citation omitted). Rational basis review, while not "toothless," is "indulgent and respectful," and the relevant legislative or regulatory action should be upheld if its bears any "rational relationship to a legitimate government objective." *Windsor v. United States*, 699 F.3d 169, 180 (2d Cir. 2012). Importantly, "the Government has no obligation to produce evidence, or empirical data to sustain the rationality of a statutory classification," but rather "can base its statutes on 'rational speculation.'" *Beach Comm'ns*, 508 U.S. at 315. "Moreover, because [the courts] never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislator." *Id.*

Although the Second Circuit has yet to clarify precisely how to apply these principles at the motion to dismiss stage, several Circuits – as observed by at least one court in this District – have determined, straightforwardly, that "[t]he solution to the challenge of conducting rational basis review at the motion to dismiss stage . . . is to take as true all of the complaint's allegations and reasonable inferences that follow, and then apply the resulting facts in light of the deferential rational basis standard." *Smith v. Defendant A*, 08-cv-[], 2009 WL 1514590, at *5 (S.D.N.Y. May 29, 2009) (collecting cases from the Seventh, Eighth, Ninth, and Tenth Circuits). This means that "[w]hen neither the complaint nor the non-moving party's opposition negate 'any reasonably conceivable state of facts that could provide a rational basis' for the challenged classification, a defendant's motion to dismiss an equal protection claim will be granted." *Immaculate Heart Cent. Sch. v. N.Y. State Pub. High Sch. Athletic Ass'n*, 797 F. Supp. 2d 204, 211 (N.D.N.Y. 2011) (quoting *Sullivan v. City of New York*, 08-cv-7294, 2011 WL 1239755, at *4-5 (S.D.N.Y. Mar. 25, 2011)); *accord Sullivan*, 2011 WL 1239755, at *4-5; *Adams v. N.Y. State Educ. Dep't*, 752 F. Supp. 2d 420, 459 (S.D.N.Y. 2010); *see also Hettinga v. United States*,

677 F.3d 471, 479 (D.C. Cir. 2012) (per curiam) ("Even at the motion to dismiss stage, a plaintiff

alleging an equal protection violation must plead facts that establish that there is not 'any

reasonable conceivable state of facts that could provide a rational basis for the classification.'"

(quoting *Dumaguin v. Sec'y of Health and Human Servs.*, 28 F.3d 1218, 1222 (D.C. Cir. 1994)).

Here, even taking the allegations at bar as true and drawing all reasonable inferences for

the Plaintiffs, the Amended Complaint itself identifies differences in circumstance that constitute

a legally rational basis for the Defendants' disparate regulatory treatment of medallion taxicabs

and FHVs – and Plaintiffs fail to negate that basis. Specifically, and as discussed above, under

New York State and City law, medallion taxicabs are undisputedly the *only* vehicles permitted to

accept spontaneous street hails from customers seeking immediate ground transportation. *See,*

*e.g.*, Compl. ¶ 5; N.Y.C. Admin. Code tit. 19 § 504(a)(1) (2017). The importance of this

fundamental distinction in circumstance is in no way negated by allegations that these two

groups may otherwise share certain characteristics, such as operating similar business models

and providing similar services. *See, e.g.*, Comp. ¶¶ 185, 193, 218, 237, 279; *see also Prestopnik*

*v. Whelan*, 249 F. App'x 210, 213 (2d Cir. 2007) (Summary Order) (dismissing equal protection

claim because "[t]he circumstances of [the plaintiff] and those of the proposed comparator were

not . . . *identical in all relevant respects*") (emphasis added); *Siao-Pao v. Connolly*, 564 F. Supp.

2d 232, 244 (S.D.N.Y. 2008) (A plaintiff's "establishment of similarities with" a comparator

class "does not necessarily create an equal protection violation.") (internal quotation marks

omitted); *Kenmore Mercy Hosp. v. Daines*, 09-cv-162S, 2011 WL 4368564, at *5 (W.D.N.Y.

Sept. 19, 2011) (noting that a single distinction "alone means that the circumstances of [the

plaintiff and the comparator class] are not *prima facie* identical") (internal quotation marks

omitted). Quite simply, medallion taxicabs are not similarly situated to FHVs because medallion

16

taxicabs, as alleged by Plaintiffs, have, effectively, a collective, government-sanctioned monopoly over one particular form of hailing. Indeed, several courts around the country addressing Equal Protections claims substantially similar to the one at issue here have, in thoughtful and persuasive decisions, relied predominantly on the "one central fact" that "taxicabs are the *only* vehicles-for-hire available for street hail" to deem "justif[ied]" a wide variety of "distinctions" in the treatment of traditional taxis and application-based FHV companies by municipal statutory and regulatory schemes. *Gebresalassie v. District of Columbia*, 170 F. Supp. 3d 52, 60-68 (D.D.C. 2016) (dismissing equal protection claim); *see also Newark Cab Ass'n v. City of Newark*, 16-cv-4681, 2017 WL 214075, at *6 (D.N.J. Jan. 18, 2017) ("Taxis but not [FHVs], may pick up passengers who hail them directly on the street. Because people who hail taxis seldom have a previous relationship with the taxi driver they are flagging down, it makes sense for the City to try to protect passengers [with different regulations].").

This core distinction provides more than sufficient justification for the challenged TLC regulations, which may well promote safety, comfort, convenience, ready identification and accessibility, and uniformity of service in an industry characterized by spontaneous hails featuring no prearrangement or preexisting customer-company relationship. *See* Defs.' Mem. 31-41 (articulating nondiscriminatory bases for regulations). For example, it is readily conceivable that Defendants rationally determined, or speculated, that vehicle specifications such as the Accessible Conversion Rules and the requirements for standardized vehicle attributes promote passenger safety and convenience and vehicular accessibility. *See* 35 R.C.N.Y §§ 67:04-15; *see also Beach Comm'ns*, 508 U.S. at 315 (legislative choice may validly be made based upon "rational speculation"). Likewise, it would be rational to conclude that passenger convenience is enhanced by the standardization of fares notwithstanding the comparatively

17

randomized nature of a street hail. *See* 35 R.C.N.Y § 58-26; *see also Boston Taxi Owners Ass'n, Inc. v. Baker*, 16-cv-11922, 2017 WL 354010, at *6 (D. Mass. Jan. 24, 2017) ("[I]t is conceivable that the state legislature concluded that taxis should be subject to tighter regulation of rates to protect passengers" because "[u]nlike [transportation network companies, such as Uber and Lyft], which can only pick up passengers through pre-arrangement, taxis can accept street hails," during which "the passenger has no information about the taxi driver and has no opportunity to negotiate the fare"). As Judge Kollar-Kotelly recently recognized in *Gebresalassie*, moreover, uniquely mandating medallion taxicabs' compliance with vehicle color and other appearance specifications, "self-evidently facilitates customers identifying taxicabs on the street in order to hail them" – an interest that, "standing alone, is enough to provide a rational justification for the distinction" in the relevant regulatory scheme. 170 F. Supp. 3d at 66. And lease caps, for their part, may rationally be thought to promote public safety by preventing leasing practices that incentivize drivers to operate an unsafe number of hours on a given shift. *See* Defs.' Mem. 32-33.

The City's for-hire ground transportation industry – like its analogues in other parts of the country and the world – may well, as Plaintiffs allege, be rapidly evolving. And a notable feature of that evolution may indeed be that the Ubers and Lyfts of the world increasingly share important characteristics with traditional medallion taxicabs, including, as identified by Plaintiffs, the customers they serve, the drivers they employ, the manner in which they transact sales, and even the immediacy with which their services are delivered. *See, e.g.*, Compl. ¶¶ 185, 193, 218, 237, 279. But marshaling such similarities risks obscuring persistent (and undisputed) differences in the manner in which these industry participants interact with and relate to their consumers. One set responds, by virtue of a government-created monopoly, to spontaneous

street hails by people with whom they have no preexisting contractual relationship and the pick-up takes place with no information (for example, names, vehicle type) having yet been formally exchanged.  The other responds, pursuant to a preexisting company-customer contract, to remotely transmitted electronic hails and the pick-up takes place following at least a minimal exchange of information.  Such differences, easily "justify" Defendants' decision to subject these participants to "differential" regulatory treatment on the basis of legitimate government policy to serve the sorts of interests discussed above.  *Ruston*, 610 F.3d at 60.  Under the deferential standards of rational basis review, nothing more is required for the challenged regulations to survive.  *See Beach Comm'ns*, 508 U.S. at 313 ("[A] statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against an equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.").

Other courts have, as noted above, reached substantially the same conclusion.  Indeed, as Judge Gorton of the District of Massachusetts observed in a recent decision, "respected jurists" representing multiple jurisdictions have almost "uniformly dismissed" equal protection claims brought by taxicab industry participants of the sort at issue here.  *See Boston Taxi Owners*, 2017 WL 354010, at *5-6 ("Even taking as true all of plaintiffs' allegations that taxicabs and [Uber-like companies] are similarly situated, plaintiffs have failed to negate all of the purported bases for the enactment of [the regulation].)"; *see also Ill. Trans. Trade Ass'n v. City of Chicago*, 839 F.3d 594, 598 (7th Cir. 2016) (holding at the pleading stage that "[t]here are enough differences between taxi service and [Uber-like services] to justify different regulatory schemes, and the existence of such justification dissolves the plaintiffs' equal protection claim"); *Gebresalassie*, 170 F. Supp. 3d at 60; *Newark Cab*, 2017 WL 214075, at *6; *Desoto CAB Co., Inc. v. Picker*, 15-

cv-04375, 2017 WL 118810, at *5-9 (N.D. Cal. Jan. 12, 2017) (dismissing similar equal

protection claim).[4]  The Court sees no basis on which to disagree with these well-reasoned

decisions.

For these reasons, the Court concludes that Plaintiffs fail to plausibly allege that there is

no rational basis for the difference in treatment complained of, and, accordingly, Defendants'

motion to dismiss Plaintiffs' equal protection claim is GRANTED.

### 3.    Plaintiffs' Federal Takings Claim is Unripe for Adjudication

Plaintiffs' Fifth Amendment takings claim is based on allegations, discussed above, that

the TLC's adoption of the E-Hail Rules has effectively deprived Plaintiffs of their purported

"statutory right to hail exclusivity" without just compensation.  Compl. ¶¶ 319-27.  Defendants

contend that this claim is unripe for judicial review.  The Court agrees.

In *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*,

473 U.S. 172 (1985), the Supreme Court established a two-prong test for evaluating the ripeness

of a regulatory takings claim.  Specifically, to establish that a takings claim is ripe for

adjudication in federal court, a plaintiff "must 'show that (1) the state regulatory entity has

rendered a final decision on the matter, and (2) the plaintiff has sought just compensation by

means of an available state procedure.'"  *Sherman v. Town of Chester*, 752 F.3d 554, 561 (2d

Cir. 2014) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88

---

[4] The Court notes that it is aware of at least two district courts that have reached different conclusions.  One of those rulings, however, was overruled, *see Illinois Trans. Trade Ass'n v. City of Chicago*, 134 F. Supp. 3d 1108, 1114 (N.D. Ill. 2015), *rev'd in part*, 839 F.3d 594 (7th Cir. 2016), and the other was effectively disavowed by its author in a later decision. *Compare Boston Taxi Owners Ass'n, Inc. v. City of Boston*, 180 F. Supp. 3d 108, 118 (D. Mass. 2016) (permitting a similar equal protection claim to proceed), *with Boston Taxi Owners Ass'n, Inc. v. Baker*, 16-cv-11922, 2017 WL 354010, at *6 (D. Mass. Jan. 24, 2017) (finding that "although this Court suggested, before the enactment of [a clarifying statute], that there was no rational basis for the City of Boston to differentiate between taxis and [Uber-like vehicles], current, persuasive authority, buttressed by such enactment, favors the [the dismissal of an equal protection claim].").

(2d Cir. 2002)).  The latter "requirement stems from the Fifth Amendment, which 'does not proscribe the taking of property, it proscribes taking without just compensation.'" *Southview Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 99 (2d Cir. 1992) (quoting *Williamson Cty.*, 473 U.S. at 194).  Notably, that requirement applies only if the relevant jurisdiction offers a "reasonable, certain and adequate provision for obtaining compensation." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 379-80 (2d Cir. 1995) (quoting *Williamson Cty.*, 473 U.S. at 194). Nevertheless, the Second Circuit has made clear that "a state compensation procedure will be deemed available and adequate . . . even when that procedure remains unsure and undeveloped." *Southview Assocs.*, 980 F.2d at 99.  As one district court has recognized, "[c]ourts within the Second Circuit have uniformly dismissed Fifth Amendment takings claims at the pleadings stage when plaintiffs fail to sufficiently allege that they have availed themselves of such state procedures." *Viteritti v. Inc. Village of Bayville*, 831 F. Supp. 2d 583, 591 (E.D.N.Y. 2011) (citing, *inter alia*, *Vandor, Inc. v. Militello*, 301 F.3d 37, 38-39 (2d Cir. 2002)).

Plaintiffs here allege that the Credit Union Plaintiffs commenced a proceeding in New York Supreme Court against Defendants, among others, pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR"), seeking to "uphold the meaning of hail exclusivity." They further allege that their petition was dismissed and that thereafter they were denied leave to renew.  Compl.  ¶¶ 174-76; *see Melrose Credit Union v. City of New York*, No. 6443/15 (N.Y. Sup. Ct. Sept. 8, 2015) (filed in this action at Declaration of Michelle Goldberg-Cahn in Support of Defendants' Motion to Dismiss ("Goldberg-Cahn Dec.") Ex. B, Dkt. No. 59-1); Pls.' Opp'n 84-89.  At the time they initiated this action, the Credit Union Plaintiffs were allegedly in the process of perfecting a noticed appeal of one or both of those decisions to the New York Supreme Court, Appellate Division.  Compl. ¶ 177.  Defendants argue that, notwithstanding

those steps, Plaintiffs have failed to satisfy the second prong of *Williamson County* because they have not alleged that they actually pursued *just compensation* for the alleged taking in connection with that Article 78 proceeding or otherwise. Defs.' Mem. 44-46; Defendants' Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Amended Complaint, Dkt. No. 66 ("Defs.' Reply Mem."), at 17-19. Plaintiffs maintain that their takings claim is ripe because New York "does not provide a reasonable, certain and adequate means to secure just compensation," and, to the extent that it does, the Credit Union Plaintiffs exhausted those means through their Article 78 proceeding. Pls.' Opp'n 87-89.

As an initial matter, the Court easily concludes that New York provides at least one "reasonable, certain and adequate provision for obtaining compensation" within the meaning of *Williamson County*. Tracking the Fifth Amendment to the U.S. Constitution, Article I, Section 7 of the New York State Constitution guarantees that "private property shall not be taken for public use without just compensation." Several courts in this Circuit have determined that the availability of inverse condemnation actions under that provision generally satisfies the availability element of the second prong of *Williamson County. See, e.g., R-Goshen LLC v. Vill. of Goshen,* 289 F. Supp. 2d 441, 449 (S.D.N.Y. 2003), *aff'd sub nom., R-Goshen LLC v. Andrews*, 115 F. App'x 465 (2d Cir. 2004) (Summary Order); *Livant v. Clifton,* 334 F. Supp. 2d 321, 326 (E.D.N.Y. 2004) ("a state law action under Article I, Section 7 of the New York State Constitution" constitutes a "reasonable certain and adequate provision[]" for seeking just compensation") (internal quotation marks omitted); *McCormack Sand Co. v. Town of N. Hempstead Solid Waste Mgmt. Auth.*, 960 F. Supp. 589, 595 (E.D.N.Y. 1997) ("New York law provides procedures for obtaining compensation for the alleged taking [of personal property], including a cause of action for inverse condemnation under Article I, Section 7 of the New York

22

Constitution."). Indeed, Plaintiffs – while arguing that New York law provides no sufficient provision to pursue just compensation for a taking – assert a claim for compensatory damages under Article I, Section VII *in this very lawsuit. See, e.g.*, Compl. ¶ 3.

If that were not enough, the New York Court of Appeals has expressly recognized that just compensation is available under Article I, Section 7 in the context not only of regulatory takings in general, *see, e.g., 520 E. 81st St. Assoc. v. State of N.Y.*, 99 N.Y.2d 43 (2002), but of substantially the same sort of purported regulatory taking alleged here: alterations to a plaintiff's personal property effected by agency regulations, *see, e.g., Rochester Gas & Elec. Corp. v. Pub. Serv. Comm'n of State of N.Y.*, 520 N.E.2d 528, 533 (N.Y. 1988) (analyzing a state agency's regulation of "gas utilities" and stating that "[w]hile it is clear that government regulation may permissibly affect economic interests or expectations, if the regulation goes too far the government's action will be treated as a public taking for which just compensation is required"). Still further, the Second Circuit has squarely held that takings clauses analogous to Article I, Section 7 in the Constitutions of Vermont and Connecticut provide adequate procedures for seeking just compensation under *Williamson County. See Villager Pond*, 56 F.3d at 380 (concluding that even though "no Connecticut case has been cited wherein compensation was provided for a taking like the one alleged here, [plaintiff] is still required to look to the state for compensation" under Connecticut Constitution Art. I § 11, which states "[t]he property of no person shall be taken for public use, without just compensation therefor"); *Southview Assocs., Ltd.*, 980 F.2d at 100 (deeming takings claim unripe because the plaintiff had yet to attempt to obtain just compensation under Vermont Constitution Chapter I, Article 2, which provides that "whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money."). In light of these authorities, the Court has no difficulty determining, as a

matter of law, that the New York constitution provides at least one mechanism for seeking just compensation that passes muster under *Williamson County*.

Plaintiffs, of course, do not allege that they pursued compensation via that mechanism in state court. They allege only, as noted, that the Credit Union Plaintiffs instituted an Article 78 proceeding against Defendants and argue, in sum and substance, that, to the extent New York maintains any adequate procedure for seeking just compensation in response to a regulatory taking, the dismissal of that Article 78 proceeding exhausted it. Bracketing the question – briefed at some length by the parties – of whether, in light of the rules governing damages available in Article 78 proceedings, such a proceeding could ever yield just compensation for purposes of *Williamson County*, Plaintiffs' contention must be rejected for the simple reason that their Article 78 petition *did not in fact seek compensation of any kind* – but rather only equitable relief. *See Melrose Credit Union*, No. 6443/15, at 6-11 (analyzing and dismissing all causes of action). Indeed, the limited scope of the action was explicitly set forth on the face of the Article 78 complaint, which states that "petitioners intend to commence a separate action arising from New York City's destruction of the taxicab medallion, in violation of the Takings Clause of the Fifth Amendment to the United States Constitution, and its violation of the Takings Clause of Article l, § 7 of the New York State Constitution." Goldberg-Cahn Dec. Ex. A ¶ 29 n.4, Dkt. No. 59-1.

The Court is mindful that the Second Circuit has recognized in a brief *per curiam* decision that an Article 78 proceeding may, in certain circumstances, potentially constitute a "constitutionally sufficient" procedure to address a takings claim at the state level. *See Vandor*, 301 F.3d at 39. But it knows of no authority to support the conclusion that the Credit Union Plaintiffs' particular Article 78 action – an action that sought no monetary damages – satisfies

the "sought compensation" prong of *Williamson County. See Williamson Cty.*, 473 U.S. at 194 n.13 (distinguishing between "the procedures provided for review of [the state's regulatory] actions, such as those for obtaining a declaratory judgement," with "procedures that allow a property owner to obtain compensation for a taking" and emphasizing that because "no constitutional violation occurs until just compensation has been denied," a property owner must "utilize procedure *for obtaining compensation* before bringing a" § 1983 action") (emphasis added).

For these reasons, the Court determines, as a matter of law, that (1) New York provides a procedure for obtaining just compensation that satisfies *Williamson County*, (2) Plaintiffs, by their own allegations, have not attempted to secure compensation via that procedure, and (3) the state proceeding on which Plaintiffs exclusively premise the ripeness of their federal takings claim asserted here is inadequate for failure to seek just compensation. *See Williamson Cty. Reg. Planning Comm'n*, 473 U.S. at 194 ("[I]f a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."); *see also Singh v. Joshi*, 15-cv-5496, 2016 WL 4272349, at *3 (E.D.N.Y. 2016) (holding that in order for a substantially identical takings claim brought by medallion owners to be ripen, they must bring a claim in state court asserting a violation of Article I, Section 7). Accordingly, Plaintiffs' Fifth Amendment takings claim is unripe for review, and Defendants' motion to dismiss that claim is GRANTED.

### 4.    Plaintiffs Fail to State a Procedural Due Process Claim

The Court turns next to Plaintiffs' procedural due process claim. Plaintiffs allege, as noted, that the TLC's adoption of the Accessible Conversion Rules effected a "forced conversion" of the previously unrestricted medallions – such as those owned by the Medallion

Plaintiffs and those in which the Credit Union Plaintiffs hold security interests – into so-called "accessible medallions" without sufficient notice or a meaningful opportunity for Plaintiffs to be heard. *See, e.g.*, Compl. ¶¶ 34, 71, 118, 342-48.

The Fourteenth Amendment requires that "[n]o state shall . . . deprive any person of . . . property, without due process of law." "In order to assert a violation of procedural due process rights, a plaintiff must 'first identify a property right, second show that the [State] has deprived him of that right, and third show that the deprivation was effected without due process.'" *Jones v. Cty. of Suffolk*, __ F. Supp. 3d __ , 2017 WL 678480, at * (E.D.N.Y. 2017) (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 569 (1972)). Thus, in a federal action "brought to enforce procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011). Regarding the first element, the Second Circuit has explained that "[i]n determining whether a particular property interest rises to the level of constitutional protection, a court must look to whether the interest involved would be protected under state law and must weigh the importance to the holder of the right." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 317 (2d Cir. 2002) (internal quotation marks omitted)); *see also Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1030 (1992) (because the Constitution protects rather than creates property interests, courts must "resort to 'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments") (quoting *Roth*, 408 U.S. at 577).

Defendants contend primarily that Plaintiffs do not plausibly allege a cognizable property interest and, in any event, fail to allege a meaningful opportunity to be heard. Defs.' Mem. 51-55. The Court agrees.

First, an unremarkable proposition: critical to the Court's analysis of Defendants' first argument (that there is no constitutionally protected property interest at issue) is determining precisely what property Plaintiffs purport to have lost. Nothing in the Amended Complaint suggests that the promulgation of the Accessible Conversion Rules, or any other regulations implicated in this lawsuit, has resulted in, or imminently will result in, any literal, physical deprivation or substitution of Plaintiffs' medallions or vehicles. Rather, it is evident to the Court, Plaintiffs seek to protect some intangible right or privilege allegedly attendant on their medallions (or the medallions in which they hold security interests). Defendants, for their part, seek to characterize the claimed property interest as based on the market value of the Plaintiffs' medallions. Defs.' Mem. 51-52. Plaintiffs resist this framing of the issue, arguing – it would seem – that it is the purported "forced conversion" of unrestricted medallions into accessible medallions that, in of itself, constitutes the deprivation of property. Pls.' Opp. 107-08. Indeed, Plaintiffs expressly assert in their opposition papers that "they are not claiming to have a protected property interest in the market value of the medallions." *Id.*

Plaintiffs make little, if any, effort to flesh out the distinction they seek to draw, and, indeed, it is repeatedly belied by the allegations of the Amended Complaint. For example, the Amended Complaints describes the effect of the Accessible Conversion Rules as follows:

> [T]he Accessible Conversion Rules effectively converted the unrestricted medallion – *i.e.*, a medallion that was never required to be placed on an accessible vehicle – into a restricted medallion – *i.e.*, a medallion that is required to be placed on an accessible vehicle on an alternative basis. *Because accessible medallions are far less valuable than unrestricted medallions, Defendants have effectuated*

27

> *a complete taking of the difference in value between the independent*
> *unrestricted medallion and the independent accessible medallion.*

Compl. ¶ 148 (emphasis added).  It further alleges that

> [T]he TLC was at all times aware that unrestricted medallions were
> *more valuable*, particularly since the TLC was responsible for
> determining the fair market value of each medallion . . . .  By
> adopting the Accessible Conversion Rules, the TLC has knowingly
> and deliberately *devalued Credit Union Plaintiffs' unrestricted*
> *medallion collateral and impaired their security interest in those*
> *medallions.*

Compl. ¶ 160 (emphasis added).  Time and again, the Amended Complaint fails to identify any

harm wrought by the Accessible Conversion Rules other than the diminution in their value as

collateral for loans and the decrease in lease payments flowing to Medallion Plaintiffs as result

of the purported burden imposed by the Rules.  *See, e.g., id.*  ¶¶ 159 ("[B]ecause of the new

Accessible Conversion Rules, [Plaintiffs] are being forced to convert those otherwise more

valuable unrestricted medallions into less valuable and more burdensome accessible

medallions."), 60, 240-41.

That Plaintiffs consistently reference a forced "conversion" is of no particular moment.

As the allegations again themselves makes clear, the "conversion" complained of is an

"*effective[]* conver[sion]."  *Id.* ¶ 148.  That is, Plaintiffs are not – by the Amended Complaint's

own admission – actually being compelled to exchange one piece of property for another.

Rather, Plaintiffs' allege in substance that the economic benefits of owning a particular piece of

property are being adversely effected by regulations undisputedly affecting the entire medallion

taxicab industry.  Put differently, the market value of their property is allegedly being impaired.

Plaintiffs' opposition papers do not identify or suggest any interest in their medallions avoiding

"conversion" untethered from an interest in the medallions' economic value, and, notably, they

cite *zero* authority for recognizing any such interest.  Thus, the Court construes Plaintiffs'

asserted property interest – their self-serving "conversion" metaphor notwithstanding – as an interest in the value of their medallions.

And that is an interest that courts across the country, including in several of the decisions discussed above, have resoundingly declined to afford constitutional protection. *See, e.g., Minneapolis Taxi Owners Coal. v. City of Minneapolis*, 572 F.3d 502, 510 (8th Cir. 2009) ("[T]axicab licensees do not have protected property interests in the market value of their licenses," and "taxicab licenses do not carry an inherent property interests guaranteeing the economic benefits of using the taxicab license."); *see also Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 269 (5th Cir. 2012) (refusing to recognize a property interest in the market value of taxicab licenses because "whatever interest [p]laintiffs hold in their [licenses] is the product of a regulatory scheme that also vests the City with broad discretion to alter or extinguish that interest"); *Newark Cab Ass'n*, 2017 WL 214075, at *5 ("Because Plaintiffs remain in possession of the medallions and there is no property interest in their market value, Plaintiffs' Taking Clause and substantive due process claims fail."); *Gebresalassie*, 170 F. Supp. 3d at 70 (same); *Boston Taxi Owners Ass'n, Inc. v. City of Boston*, 84 F. Supp. 3d 72, 79-80 (D. Mass. 2015) ("The Court agrees that the market value in a taxicab medallion, which is derived solely from the strict regulation of taxicabs in the City, cannot constitute a protected property interest."); *cf. Illinois Transp. Trade Ass'n*, 839 F.3d at 596 ("'Property' does not include a right to be free from competition . . . . Taxi medallions authorize the owners to own and operate taxis, not to exclude competing transportation services."). Indeed, the Court is aware of no decision to the contrary.

A central rationale underlying these uniform conclusions is that whatever interest the owner of a taxicab medallion or license holds in that item is fundamentally the product of what is

in many, or even most, jurisdictions a pervasive regulatory scheme that "vests the City with broad discretion to alter or extinguish that interest." *Dennis Melancon*, 703 F.3d at 273-74; *see also Minneapolis Taxi Owners*, 572 F.3d at 509 (no property interest in market value of license because of the holders' "understanding the license to participate in the highly regulated taxicab market is subject to regulatory change"). That is plainly the case here. As the Second Circuit has recognized, "[b]ecause taxis are an important part of the public life of the City and have a City-granted monopoly on providing a crucial services, the taxi industry is pervasively regulated by the [TLC]," and the TLC "has been given broad authority to promulgate rules dealing with *every aspect of the industry.*" *Statharos v. N.Y.C Taxi & Limousine Comm'n*, 198 F.3d 317, 324 (2d Cir. 1999) (emphasis added). The New York Court of Appeals has likewise emphasized the TLC's "extremely broad authority to enact rules" under its sweepingly framed stated purposes of "'continuance, further development and improvement of taxi and limousine service in the City of New York.'" *Greater N.Y. Taxi Ass'n v. N.Y.C. Taxi & Limousine Comm'n*, 25 N.Y.2d 600, 608-09 (2015) (quoting N.Y.C. Charter § 2300). For example – and as Defendants note – Section 2303 of the New York City Charter confers upon the TLC broad authority over most, if not all, all aspects of taxi service, including among other things, "[t]he regulation and supervision of standards and conditions of service," and "[r]equirements of standards of safety, and design, comfort, convenience . . . and efficiency in the operation of vehicles and auxiliary equipment." Plaintiffs identify no aspect of New York State or City law or the TLC rules that would undermine this characterization of the regulatory scheme at issue, or otherwise serve in any way to meaningfully distinguish the circumstances presented here from those addressed in the cases discussed above.

Accordingly, the Court concludes that Plaintiffs' only plausibly asserted property interest in the medallions – their economic value – is not entitled to constitutional protection and therefore cannot support a due process claim.

In any event, even if Plaintiffs were able to allege a cognizable property interest, they also fail to plead facts that, if proven, could support a conclusion that they were denied any process with respect to the alleged deprivation of those interests. As the Supreme Court has long recognized in the due process context, "[t]he formality and procedural requisites for [the relevant] hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings," but the opportunity to be heard remains the Constitution's "root requirement." *Boddie v. Connecticut*, 401 U.S. 371, 378-79 (1971). If nothing else, the Court has directed, the hearing "must be at a meaningful time and [conducted] in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (internal quotation marks omitted).

Here, quite simply, Plaintiffs allege no facts whatsoever regarding the process by which the Accessible Conversion Rules were promulgated, instead averring only that the relevant rulemaking "arose" out of the settlement of the *Noel* litigation noted above. *See* Compl. ¶¶ 145 & n.8, 342-48. The Court is aware of no authority, and Plaintiffs identify none, suggesting that the mere fact that a regulatory agency initiates a rulemaking in response to civil rights litigation necessarily renders the resulting process procedurally inadequate for constitutional purposes. To be sure, Plaintiffs conclusorily assert that they were denied "notice or the opportunity to be heard" in connection with the rulemaking, Compl. ¶ 344, but such assertions are the archetypal "legal conclusion[s] couched as . . . factual allegation[s]" that the Court is not bound to accept, even at the pleadings stage. *Twombly*, 550 U.S. at 555. In the absence of more concrete factual allegations giving rise to at least a plausible inference of, for example, a rulemaking process

tainted by sham notice-and-comment proceedings or predetermined results, the Court is left to speculate as to whether Plaintiffs were denied sufficient process.  That falls far short of satisfying the requirements of Rule 12(b)(6), and constitutes an independent ground for dismissal of the Plaintiffs' due process claim.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 ("Factual allegations must be enough to raise a right to relief above the speculative level.").

For all of these reasons, Defendants' motion to dismiss the due process claim is GRANTED.[5]

### B.    State Law Claims

Having disposed of all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over Plaintiffs' remaining state law claims.  *See In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (per curiam) (noting that "when the federal claims are dismissed the 'state claims should be dismissed as well'" (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966))).

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss Plaintiffs' federal claims is GRANTED, and the Court declines to exercise supplemental jurisdiction over the state law claims.  The Clerk of Court is respectfully directed to terminate the motion at Dkt. No. 58 and to close this case.

SO ORDERED.

---

[5] Because the Court resolves Defendants' motion to dismiss Plaintiffs' federal claims on the grounds discussed above, it need not and does not reach or address Defendants' contentions that this action should be dismissed on the basis of *res judicata* and/or the doctrine of laches, both of which are affirmative defenses on which Defendants would bear the burden of persuasion. *See Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 398 (2d Cir. 2003) (*res judicata* is an affirmative defense); *Strom v. Siegel Fenchel & Peddy P.C. Profit Sharing Plan*, 497 F.3d 234, 241 (2d Cir. 2007) (same with respect to laches).

Dated: March **30**, 2017
New York, New York

_____
ALISON J. NATHAN
United States District Judge